UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CV 2835

—————————————————————— x

CITY OF MONROE EMPLOYEES'
RETIREMENT SYSTEM, Individually and On
Behalf of All Others Similarly Situated,

                              Plaintiff,

     vs.

THE HARTFORD FINANCIAL SERVICES
GROUP, INC., RAMANI AYER, THOMAS
M. MARRA, DAVID M. JOHNSON and
LIZABETH H. ZLATKUS,

                          Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.     This is a class action on behalf of all persons or entities who acquired the common stock of The Hartford Financial Services Group, Inc. ("The Hartford" or the "Company") between December 10, 2007 and February 5, 2009, inclusive (the Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.     The Hartford is one of the largest investment and insurance companies based in the United States, with offices in Japan, Brazil, Ireland, England, Canada, and the United States. The Hartford is a provider of investment products – variable annuities, mutual funds, college savings plans – as well as life insurance, group and employee benefits, automobile and homeowners' insurance, and business insurance.

3.     As a financial services company, The Hartford's capital position is critical in maintaining its credit rating and high regulatory risk-based capital ("RBC"). Indeed, both are important security for corporations and individuals evaluating insurance coverage which may become payable several decades in the future. Rating agencies and state insurance regulators develop factors representing the riskiness of various components of an insurer's assets and liabilities. These factors, multiplied by the components of the balance sheet, establish a minimum level of capital.

4.     Throughout the Class Period, defendants repeatedly represented that The Hartford's capital position was "*sound*" and in "*great shape*" and that its "*capital strength*" would allow it to "*navigate the market cycles*" and maintain its credit rating. These statements included the following:

- "*The Hartford is entering 2008 from a position of great strength*.'" (12/10/07.)

- The Hartford is "'*entering 2008 in a sound financial position . . . well prepared to weather the current turbulent markets*.'" (1/24/08.)

- 1 -

- *"'Our capital strength gives us the ability to invest in operations and navigate the market cycles.'"* (4/28/08.)

- *"[O]ur financial position remains excellent . . . [a]nd our balance sheet is very strong . . . ."* (4/29/08.)

- The Hartford's capital position and balance sheet are in *"great shape"* – *"[w]e have the capital necessary to meet our business needs and we have at least $1.5 billion of capital margin."* (7/29/08.)

- *"I am confident The Hartford is on a firm capital footing."* (7/29/08.)

5.      While defendants were assuring the market that The Hartford's capital position was sound, they were taking massive risks by investing heavily in low quality residential and commercial mortgage-backed securities and significantly increasing their exposure by attempting to mimic the return on these and other low quality assets through credit default swap contracts. Investments in mortgage-backed securities exposed the Company to capital fluctuations based on the market value of each underlying security. Because such market values are determined in a thinly traded market, they are subject to significant mark-downs when the market becomes illiquid. Defendants not only bet the Company's financial condition and capital position on mortgage-backed securities, they speculated on credit default swaps in an attempt to replicate the returns on many of those same investments, in essence "doubling down" on their risk.

6.      Defendants misrepresented the heightened investment risk they were taking on the Company's balance sheet through credit default swap contracts by portraying these very complicated derivative contracts as no more risky than a "corporate bond." For instance, in a January 25, 2008 conference call with analysts to discuss the Company's fourth quarter 2007 financial results, the Company's Chief Financial Officer ("CFO"), defendant David M. Johnson ("Johnson"), stated in response to an analyst's question:

> Sure. Eric, the vast majority of what you saw in the fourth quarter was losses associated with credit derivative positions. That is what is reported in that line. And I look at that in two different ways depending on the credit derivative strategy.

- 2 -

*A portion of that loss is credit derivative strategies where we did effectively replication trade and took credit risk very similar to the risk we would take by owning a corporate bond by assuming credit risk through buying or selling credit derivatives and then also getting other fixed income investments associated with it.*

*So what you're seeing here is akin to the swing in the fair value of that replicated trade that otherwise would have been recorded in AOCI if this had been just a traditional corporate bond.* So I look at that as – I don't look at it as accounting noise because it reflects a change in fair value. On the other hand, I look at the fact that fair value is going to swing a fair amount when credit spreads gap out as they are in the current scenario and we would look for the vast majority of our corporate bond portfolio losses that you are seeing in unrealized loss in AOCI to come back. We feel the same way about the credit default swaps, which tend to be 10-year contracts that you see marked in this line.

7.      However, The Hartford's purportedly "corporate bond" replicated securities were nothing like corporate bonds – they were mortgage-backed securities and credit default swaps used to ***increase*** the risk of the mortgage-backed securities. These undisclosed risks later proved catastrophic for the Company's investment portfolio and capital position.

8.      To further leverage the risk to which they exposed the Company throughout the Class Period, defendants engaged in a securities lending program. Securities lending programs allow institutions such as The Hartford to earn additional income by loaning out their securities in exchange for cash collateral, which, when invested safely and properly, can result in a modest return. Indeed, typically collateral provided in exchange for securities is invested very conservatively, for example in U.S. Treasury bills, because the Company could be called upon to return such collateral at any time. Indeed, The Hartford purported to do just that – invest the cash collateral it received in very safe bonds and short-term investments. Defendants, however, caused the Company to invest the cash collateral it received in highly risky investments, including residential and commercial mortgage-backed securities – low quality assets in thinly traded markets which incurred massive losses. Even more egregious, defendants caused the Company to lend the securities it held in its "separate accounts," which are available solely for the policyholders of variable annuities backed by these accounts, and invested that

cash collateral in highly risky derivative investments which sustained massive losses. Because The Hartford was forced to pay back the cash collateral it held in exchange for the securities when such securities were returned, its regulatory capital position was reduced severely.

9.      In the April 29, 2008 conference call with analysts to discuss the Company's second quarter 2008 financial results, defendant Johnson – who announced his resignation from his post as CFO in January 2008 for unspecified reasons and who left the Company shortly after this conference call – represented that the Company had (i) impaired its mortgage-backed securities portfolio sufficiently to withstand "*a major recession*," and (ii) reduced its exposure to derivative investments, including credit default swaps, in order to "*materially reduce the volatility from this investment category in the future*."

10.     Similarly, on July 29, 2008, in their third quarter 2008 earnings conference call, defendants continued to assure the market that the Company's balance sheet was in "'*great shape*,'" that its capital position was so strong that the Company repurchased $500 million of its shares in June and July 2008, and that the Company had subjected its subprime and commercial mortgage-backed securities ("CMBS") assets to a *rigorous* "*stress test*" and "*impairment process*." Thus, during both their April 28 and July 29, 2008 analyst conference calls, defendants misrepresented the scope and nature of the Company's mortgage-backed securities and derivative investments and the risks related thereto.

11.     Indeed, just two months later in September 2008, The Hartford's capital position dropped significantly as the equity markets declined and its significant derivative counterparty, Lehman Brothers Holdings, became insolvent. In response, the Company sold off certain of its derivative investments which it held under its hedging program. This helped boost the Company's regulatory capital position, but it did nothing to minimize the risks from its derivative investments

linked to mortgage-backed securities. It also left the Company heavily exposed with respect to its variable annuity guarantees, which the Company referred to as "GMWB," the losses on which ultimately led to massive writedowns of its intangible asset for Deferred Acquisition Costs (referred to at The Hartford as "DAC unlocking") of $932 million and $274 million, in the third and fourth quarters of 2008, respectively. At the same time, the Company remained heavily exposed to mortgage-backed securities both directly and through credit default swap contracts used to replicate the returns on these low quality investments.

12.    It was during this time that the market began to question the Company's capital position and ability to back its variable annuity guarantees. On October 1, 2008, Fitch – while maintaining its credit ratings on The Hartford – changed its outlook to negative from stable, and from September 26, 2008 to October 3, 2008, the Company's stock declined from $56.64 per share to $27.40 per share.

13.    On October 6, 2008, the Company reported that it would receive an infusion of capital from Allianz SE, a German insurer, which invested $2.5 billion with The Hartford. A portion of this investment replaced the $1 billion that The Hartford had spent repurchasing shares earlier in the year in order to prop up its stock price. The Company also announced that it expected to report a net loss for the third quarter of $8.50 to $8.80 per share, including net realized capital losses of $2.1 to $2.2 billion, the majority of which included impairments to its investment portfolio. Finally, the Company announced that its Chief Investment Officer, Dave Znamierowski, was leaving the Company, effective immediately, and being replaced by Greg McGreevey, "'to bring a fresh perspective to our investment operations.'" As the market digested this news over the following several days, The Hartford's stock dropped from $30.90 on October 6, 2008 to just $19.23 on October 10, 2008.

14.    On October 18, 2008, as the Company's capital position continued to deteriorate, Moody's placed The Hartford's ratings on review for possible downgrade, based on the weakening credit profile of its life insurance units.

15.    On October 29, 2008, The Hartford reported "*a third quarter 2008 net loss of $2.6 billion, or $8.74 per diluted share*." According to the press release, its "*net realized capital loss was $2.2 billion*." With respect to its variable annuities business, "*third quarter 2008 net income reflected a $932 million after-tax charge related to the company's revision of its estimates of future gross profits, commonly referred to as a 'DAC unlock.'*"

16.    The Company was also forced to disclose massive losses in its investments in the third quarter:

> "Our holdings in the financial sector weighed heavily on our investment performance in the quarter," said Ramani Ayer. . . .
>
> Net investment income, excluding trading securities, in the third quarter was down 15 percent from the prior year due to lower yields on fixed maturity investments and $101 million of pre-tax losses on limited partnerships and other alternative investments. Limited partnerships and other alternative investments contributed $42 million of pre-tax net investment income in the third quarter of 2007.
>
> *The net realized capital losses totaled $2.2 billion for the quarter, after-tax and DAC, compared to a loss of $212 million in the third quarter of 2007. Other-than-temporary impairments made up $2.0 billion of the realized capital losses in the quarter.* The majority of these impairments were related to the company's investments in the financial services sector, which was negatively affected by recent market turmoil. *The net unrealized loss on available-for-sale securities was $3.8 billion, after-tax and DAC, as of September 30, 2008.*
>
> *The Hartford's total investments, excluding trading securities, were $89.8 billion as of September 30, 2008, compared to $94.2 billion in the year ago period.* Depressed valuations from widening credit spreads drove the majority of the decline in asset values.

17.    Even while disclosing The Hartford's $2.2 billion net realized capital loss for the third quarter, defendants falsely stated that the "majority" of these impairments were related to "investments in the financial services sector," a reference to AIG and Lehman Brothers. In fact, the

majority of the impairments resulted from the Company's speculation in risky mortgage-backed securities and related credit default swap contracts.

18.    Also on October 29, 2008, defendants held a conference call with analysts and institutional investors to discuss the Company's third quarter financial results and capital position. During that call the Company explained that "[t]he DAC unlock and negative returns on alternative investments reduced core earnings" and that it had "lowered [its] core earnings guidance range to $4.30 to $4.50 per share."

19.    With respect to The Hartford's hedging program, defendant Lizabeth H. Zlatkus ("Zlatkus") stated that "*[o]ur [hedging] program continues to perform within our expectations*," but finally acknowledged that due to the high cost of protecting against rising volatility the Company had *under-hedged this risk*. In the third quarter conference call, defendant Ztlatkus announced:

> Now, three issues are driving most of the losses in the quarter and month-to-date. *First, we have been underhedged for Vega or volatility for some time. We felt [volatility] prices were unreasonable and decided not to chase it upwards*.

20.    The Company had maintained throughout the Class Period that its best-in-class hedging program covered the liabilities arising from its variable annuity guarantees, providing offsetting assets to balance increases in liabilities due to market declines or increases in market volatility. Without telling investors, the Company greatly reduced the amount of its hedging of exposure to market volatility in the third quarter of 2008.

21.    However, even as the Company announced disappointing third quarter results, lowered its core earnings guidance, and acknowledged that it had *under-hedged* its variable annuity guarantees, defendants continued to provide positive, but false, assurances to the market with respect to the fourth quarter and 2008 year-end. For instance, with respect to the Company's capital position, defendant Zlatkus assured the market that "*as we sit here today, The Hartford is capitalized at levels that are consistent with the standards that rating agencies have historically*

- 7 -

*used for AA minus level companies*," though just ten days earlier Moody's had placed the Company on review for possible downgrade.

22.     Even with respect to The Hartford's securities lending program, defendants also continued to mislead the market. Greg McGreevey, The Hartford's new Chief Investment Officer, stated that the Company intended to "shrink" the securities lending program, but failed to disclose that the Company had invested the cash collateral it received in exchange for its securities in highly risky derivative investments that had collapsed. Defendants also failed to adequately disclose that the Company had leveraged its segregated accounts, backing its variable annuity guarantees, by loaning securities from those accounts and investing the cash collateral in highly risky derivative investments.

23.     With respect to the future profitability of its variable annuity business (DAC unlock), which the Company traditionally examined only once annually during the third quarter, and which resulted in a $932 million after-tax charge for the third quarter of 2008, defendants assured investors that the markets would have to deteriorate substantially to justify an "off-cycle unlock," *i.e.*, another after-tax charge in the fourth quarter of 2008. For example, defendant Ramani Ayer ("Ayer") stated, "*but basically, markets have deteriorated substantially from here, so – for us to have an off-cycle unlock. So, we're not anywhere near that yet. So there's still a lot of room in that from that standpoint.*" As defendant Ayer made those statements on October 29, 2008, the S&P Index closed at 930.09, just 3% higher than its year-end close of 903.25.

24.     With the news of The Hartford's significant losses and under-hedging of liabilities, shares dropped to $9.62 per share on October 30, 2008, from $19.86 per share on October 29, 2008, and from the Company's Class Period high of $93.30 per share on December 10, 2007. However, even with that drop, The Hartford's shares remained artificially inflated due to defendants' false and misleading statements regarding the nature and riskiness of the Company's investments, the

sufficiency of its capital position, the scope of its securities lending program and the likelihood of an offcycle DAC unlock in the fourth quarter.

25.    On November 3, 2008, The Hartford provided additional assurance that its capital position was sufficient in a report on Form 8-K filed with the SEC.  In a press release that same day, the Company and defendant Ayer stated that The Hartford's capital position and estimated RBC ratio *"is more than sufficient for current market conditions and in the event markets deteriorate further."*

26.    In response to these and other false and misleading statements in the Company's Form 8-K filing, the Company's share price jumped from $10.32 per share on October 31, 2008 to $16.28 per share on November 3, 2008, a 57% increase.

27.    On November 17, 2008, however, *The Associated Press* published an article entitled "Hartford Financial down on variable annuity worry," which stated that the Company would seek TARP funds:

> Shares of The Hartford Financial Services Group Inc. plunged Monday, reversing gains recorded Friday after it said it would buy a thrift and *seek government bailout money, as investors fretted about the insurance company's variable annuity business and amid fears it could face a ratings downgrade.*
>
> Hartford Financial shares fell $2.55, or 20.1 percent, to $10.10 in afternoon trading, on nearly twice normal volume.
>
> The drop erased a 21 percent gain from Friday's session after Hartford said it would buy Sanford, Fla.-based Federal Trust Corp. for about $10 billion, and become a thrift holding company. *That move would enable it to take part in the federal bailout program, and Hartford Financial said it expects to be eligible for $1.1 billion to $3.4 billion in government bailout money after the buyout.*
>
> Monday's decline reflected concerns about the insurer's variable annuity business, which offers policies that have guaranteed minimum payouts or monthly withdrawal benefits. *Investors are worried the payout obligations may exceed the amount of capital the company has on hand, due to the plunge in the overall market and Hartford Financials' own shares this year.*

28.    In order to reassure the market and once again artificially inflate the price of The Hartford's shares, defendants held an Investor Day conference in New York with analysts and institutional investors on December 5, 2008, less than four weeks before the end of the year. During that conference, defendants ***increased*** their guidance for 2008 core earnings from a range of $4.30 to $4.50 to a range of $4.70 to $4.90 per share. Given that the third quarter core earnings were $3.46 per share, this projected fourth quarter core earnings of $1.24 to $1.44 per share. This guidance was premised on the S&P closing at 860 for the year. And once again defendants represented that The Hartford's capital position was strong and improving – "*we are well capitalized . . . a significant improvement . . . since the filing of our 8-K.*" The Company also projected an RBC ratio of 535%. This assured investors that the Company's statutory operating subsidiaries would be financially solid when reviewed by prospective purchasers of their products. Defendants also assured the market again that the chances of an after-tax charge in the fourth quarter, based on the profitability of The Hartford's variable annuity business ("off-cycle DAC unlock"), were extremely remote. Defendant Zlatkus stated that based on the Company's financial modeling, "*we would look at the low-800 S&P range to be when we may have to have an off-cycle DAC unlock in the US.*"

29.    With news that The Hartford was raising its core earnings guidance, and with only a remote chance of an off-cycle DAC unlock, the Company's shares doubled that day from $7.21 at market close on December 4, 2008 to $14.59 when the market closed on December 5, 2008.

30.    Even though defendants' December 5, 2008 guidance came just a few weeks before the end of the Company's fiscal year, after the markets closed on February 5, 2009, The Hartford was forced to report disastrous fourth quarter and 2008 year-end financial results. Not only did The Hartford miss its projected core earnings guidance for 2008 of $4.70 to $4.90 per share, it reported core earnings for the year of only $2.74 per share. For the fourth quarter, rather than its projected

core earnings of $1.24 to $1.44 per share, it reported a core earnings *loss* of $0.72 per share. These results were even more stunning as the S&P closed the year over 900 – *well above the 860 or low 800 level which defendants stated on December 5, 2008 was required to meet their core earnings guidance and to prevent an off-cycle DAC unlock, respectively*. And while defendants had repeatedly assured the market throughout the Class Period that the Company's capital position was sound and could fully support its current credit rating, *that same day Moody's downgraded The Hartford's long-term senior debt rating (to Baa1 from A3) and the Company's P&C and life insurance subsidiaries (to A1 from Aa3)*. As a result of this devastating news, The Hartford's shares fell from $15.09 on February 5, 2009 to close at $12.68 per share on February 6, 2009.

31.     Shortly thereafter, on February 9, 2009, Fitch downgraded The Hartford's senior debt rating to "BBB+" from "A." Fitch also downgraded the Company's life insurance subsidiaries to "A" from "AA-" and its P&C insurance subsidiaries to "A+" from "AA-," and maintained a "Negative" ratings outlook.

32.     The consequences of the massive and undisclosed risks inherent in The Hartford's highly complex derivative investments, its securities lending program and the leveraging of its separate accounts backing its variable annuity guarantees, were exposed in February 2009 as the Company had a net realized capital loss in fiscal 2008 of $3.6 billion, *i.e.*, write-downs of its investment portfolio. It also reported a goodwill write-off of $597 million, which included an off-cycle DAC unlock, which defendants represented would *not* occur in fourth quarter 2008 unless the S&P ended the year in the low 800s, of $274 million – a massive change to its earnings. The Company also failed to invest a certain portion of the funds it received from Allianz into its life insurance subsidiaries, as it said it would do, leaving it with a marginal RBC ratio of only 385%,

contrary to defendants' guidance of 535% provided to the market only four weeks prior to the fiscal year-end.

33.    On February 24, 2009, the Company announced that defendant Thomas M. Marra, The Hartford's President and Chief Operating Officer ("COO"), entered into a mutual agreement with the Company to relinquish his role as a member of The Hartford's Board, effective immediately, and to retire from the Company altogether.  On June 4, 2009, the Company also announced that defendant Ayer, Chairman and Chief Executive Officer ("CEO"), was leaving the Company at the end of the year for unspecified reasons.  As defendants' scheme and course of conduct, which included making extremely risky bets on mortgage-backed securities and replicating the returns on those low quality investments through credit default swap contracts, leveraging their risks on such investments even higher, began to unravel and cratered the Company's vaunted capital position, key executives – one by one – were asked to leave the Company.

34.    Defendants were aware of the following material undisclosed information which contradicted their public statements during the Class Period:

(a)    The Company's regulatory capital position was weak and deteriorating throughout the Class Period;

(b)    The Company had built up massive exposure to losses from derivative investments, including credit default swap contracts, way beyond the "corporate bond" risk references included in The Hartford's quarterly conference calls with analysts;

(c)    The Company had leveraged its risk significantly throughout the Class Period through a securities lending program in which it invested the cash collateral it received from third-party lenders in extremely risky investments, including residential and commercial mortgage-backed securities;

- 12 -

(d)    To further leverage the Company through its securities lending program, the Company took securities that had been segregated for the exclusive benefit of policyholders, in separate custodial accounts, and loaned those securities to third parties, again receiving collateral in exchange for such securities and investing that collateral in extremely risky investments, including residential and commercial mortgage-backed securities;

(e)    Contrary to defendants' representations, the Company's financial and capital position was not sound and was eroding significantly throughout the Class Period, as its derivative investments exposed it to severe liquidity risks should the credit markets not improve;

(f)    The Company's hedging program was becoming increasingly expensive to maintain due to high volatility in the equity markets;

(g)    The Company was under-hedged as it reduced its hedging during the third quarter of 2008;

(h)    The Company would have to conduct an off-cycle DAC unlock in the fourth quarter of 2008, even if the S&P finished the year above 860;

(i)    The Company's financial results were continuing to deteriorate to a much greater extent than represented due to its exposure to the U.S. real estate market and credit default swap contracts;

(j)    The Company had failed to maintain adequate internal controls to adequately report losses from investments on a timely basis;

(k)    The Company was not on track to achieve the 2008 core earnings per share forecasted for and by the Company and continually misrepresented the effect market movements would have on such earnings; and

(l)     The Company overstated its book value by not accruing for liabilities for repayment of workers compensation insurance premiums consistent with what was actually justified.

## JURISDICTION AND VENUE

35.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

37.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because The Hartford does business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

38.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

39.     Plaintiff City of Monroe Employees' Retirement System acquired the common stock of The Hartford during the Class Period and has been damaged thereby.

40.     Defendant The Hartford is a diversified insurance and financial services company. The Company provides investment products, individual life, group life and group disability insurance products, and property and casualty insurance products in the United States.  The Hartford was founded in 1810 and is headquartered and has it principal place of business in Hartford, Connecticut.

41.     Defendant Ramani Ayer ("Ayer") was, at all relevant times, Chairman of the Board and CEO of The Hartford.  On October 1, 2009, Ayer resigned his positions with the Company.

- 14 -

42.    Defendant Thomas M. Marra ("Marra") was, at all relevant times, President and COO of The Hartford. Marra resigned from the Company, effective February 24, 2009.

43.    Defendant David M. Johnson ("Johnson") was, at all relevant times, CFO and Executive Vice President of The Hartford until his resignation in May 2008.

44.    Defendant Lizabeth H. Zlatkus ("Zlatkus") is Executive Vice President and CFO of The Hartford and was Co-COO and Executive Vice President of The Hartford prior to her appointment as CFO in May 2008.

45.    The defendants referenced above in ¶¶41-44 are referred to herein as the "Individual Defendants."

## BACKGROUND

**Capital Position**

46.    One of The Hartford's key metrics is its regulatory capital, which is the capital required by state regulators and rating agencies determined by the risks present on an insurer's balance sheet. These risks include the risks due to the nature of the company's investments as well as the risks of policyholder claims. Indeed, regulatory capital is critical to any insurer because it determines its credit rating – an indication to purchasers of insurance of the company's ability to pay future claims and ultimately its ability to write business.

47.    Throughout the Class Period, defendants assured the market that The Hartford's capital position – as well as its balance sheet – was strong. In fact, in July 2008, defendants represented that The Hartford had a capital margin – an excess of what was required to support its AA credit rating – of $1.5 billion. At the same time, defendants failed to disclose the tremendous investment risks the Company was taking, including investments in credit default swaps, asset-backed securities and other derivative investments, which exposed its capital position to severe losses.

**Credit Default Swaps**

48.     A credit default swap, or CDS, is a type of credit derivative that acts like an insurance contract against specific risks. Unlike insurance, there is no requirement that the purchaser needs to be exposed to the risk the CDS is covering or that the contracts be filed with the regulators. CDSs provide financial institutions the means to transfer credit exposure and free up regulatory capital that would otherwise have to be held in reserve. CDSs were traditionally purchased by financial institutions that had purchased corporate debt and needed to protect themselves against default by the debt issuer.

49.     A CDS contract mitigates a bond purchaser's risk by transferring a given risk from one party to another without transferring the underlying bond or other asset. In the most simplistic of terms, a CDS allows one party, the lender, to sell risk and the CDS dealer counterparty to buy that risk without transferring the underlying asset. The seller of the credit risk, the lender, pays a periodic fee to the risk buyer, the CDS dealer, for taking on the risk. In return for the periodic fee, the CDS dealer agrees to pay the lender a set amount if the bond issuer defaults. The risks insured against are known as "credit events," which include defaults whether or not due to bankruptcy and significant credit rating downgrades.

50.     The chart below sets forth the relationship between the parties in a typical CDS agreement:

- 16 -

## CDS Contract Chart



51.     Using the chart above as an illustration – a CDS works as follows: A has issued to B a $10 million bond. B is now exposed to a default or other credit event by A. To offset the risk posed by such a "credit event," B can enter into a CDS with C. In this CDS scenario, C is the CDS dealer, the "protection seller," who agrees to reimburse B, the "protection buyer," against a default on a financial obligation by A, the "reference entity." B can purchase protection for the entire amount paid to A or just a portion. This amount of protection is called the "notional amount." In order to obtain this protection, B pays C a fee that reflects the risk that C believes it is assuming in protecting B against A's default.

52.     In the above example, the structure of the CDS is simple: C agrees to pay $10 million (or whatever notional amount the parties agree to) if A defaults, and B agrees to make an annual payment or premium to C to avoid the risk of default. Typically, to offset its own risk of having to pay B, C will enter into a CDS with another counterparty to hedge the risk of A's default and having to pay B.

53.     CDS contracts can also insure the performance of other investments, including asset-backed securities, as was the case with those entered into by The Hartford. While defendants represented to the market that The Hartford's credit derivative strategy replicated corporate bonds, in reality its strategy replicated and leveraged the risks of residential and other asset-backed securities. Thus, defendants bet on credit derivatives to leverage the returns on asset-backed securities, taking on enormous risks while at the same time representing to the market that the risks they were assuming were no greater than corporate bonds.

**Securities Lending**

54.     Securities lending is an investment strategy whereby a holder of securities will lend them, for a fee, to a short seller or financial institution and will receive collateral in the form of cash or U.S. government securities from the borrower. Cash received is then invested so that an additional return can be earned. The collateral is typically invested in low-risk, short-term investments, such as treasury bonds or short-term corporate debt since it might need to be repaid at a moment's notice. The extra profits can be just hundredths of a percentage point, but when applied to tens of billions of dollars of securities, the returns can be significant.

55.     The Hartford converted this rather conservative investment strategy into a high-risk gamble by investing its securities lending collateral – which it was required to return to the borrower – in highly risky derivative investments, including mortgage-backed securities. The Hartford increased its risks still further by lending the securities it held in its "separate accounts," which are segregated accounts dedicated for the sole use of variable annuity policyholders. When these investments collapsed, The Hartford was forced to tap its regulatory capital, which supported its AA credit rating, to repay the collateral to the securities borrowers. Defendants failed to disclose the massive risks The Hartford was taking through the its purportedly safe and conservative securities lending program.

**"DAC Unlock"**

56.    "DAC" refers to Deferred Acquisition Costs, which includes a portion of sales commissions and other expenses related to acquiring customers' insurance policy contracts. In the insurance industry, the DAC is recorded on the company's balance sheet as an asset. The DAC asset is amortized in proportion to the policy contract's earnings. The amortization of the DAC asset is a charge against net income in the financial statement, and is reevaluated periodically. The Hartford reviewed the profitability of its variable annuity business based on current experience, *i.e.*, investment returns, expenses and policyholder behavior, quarterly. Typically once a year in the third quarter, The Hartford adjusts its DAC amortization based on the expected future profitability of this block of business. This adjustment to its DAC is referred to as "DAC unlock." If the expected future profitability increases, then the "DAC unlock" is an earnings positive, and if that profitability decreases, then it is an earnings negative.

57.    The Hartford suffered a "DAC unlock" of ($932) million and ($274) million in the third and fourth quarters of 2008, respectively. These massive downward adjustments were based upon larger adjustments to the future expected profitability of its variable annuity business and were the results of huge losses it suffered from the bets it placed on mortgage-backed securities and credit default swaps and other market-related bets that The Hartford made.

## THE FALSE AND MISLEADING STATEMENTS

58.    The Class Period begins on December 10, 2007, with a press release entitled "The Hartford Announces 2008 Financial Outlook," in which defendants stated that The Hartford "expects 2008 core earnings per diluted share to be in the range of $9.80 to $10.20." The press release also stated the following:

> "The Hartford is entering 2008 from a position of great strength," said Ramani Ayer, chairman and chief executive officer of The Hartford. "We are coming off excellent performance in 2007. Our fundamental results have been

- 19 -

strong, and we also benefited from a favorable storm season, and not withstanding recent volatility, favorable equity markets. Looking toward 2008, The Hartford is well positioned for the opportunities of a dynamic, very competitive marketplace; we are operating in profitable businesses where we have the products, distribution and brand recognition necessary for success. The Hartford is focused on driving shareholder returns by growing book value and dividends, while managing capital at attractive returns."

59.     On January 24, 2008, The Hartford released its fourth quarter and full-year 2007

results and its 2008 guidance assumptions, which stated in part:

The Hartford Financial Services Group, Inc., one of the nation's largest diversified financial services companies, today reported fourth quarter 2007 net income of $595 million, or $1.88 per diluted share. For the full year 2007, net income was up 7 percent over the prior year to $2.9 billion.

The Hartford's core earnings in the fourth quarter of 2007 were $840 million, or $2.66 per diluted share, and were $3.5 billion, or $10.99 per diluted share, for the full year 2007. . . .

*"The Hartford's strong fourth quarter results capped an outstanding year for the company,"* said Ramani Ayer, chairman and chief executive officer of The Hartford. "In 2007, we reported record earnings, grew book value per share and generated over 15 percent return on equity. We also returned more than $1.8 billion to shareholders through dividends and share repurchases.

"We had good underlying profitability in our businesses in the fourth quarter, with the volatile credit market resulting in some capital losses. Our book value per share, excluding AOCI, rose 2 percent from September 30, and is up 11 percent in the past 12 months. *We are entering 2008 in a sound financial position and are well prepared to weather the current turbulent markets.*

"The Hartford hit several major milestones this year, including surpassing one million small commercial policies in force, accumulating more than $50 billion of assets in The Hartford's family of mutual funds, and crossing $400 billion in assets under management for the corporation. The progress we have made with our diversified businesses is the result of our strong execution and unrelenting focus on improvements in product, distribution and technology," added Ayer.

REVIEW OF BUSINESS UNIT RESULTS

Life Operations

"This year, The Hartford's life operations delivered record net income performance," said Ayer. "Our efforts to diversify our earnings base and grow scale in our asset accumulation businesses are working. Total 2007 deposits grew significantly to $53 billion in our U.S. and international investment businesses, with

notable growth in mutual funds, institutional sales and 401(k) plans. We also recently announced three acquisitions in our retirement plans group that will open up new markets and provide us with greater scale."

Assets under management grew to $372 billion as of December 31, 2007, up 14 percent over the last twelve months. Net income was $277 million for the fourth quarter of 2007, including the effect of $180 million of net realized capital losses. Net income in the fourth quarter of 2006 was $359 million, including a $63 million charge related to the 2006 DAC unlock and $4 million of net realized capital gains unrelated to the DAC unlock.

Life operations reported full year 2007 net income of $1.6 billion, including a $210 million benefit related to the third quarter DAC unlock. Full year 2007 net income was also impacted by $429 million of net realized capital losses unrelated to the DAC unlock. Net income for the full year of 2006 was $1.4 billion, including the $63 million charge related to the DAC unlock mentioned above and $142 million of net realized capital losses unrelated to the DAC unlock.

\*      \*      \*

2008 GUIDANCE

Based on the assumptions below, The Hartford currently expects 2008 core earnings per diluted share to be between $9.80 and $10.20. The company's previous guidance range was also $9.80 to $10.20 per diluted share. The guidance contained within this news release is subject to unusual or unpredictable benefits or charges that might occur in 2008. Historically, the company has frequently experienced unusual or unpredictable benefits and charges that were not anticipated in previously provided guidance.

60.    On January 25, 2008, defendant Johnson made the following statements in a conference call with analysts to discuss the Company's fourth quarter 2007 financial results:

Sure. Eric, the vast majority of what you saw in the fourth quarter was losses associated with credit derivative positions. That is what is reported in that line. And I look at that in two different ways depending on the credit derivative strategy.

*A portion of that loss is credit derivative strategies where we did effectively replication trade and took credit risk very similar to the risk we would take by owning a corporate bond by assuming credit risk through buying or selling credit derivatives and then also getting other fixed income investments associated with it.*

*So what you're seeing here is akin to the swing in the fair value of that replicated trade that otherwise would have been recorded in AOCI if this had been just a traditional corporate bond.* So I look at that as – I don't look at it as accounting noise because it reflects a change in fair value. On the other hand, I look at the fact that fair value is going to swing a fair amount when credit spreads gap out

as they are in the current scenario and we would look for the vast majority of our corporate bond portfolio losses that you are seeing in unrealized loss in AOCI to come back. We feel the same way about the credit default swaps, which tend to be 10-year contracts that you see marked in this line.

61.    On April 28, 2008, The Hartford issued a press release entitled "The Hartford Announces First Quarter Net Income Of $145 Million, Or $0.46 Per Diluted Share," which stated in part:

> The Hartford Financial Services Group, Inc., one of the nation's largest diversified financial services companies, today reported first quarter 2008 net income of $145 million, or $0.46 per diluted share. The Hartford's net income in the first quarter of 2007 was $876 million, or $2.71 per diluted share. First quarter 2008 results included net realized capital losses of $648 million, after tax, of which $220 million related to the implementation of accounting standard SFAS 157. . . .

> "The Hartford performed well in what proved to be a volatile economic climate this quarter," said Ramani Ayer, The Hartford's chairman and CEO. "Similar to other financial institutions, we reported considerable capital losses this quarter, and returns on our alternative investment portfolio were well below our expectations. Despite these headwinds, strong execution helped us deliver a 9 percent increase in property and casualty ongoing operations underwriting income, and our assets under management in life grew 10 percent, including the completed retirement plans acquisitions.

> "*Our capital strength gives us the ability to invest in operations and navigate the market cycles. The Hartford is focused on positioning the company for long-term growth*," added Ayer.

> REVIEW OF BUSINESS UNIT RESULTS

> Life Operations

> "In this turbulent market, mutual funds proved to be a top performer, setting a new quarterly record for deposits at $4 billion. We finalized our three acquisitions in retirement plans that lay the groundwork for The Hartford to expand in this exciting market segment. We are investing for the future with new products on the horizon in many of our businesses," added Ayer.

> Assets under management were $370 billion as of March 31, 2008, up 10 percent over the last twelve months, largely driven by the assets acquired from the retirement plans transactions and positive flows in the mutual fund business. Life reported a net loss of $155 million for the first quarter of 2008, primarily due to the effect of $550 million of net realized losses, including $220 million related to the

implementation of accounting standard SFAS 157. Net income for the first quarter of 2007 was $438 million.

\*   \*   \*

2008 GUIDANCE

Based on the assumptions below, The Hartford currently expects 2008 core earnings per diluted share to be between $9.20 and $9.50. The company's previous guidance range of $9.80 to $10.20 per diluted share was established on December 10, 2007, based on the credit and equity markets at that time. The guidance contained within this news release is subject to unusual or unpredictable benefits or charges that might occur in 2008. Historically, the company has frequently experienced unusual or unpredictable benefits and charges that were not anticipated in previously provided guidance.

62.   Following the release of The Hartford's first quarter 2008 earnings, Ayer assured

investors as to the safety and valuation of its fixed income securities during the Company's quarterly

earnings conference call on April 29, 2008:

*Now, recognizing that we have taken significant losses in our $94 billion investment portfolio over the past two quarters, we remain comfortable with the overall portfolio. Our investments are well diversified and of high quality, and over 80% of the portfolio consists of fixed maturities, of which more than 95 % are investment grade or high-quality government securities.*

\*   \*   \*

Despite the unprecedented dislocations we have experienced in the fixed-income markets, we remain comfortable with our ABS, CMBS, and CLO positions. *While we will continue to monitor these securities, we believe that the impairments we have booked meaningfully exceed the ultimate economic losses we will experience.*

\*   \*   \*

*Now, our financial position remains excellent.* Book value per share ex-AOCI increased 8% over the last 12 months to $63.79. *And our balance sheet is very strong – our $1.5 billion capital margin is in place and we have significant debt capacity.* So as I look forward, I'm particularly excited about our new developments in our U.S. VA business. This is a competitive market with a focus on product.

Now I don't want to take away from Tom's comments, but I'm enthusiastic about our U.S. VA product launch next week. I believe our team has developed a competitive offering with enhanced Lifetime Income benefits and investment

- 23 -

options. *So all in, I'm very confident in the fundamentals of our businesses, our market positions, and our ability to manage through this volatile period.*

63.    During that same conference call, defendant Johnson stated the following:

In the quarter, we impaired to market value those CMBS securities where our modeling showed a potential cash-flow problem in the event of a major recession. Credit derivatives also again caused pain, accounting for about $100 million of the $111 million loss in the bottom row under other.

I am pleased to report that we took some decisive steps in the quarter to reduce this volatility, exiting or offsetting entirely our exposure to CMBS indexes and substantially reducing our exposure to general corporate CDFs. This should materially reduce the volatility from this investment category in the future.

\*        \*        \*

I'd like to conclude with a few comments on capital. Since 2003, we have worked hard to build The Hartford's capital strength. *Despite the turbulence of the last nine months, The Hartford remains in a very strong position. We would need to see a further dramatic deterioration in market conditions from what we've seen to date for us to need to raise additional capital.*

At the end of the quarter, our capital margin of at least $1.5 billion of statutory capital remains very well protected. We have several billion dollars of debt capacity and $500 million in our standby hybrid capital facility. And finally many of our operations, particularly P&C, continue to generate strong statutory capital flows despite the markets.

\*        \*        \*

The bottom line is that, based on where we sit today, our financial position still gives us the capacity to buy back $1 billion of our stock at year-end, should we decide to do so, while still maintaining all the margins I just described.

64.    On July 28, 2008, The Hartford issued a press release entitled "The Hartford Announces Second Quarter Net Income Of $543 Million, Or $1.73 Per Diluted Share," which stated in part:

The Hartford Financial Services Group, Inc., one of the nation's largest diversified financial services companies, today reported second quarter 2008 net income of $543 million, or $1.73 per diluted share. The Hartford's net income in the second quarter of 2007 was $627 million, or $1.96 per diluted share. Second quarter 2008 results included net realized capital losses of $156 million after tax, compared with net realized capital losses of $148 million in the prior year. . . .

- 24 -

"We delivered good results in some very tough markets this quarter, even with higher than average catastrophes," said The Hartford's chairman and chief executive officer Ramani Ayer. "Our property and casualty ongoing operations reported a combined ratio of 90.7, excluding catastrophes and prior year development. On the life side, our mutual fund and retirement plans businesses posted a record $6.3 billion in deposits for the quarter." The Hartford grew book value per share, excluding AOCI, by 7 percent over the last twelve months. . . .

*The Hartford's capital position remains strong.* We have purchased $500 million in shares of our common stock on the open market to date and we committed to a $500 million accelerated stock repurchase program in early June. *We are well positioned to weather the current markets, holding a capital margin of at least $1.5 billion above and beyond our capital requirements,*" added Ayer.

REVIEW OF BUSINESS UNIT RESULTS

Life Operations

"Our life operations generated excellent returns, earning $334 million in net income in the second quarter. Wholesaling execution in retail mutual funds led to a record quarter for deposits in that business. Our May 2008 variable annuity product launch in the U.S. is being met with a positive reception, though difficult equity markets are likely to challenge growth," added Ayer.

Assets under management were $363 billion as of June 30, 2008, up 3 percent over the last twelve months, largely driven by growth in mutual funds, retirement plans and institutional solutions, as well as assets from the retirement plans acquisitions. Life reported net income growth of 5 percent over the prior year. The second quarter of 2008 included $120 million of net realized capital losses and a $32 million tax benefit, of which $22 million related to prior periods. The second quarter of 2007 included $130 million of net realized capital losses.

\* \* \*

INVESTMENTS

Total net investment income for the quarter, excluding trading securities, was $1.2 billion, down 8 percent from the prior year. Net investment income generated from limited partnerships and other alternative investments for the quarter was $25 million, compared with $107 million in the prior year.

Net realized capital losses for the quarter were $156 million for the quarter, after-tax and after-DAC, including total impairments of $88 million. Net realized capital losses were $148 million in the prior year, including total impairments of $28 million.

2008 GUIDANCE

Based on the assumptions below, The Hartford currently expects 2008 core earnings per diluted share to be between $9.20 and $9.50. This range excludes any effect from the company's planned third quarter DAC unlock and remains unchanged from the guidance range established on April 28, 2008.

In the third quarter of 2008, the company expects to complete its review of all assumptions underlying the company's estimate of future gross profits used in the determination of certain asset and liability balances, principally life deferred acquisition costs (DAC). Primarily due to declines in market levels since the last DAC unlock, the company expects to record a charge in the third quarter. The actual DAC unlock will be dependent on market conditions on the date of the unlock, as well as the results of the 2008 assumption studies which are due to be completed in the third quarter. Additional information regarding the factors that affect the DAC unlock can be found in the company's Form 10-Q for the second quarter of 2008.

65.    During the July 29, 2008 quarterly conference call following the release of The

Hartford's second quarter 2008 earnings, defendant Ayer emphasized the strength of the Company's

balance sheet:

> *Also, our CMBS and RMBS securities continue to perform well. While market pricing for these asset classes remains depressed, we are confident that the ultimate economic losses will be a fraction of the mark-to-market losses.*

> The Hartford has worked diligently over the past five years to fortify its balance sheet. *One of the reasons we built our capital position was to address the challenges of market conditions like the ones we face today. Our balance sheet remains in great shape and even after weathering the effects of market volatility over the past year.*

> I know our investors believe capital flexibility is precious. We do too. *We have the capital necessary to meet our business needs and we have at least $1.5 billion of capital margin.* Our liquidity is excellent and we have additional debt capacity should it be necessary. *All said, I am very comfortable with the company's financial position.*

66.    During that same conference call, defendant Zlatkus reassured the market with

respect to the Company's capital position:

> Our comfort in The Hartford's capital position was one of the factors that led us to buy back stock during the second quarter. We repurchased $371 million of stock in the open market through the end of June. And in July, we bought back

another $129 million, bringing our total open market purchases year-to-date to $500 million.

We also issued our first hybrid debt security in the second quarter. The $500 million we raised were used to fund an accelerated share repurchase program. We look at the pairing of the hybrid and the ASR as an efficient tuning of the Company's capital structure. So all-in, I feel very good about the capital actions we have taken this year and I am confident The Hartford is on a firm capital footing.

*      *      *

I think what is important is, again, I go back to looking at how we plan for our capital and how we stress test it, and we feel good about our capital position in light of both the equity markets today and under some stress scenarios.

67.    In The Hartford's report on Form 10-Q, filed with the SEC on July 28, 2008, defendants stated the following:

- With respect to the Company's *securities lending program* –

As of June 30, 2008 and December 31, 2007, under terms of securities lending programs, the fair value of loaned securities was approximately $3.9 billion and $4.3 billion, respectively, and was included in fixed maturities and equities securities, available-for-sale, and short-term investments in the condensed consolidated balance sheets.

- With respect to *DAC unlocking* –

In addition, the Company routinely stress tests its DAC and sales inducement assets for recoverability against severe declines in its separate account assets, which could occur if the equity markets experienced a significant sell-off, as the majority of policyholders' funds in the separate accounts is invested in the equity market. As of June 30, 2008, the Company believed U.S. individual and Japan individual variable annuity separate account assets could fall, through a combination of negative market returns, lapses and mortality, by at least 44.3% and 69.3%, respectively, before portions of its DAC and sales inducement assets would be unrecoverable.

- With respect to the Company's *hedging program* –

Contracts not covered by reinsurance generate volatility in net income each quarter as the underlying embedded derivative liabilities are recorded at fair value. In order to minimize the volatility associated with the non-reinsured GMWB liabilities, the Company established a dynamic hedging program.

The Company uses hedging instruments to hedge its non-reinsured GMWB exposure.

68.    On September 26, 2008, The Hartford's stock closed at $56.64 per share.  By
September 30, 2008, it had dropped to $40.99 per share as the market began to realize the amount of
troubled derivative investments being held by certain insurance companies, including The Hartford.

69.    In reaction to this decline, on October 1, 2008, The Hartford issued a statement in a
press release which stated in part:

> The Hartford Financial Services Group, Inc., today issued the following statement.  It
> is not the company's policy to generally comment on fluctuations in its share price.
>
> We are disappointed with our recent stock performance but recognize we are
> living through a period of unprecedented market conditions.  The Hartford's core
> operating businesses are performing well and our liquidity remains strong.
>
> The Hartford has a strong history of managing through challenging times.
> We were pleased that both Moody's and Fitch maintained our excellent insurance
> financial strength ratings at a AA level following their review.  However, both
> agencies did change our outlook, largely due to market conditions.
>
> ***We are confident in our financial strength and in our ability to meet our
> commitments to customers.  Nothing is more important to us than honoring those
> promises and maintaining our strong ratings***.
>
> Our financial position, our long history and the strength of the operating
> businesses that form the foundation of our company give us confidence.  For 198
> years, The Hartford has successfully navigated through many different business
> cycles and challenging climates.

70.    This statement slowed to some extent the decline in The Hartford's stock price which
had dropped from $63.08 per share at the end of August 2008 to $38.11 per share by the beginning
of October 2008.

71.    On October 28, 2008, The Hartford's stock price closed at $19.22 per share.

72.    Then, on October 29, 2008, the Company issued a press release entitled "The
Hartford Announces Third Quarter Results," which stated in part:

> The Hartford Financial Services Group, Inc. today reported a third quarter
> 2008 net loss of $2.6 billion, or $8.74 per diluted share.  The Hartford's net income
> in the third quarter of 2007 was $851 million, or $2.68 per diluted share. . . .

"This was an extremely difficult quarter for the company. Volatile credit and equity markets and the largest catastrophe in the past three years significantly affected our results," said Ramani Ayer, The Hartford's chairman and CEO. "*Earlier this month, we took decisive action to fortify our capital by securing a $2.5 billion investment from Allianz. The Hartford is financially strong with the liquidity and capital to meet our commitments to our customers.*"

                    *        *        *

In the third quarter of 2008, the net realized capital loss was $2.2 billion, after-tax, compared with a net realized capital loss of $212 million, after-tax, in the third quarter of 2007. In addition, third quarter 2008 net income reflected a $932 million after-tax charge related to the company's revision of its estimates of future gross profits, commonly referred to as a "DAC unlock." The company reported an after-tax gain of $213 million in the third quarter of 2007 related to the DAC unlock. Estimates of future gross profits are used in the determination of certain asset and liability balances, including deferred acquisition costs (DAC).

                    *        *        *

INVESTMENTS

"Our holdings in the financial sector weighed heavily on our investment performance in the quarter," said Ramani Ayer. "We recently named Greg McGreevey as chief investment officer for the company. Greg and his team are taking a series of actions to stabilize the portfolio and improve its performance over time."

Net investment income, excluding trading securities, in the third quarter was down 15 percent from the prior year due to lower yields on fixed maturity investments and $101 million of pre-tax losses on limited partnerships and other alternative investments. Limited partnerships and other alternative investments contributed $42 million of pre-tax net investment income in the third quarter of 2007.

*The net realized capital losses totaled $2.2 billion for the quarter, after-tax and DAC, compared to a loss of $212 million in the third quarter of 2007.* Other-than-temporary impairments made up $2.0 billion of the realized capital losses in the quarter. The majority of these impairments were related to the company's investments in the financial services sector, which was negatively affected by recent market turmoil. The net unrealized loss on available-for-sale securities was $3.8 billion, after-tax and DAC, as of September 30, 2008.

The Hartford's total investments, excluding trading securities, were $89.8 billion as of September 30, 2008, compared to $94.2 billion in the year ago period. Depressed valuations from widening credit spreads drove the majority of the decline in asset values. The company received a direct investment from Allianz of $2.5 billion, which closed on October 17, 2008. The company believes its current

- 29 -

portfolio position and strong underlying operating cash flows provide sufficient liquidity to meet its needs.

2008 GUIDANCE

*Based on the assumptions below, The Hartford currently expects 2008 core earnings per diluted share to be between $4.30 and $4.50*.

73.    With the news of The Hartford's significant losses, shares dropped to $9.62 per share on October 30, 2008 from $19.86 per share on October 29, 2008, and from the Company's Class Period high of $93.30 per share on December 10, 2007.

74.    On the conference call following the October 29, 2008 earnings release, The Hartford's new Chief Investment Officer indicated he would minimize the derivatives exposure which caused so much damage to The Hartford:

I also intend to continue to decrease our exposure to credit derivatives, shrink the securities lending program, and reduce exposure to certain capital-intensive and volatile asset classes, like hedge funds. I don't want to suggest that we can make wholesale changes in the portfolio near-term.

It's not economically prudent or feasible to sell severely depressed assets at the height of market fear. Over time, however, we will make prudent portfolio decisions that effectively optimize investment performance, capital, and earnings stability.

75.    On November 3, 2008, The Hartford filed a report on Form 8-K with the SEC, and issued a press release in which The Hartford and Ayer stated that the Company's capital position and estimated RBC ratio "*is more than sufficient for current market conditions and in the event markets deteriorate further*."

76.    With the news that The Hartford purportedly had stabilized its capital position, its share price increased from $10.32 per share on October 31, 2008 to $16.28 per share on November 3, 2008, a 57% increase.

77.    On November 17, 2008, *The Associated Press* published an article entitled "Hartford Financial down on variable annuity worry," which stated in part:

Shares of the Hartford Financial Services Group Inc. plunged Monday, reversing gains recorded Friday after it said it would buy a thrift and seek government bailout money, as investors fretted about the insurance company's variable annuity business and amid fears it could face a ratings downgrade.

Hartford Financial shares fell $2.55, or 20.1 percent, to $10.10 in afternoon trading, on nearly twice normal volume.

The drop erased a 21 percent gain from Friday's session after Hartford said it would buy Sanford, Fla.-based Federal Trust Corp. for about $10 billion, and become a thrift holding company. That move would enable it to take part in the federal bailout program, and Hartford Financial said it expects to be eligible for $1.1 billion to $3.4 billion in government bailout money after the buyout.

*Monday's decline reflected concerns about the insurer's variable annuity business, which offers policies that have guaranteed minimum payouts or monthly withdrawal benefits. Investors are worried the payout obligations may exceed the amount of capital the company has on hand, due to the plunge in the overall market and Hartford Financials' own shares this year.*

The stock closed Friday down 85 percent for the year, and 70 percent in the quarter.

Citi Investment Research analyst Joshua Shanker said some investors may be concerned about the potential for Moody's Investor Services downgrading Hartford Financial, but he suggested that other insurers face a similar concern, which would reduce the impact of a ratings cut. "We believe that the current stock price is confusing a downgrade with the risk of insolvency," Shanker wrote.

78.     On December 5, 2008, defendants held an "Investor Day" presentation in New York

for certain institutional investors and industry analysts. At that presentation, defendant Ayer stated:

- "The Hartford is well capitalized and has ample liquidity."

- "Both our Property & Casualty and Group Benefits and Life Insurance operations are all doing very well and will continue to do well in 2009."

- "[W]e are taking steps as we think about the annuity business to ensure ourselves that we are de-risking the portfolio."

79.     During that same presentation, defendant Zlatkus stated:

I have several subjects to cover this morning, first an update on our 2008 guidance. You will see that it is up. *Next, I'd like to cover our hedging program and how we've weathered through these markets, both from a GAAP perspective and a capital perspective. Next of course the all-important topic of capital, and you will*

- 31 -

*see that we are well capitalized. And then finally, I will cover our liquidity and how we view that, and we have ample liquidity.*

So with that, ***let's turn to the next slide in terms of 2008 earnings guidance. You will see that we are up $0.40 of the range on both the bottom and the top end.*** Let me cover a few reasons. ***First***, we've had favorable prior-period – prior accident year reserve releases that have generated $0.62 a share, and we're very pleased about that. You also see that we have $0.13 a share due to a revised estimate of our 3Win product that we had mentioned in our third quarter, so the loss on that has come down a bit. We've also had lower underwriting losses in our other operations, and that's about $0.8 a share.

Now, we all know we have a very challenging quarter. So partially offsetting that, we've seen some deterioration on our expected yields on alternative investments, again our hedge funds and partnerships. That's about $0.30 a share. And while you'll see from John that at the Life Company we're within guidance in a lot of areas, the lower AUM is costing us about $0.10 a share. So obviously, assets under management are down with the markets down. ***Overall, once again up $0.40 on the range***.

Now, I do want to spend a moment to talk about ***the potential for a off-cycle DAC unlock. You may recall that at the end of that third quarter the market was at 1165, it has clearly dropped significantly since then, so we have modeled when we would have an off-cycle DAC unlock***.

As you know, this is primarily determined by the customer separate account returns, and so while there's no one indicator in the US, I think the S&P gives you an indication of that. ***And we would look at the low-800 S&P range to be when we may have to have an off-cycle DAC unlock in the US.***

80.    Defendant Zlatkus also presented the following slide at the Investor Day conference

in presenting the Company's increased 2008 guidance:

We are increasing our 2008 guidance for core earnings

| Guidance – 2008 Core Earnings per Share | Low | High |
|---|---|---|
| EPS Guidance as of 10/29/08 | $4.30 | $4.50 |
| Changes to outlook: | | |
| - Prior period P&C reserve releases | $.62 | |
| - Revised estimate of the impact of 3Win trigger | $.13 | |
| - Lower underwriting loss in Other Operations | $.08 | |
| - Lower than expected yields on alternative investments | ($.30) | |
| - Lower than expected daily S&P 500 | ($.10) | |
| (assumes S&P 500 ends the year at 860) | | |
| - Other | ($.03) | |
| EPS Guidance as of 12/05/08 | $4.70 | $4.90 |

The Hartford Financial Services Group, Inc.                                    26

81.    Defendant Zlatkus also stated the following with respect to the Company's hedging

program:

Now, let's talk about our hedging program and really what I'll call our risk management program, particularly for our guaranteed minimum withdrawal risk. Let's first cover this slide. There's a lot of numbers on there.

If you look at the blue line, that represents the monthly change of our guaranteed minimum withdrawal benefit liability. Again, that's a GAAP liability. And the red line represents the after-tax, after-DAC net income gain or loss resulting from our hedging program.

It is important to note that the blue line – again that's our total liability, and we manage the risk of the total guaranteed minimum withdrawal benefit liability by both reinsuring about 28%, long-dated customized derivatives above 28%, and then our dynamic three [greek] hedging about 44%.

So, what happened? This is a chart. It's just as of October. And in the month of October alone, the liability increased over $2 billion in one month, clearly more than we have ever seen since we began our hedging program and selling our guaranteed living benefits. And then in November, it rose about the same amount. So, I'm going to give you more color as to what we're seeing as of December 1st. So with the change through this quarter, end of the quarter through December 1st, we're looking at a change in the liability of about $5 billion. This is clearly a volatile time.

- 33 -

So, how did we do in terms of hedging performance? Well including some additional what I would call statutory protection, some additional hedging we put on through the quarter, if we had to put a pin in the numbers as of December 1st, I would give you a range of about $300 million to $400 million of losses after tax.

We do recognize there's obviously a negative impact to our bottom line, but I'd like to take a moment to talk about the impact or the benefit of that hedged asset on our statutory or capital position.

In fact while again we did have losses on our hedging program from a GAAP perspective, the hedge has actually performed better, much better than we had modeled from a capital perspective. And why is that?

Well rates have gone down dramatically, particularly in the last several weeks, and volatilities, as you know, are at all-time highs. That has allowed our hedge asset to rise in value much faster than the corresponding liability increase from a statutory perspective. So if anything, our hedged asset has performed better than modeled from a capital perspective, and you'll see that for some of the reasons [sic] why our RBC ratios at the Life Company have improved.

So once again, how I would look at this is I really feel that under these kind of extreme stress markets when we had thought about our hedging program and how it would work under such extreme scenarios, we certainly weren't hoping for them, it actually has performed within what we would have anticipated.

82.    And with respect to the Company's capital position, defendant Zlatkus stated the

following:

Now, let's talk about The Hartford's capital position. Again, as Ramani has said, we are well capitalized. Let me start by just reminding everyone again, as of the third quarter we had over $13 billion of statutory surplus, and that did not include the $2.5 billion [Allianz] investment.

So while some of the recent market conditions have clearly consumed a bit of that surplus, it's important to note that we are very well positioned. Certainly, that's because that capital is above and beyond our reserves to fully fund all of our policyholder obligations and really effectively compete in our markets.

But turning to what I would call our capital position, which is how I think most of you think of it, I wanted to talk about a significant improvement that we've [sic] since the filing of our 8-K. First as you can see, assuming that the S&P ended that year at 800, we would project a Life Company risk-based capital ratio of at least 420%. That's up from 300% that we last reported it on our 8-K, and I'll get into the reasons for that in a moment.

*      *      *

- 34 -

So now let's talk about our Life Company RBC ratios, and I know everybody's wondering about the improvement. First, I want to give you a little color on the slide. So on the left-hand – or right-hand side, you can see that that's our 11/03 estimate, the estimates that we gave you for our 8-K. And then, you can see our most recent or current estimates of our RBC ratio.

You'll also note we talk about credit-related impacts in here. In the last estimate, they were about 500 and 750, and you'll see that in this case we don't have a change because we don't see a huge correlation between equity markets and our spreads.

So, the 50 basis points today represents about $700 million. One of the things I will tell you, it's just a little hard to reconcile from the last numbers to this number because both our actual capital and our required capital has changed.

What's important . . . is . . . our capital has significantly increased. First, we have been proactive. As I had mentioned on our call, we have secured both internal and external reinsurance, which has definitely improved the ratio. Our hedging program, as we had mentioned, has performed exceedingly well relative to the statutory liabilities, and we did put some additional hedging on.

And then finally and importantly, as we know, these are estimates and they [are] highly reliant on estimates and assumptions and forecasts for the year-end. We have one more month, or actually a little over that, of actuals and refinements to our calculations. So, we feel that this new estimate of 420% at $800 million and 535% at $900 million is our new best estimate.

Now, I want to take a moment [to] talk, just mention those credit-related impacts and what that means. As Greg said, we do not anticipate any significant statutory impairments where we think we have a credit event in the fourth quarter. What that represents is both some trading flexibility, a small amount of statutory impairments, some provision for a change that we're going to have in terms of statutory impairments lining up with GAAP and also some mark-to-market impacts on our Life portfolio. And that comes from our market value adjusted fixed annuity is marked to market for statutory purposes.

So, we think that the $700 million is a conservative estimate, and we hope it proves to be such. And once again, I want to remind you, even including that $700 million, 420% at $800 million and 535% at $900 million, very pleased with our capital position.

Now, let's turn to our models for S&P of 700. As you can imagine, our ability to pinpoint an exact RBC ratio at 700 becomes increasingly more challenging as [sic] extreme levels, interrelationships again between currencies and interest rates, et cetera, does become more challenging. Having said that, we have modeled this and feel that our estimate here at 280% for the Life Company is our new best estimate at 700.

It's important to note, as I said earlier, that we have a lot of flexibility. So if the year were to end at 700 S&P, we have a variety of options to downstream capital into the Life Company. I show you an example that I take $650 million of the $1.1 billion from the excess P&C and holding company. Conversely, we could draw our contingent capital facility and only take $150 million of excess capital from the P&C and holding company.

But what's really important to note is that S&P of 700, we could maintain a 325% RBC ratio of risk-based capital at the Life Company and still have $2.85 billion of existing capital resources that would remain untapped.

*    *    *

So in summary, Hartford's capital position has significantly improved from our last update, and we believe we can withstand further market deterioration. Again as a reminder, at 700 in S&P we could have a 325% risk-based capital ratio at the Life Company and still have $2.85 billion of additional capital resources available to us. We have ample liquidity to be able to withstand this current credit cycle, and we feel our liabilities are definitely manageable.

Overall, we will continue to take strategies to further fortify our capital position, but we do believe that we are very well positioned to withstand the current market environment.

83.    Defendant Marra also stated with respect to the Company's capital position and liquidity that "*we're well capitalized. In fact, our capital position has improved. We've got a good liquidity position, a very strong liquidity position, and Greg did a nice job showing that – showing why we believe in the long-term economic – economic value of our investment performance.*"

84.    The Hartford's shares shot up to $14.59 from $7.21 on December 5, 2008 on news that the Company was raising its 2008 guidance.

85.    On February 5, 2009, after the market closed, the Company made the following announcement regarding its fourth quarter and full-year 2008 financial results:

The Hartford Financial Services Group, Inc. today reported a fourth quarter 2008 *net loss* of $806 million, or $2.71 per diluted share. The Hartford's net income in the fourth quarter of 2007 was $595 million, or $1.88 per diluted share. For full year 2008, The Hartford reported a *net loss* of $2.7 billion, or $8.99 per diluted share, compared with net income of $2.9 billion, or $9.24 per diluted share, in 2007.

*    *    *

- 36 -

At year-end 2008, The Hartford's life company had a preliminary risk-based capital (RBC) ratio of 385% and the property and casualty subsidiaries were capitalized at levels consistent with those historically associated with AA level property and casualty insurers. Additional information regarding the company's capital position is available on a Form 8-K furnished this evening to the Securities and Exchange Commission.

"We are optimistic about the resolve shown by the federal government in its efforts to stimulate the economy, but the risks still appear severe," continued Ayer. "As a result, it is prudent for us to put capital preservation and risk mitigation at the forefront of our priorities in 2009. We intend to take actions on a number of fronts. The effort to de-risk our variable annuity product portfolio is ongoing, and we will look across the enterprise for additional opportunities to reduce risk. In addition, at our next Board of Directors meeting, we plan to recommend that the Board reduce our quarterly dividend to $0.05 per share, which will save the company about $350 million annually.

"From an operational perspective, our core insurance-based businesses had a strong 2008. We had outstanding underwriting results in property and casualty, and loss estimates for the current and prior accident years developed better than expected. In addition, our group insurance and individual life businesses executed well in competitive markets," added Ayer.

In the fourth quarter of 2008, the company's net realized capital loss was $610 million, after-tax, compared with a net realized capital loss of $230 million, after-tax, in the fourth quarter of 2007. The net realized capital loss in 2008 was $3.6 billion, after-tax, largely driven by other-than-temporary impairments, compared with a net realized capital loss in 2007 of $560 million, after-tax, primarily reflecting other-than-temporary impairments.

The fourth quarter of 2008 also included a $597 million after-tax write off of goodwill, of which $323 million was recorded in corporate, with the remaining charge of $274 million recorded in the individual annuity reporting unit.

***In addition, the company's full year 2008 net loss reflected a $932 million after-tax charge, taken in the third quarter, related to the company's revision of its estimates of future gross profits, commonly referred to as deferred acquisition cost (DAC) unlock.*** The company reported an after-tax gain of $213 million in 2007 related to the DAC unlock. Estimates of future gross profits are used in the determination of certain asset and liability balances, including DAC.

86.    Together with the Company's fourth quarter and year-end earnings release, defendants held a conference call with investors and analysts on February 6, 2009, in which defendant Ayer stated:

*Turning to the numbers on slide 3, we are not happy with our fourth-quarter or full year results. We recorded a net loss of $806 million, or $2.71 a share in the fourth quarter.* Contributing to the loss were realized losses of $610 million. *Losses on our hedge program and impairments were the primary sources there. We also recorded a $597 million write-off of goodwill associated with our annuity business.*

*Core earnings in the fourth quarter were a negative $208 million, or $0.72 per diluted share. In addition to the goodwill charge, core earnings were hurt by a $152 million charge related to our 3 Win variable annuity product in Japan, negative returns on alternative investments and lower yields on our fixed income portfolio.* As I mentioned earlier, we have intentionally enhanced our liquidity position. One effect of this action has been lower net investment income as we have increased our holdings of lower yielding assets.

\*　　\*　　\*

Now please turn to slide 5 for our Life results. Our Life businesses were heavily impacted by the quarter's market turbulence. Total assets under management ended the year at $298 billion, a 20% decline from the end of 2007, primarily driven by the impact of equity market declines on account values.

With AUM down, fee-based revenues fell, negative returns on alternative investments, lower investment income and the write-off of goodwill in our annuity businesses also contributed to a $261 million loss in core earnings.

Sales of our variable annuity products were challenged, both in the U.S. and in Japan. Market volatility has slowed the pace of industry sales, which we have seen both in lower sales and deposits, as well as reduced surrender levels.

87.    During that same conference call defendant Zlatkus stated:

While we enter the year well-capitalized, our preliminary year-end numbers came in lower than our December Investor Day estimates. I will take a few minutes to walk you through the differences. Please move to slide 13.

On December 5, management's best estimate for year-end additional capital resources at the holding company and the P&C companies was $1.1 billion. In fact, we ended the year with $1.9 billion. There are a couple of reasons for this difference. First, rather than downstreaming all of the proceeds from our Allianz capital rate at the Life company, we retained $1 billion at the holding company, providing us with greater flexibility going forward.

Second, the decline in interest rates in December resulted in a smaller benefit than anticipated from the discounting of our longtailed P&C reserves in certain rating agency capital models. This decline reduced our excess capital position by roughly $400 million. Partially offsetting this were other changes to surplus, including higher

fourth-quarter income. All in, we entered 2009 with $1.9 billion of excess capital in the holding company and P&C operations.

Please turn to slide 14. In December, we provided estimated year-end Life RBC ratios at different market levels. Given the fact that the market ended the year at 903, I will focus on the comparison to Investor Day projections at a 900 S&P. *As the slide shows, our preliminary 2008 year-end RBC ratio is 385%. That compares to a December projection of 535%.* Again, the 535% reflected all of the Allianz capital being contributed to the Life company. Retaining $1 billion at the holding company results in a 70 point reduction in the RBC ratio. So the apples-to-apples comparison is 465%. That leaves an 80 point difference in the RBC ratios. Generally, the reasons for this decline fall in two categories, what I will describe as market changes and forecast variance.

One important estimate that was impacted by both market changes and forecast variance was cash flow testing required under AG39. You may recall that, on Investor Day, we believe AG39 would not impact our year-end reserve requirements. In preparing our capital projections in late November, we did not perform full-blown cash flow testing as this is done annually in the first quarter of the year with actual year-end data. Instead, we made a number of assumptions about our year-end book of business, projected market conditions and other reserve valuation inputs.

Having now conducted the actual cash flow testing on our year-end in force business, using 12/31 capital market input, it resulted in a net reserve increase of about $600 million. We think this result is unduly conservative. With that perspective, we have requested AG39 relief from our year-end reserve calculation from the Connecticut Department of Insurance. If relief is granted, the benefit will be included in our actual year-end RBC ratio. But we have not reflected any potential benefit in our preliminary 385% RBC.

A different market change that contributed to the 80 point difference was the yen strengthening in December. This increase in required reserves for the Japan annuity business resulted in a $150 million reduction in surplus. Finally, other factors netted to a benefit of about $50 million. The sum of these three impacts totaled the $700 million, which you see on the slide.

Another market change unrelated to VA was the effect of spread widening and certain investments holding. This reduced surplus by about $450 million and was largely related to the surplus required in the market value adjusted fixed annuity. Again, this amount was more than the amount that we had forecasted. To be clear, these are not impairments, but rather the impact of marking to market the assets supporting the fixed annuity liability. To the extent that credit markets recover, we expect to recapture that capital.

\*       \*       \*

Now please turn to slide 16 to discuss changes to our hedging program. In important step we took in the fourth quarter was to modify our VA hedging program to better protect statutory capital. We began to reduce volatility in interest rate protection in our program during the quarter.

From a GAAP perspective, the effects of these changes were roughly offsetting. The changes did, however, benefit our year-end capital position. Going forward, we will continue to tune our hedging program to tilt the balance towards protecting statutory surplus, recognizing that this will increase the potential for GAAP volatility.

*In the fourth quarter, the GMWB hedging program managed through the tremendous volatility of the markets reasonably well. We finished with an after-tax loss of $384 million. This was driven mostly by our underhedged vega position, basis risk and intraday market volatility*.

88.    On February 6, 2009, Moody's announced that it was downgrading The Hartford's senior debt to Baa1 from A3, and was downgrading the insurance financial strength ratings from Aa3 to A1.

89.    Defendants were aware of the following material undisclosed information which contradicted their public statements during the Class Period:

(a)    The Company's capital position was weak and deteriorating throughout the Class Period;

(b)    The Company's exposure to losses from credit derivatives, including credit default swaps and mortgage-backed securities, was a much larger and more significant risk than the Company had disclosed;

(c)    The Company had leveraged its risk significantly throughout the Class Period through a securities lending program in which it invested the cash collateral it received from third-party lenders in extremely risky investments, including residential and commercial mortgage-backed securities;

(d)    To further leverage the Company through its securities lending program, the Company took securities that had been segregated for the exclusive benefit of policyholders, in

- 40 -

separate custodial accounts, and loaned those securities to third parties, again receiving collateral in exchange for such securities and investing that collateral in extremely risky investments, including residential and commercial mortgage-backed securities;

(e)  Contrary to defendants' representations, the Company's financial and capital position was not sound and was eroding significantly throughout the Class Period, as its investments exposed it to severe liquidity risks should the credit markets not improve;

(f)  The Company was under-hedged as it reduced its hedging throughout the Class Period;

(g)  The Company's hedging program was becoming increasingly expensive to maintain due to volatility in the equity markets, requiring the Company to make cuts in the program;

(h)  The Company would have to conduct an off-cycle DAC unlock in the fourth quarter of 2008 even if the S&P finished the year above 860;

(i)  The Company's financial results were continuing to deteriorate to a much greater extent than represented due to its exposure to the U.S. real estate market and financial services sector;

(j)  The Company had failed to maintain adequate internal controls to adequately report losses from investments on a timely basis; and

(k)  The Company was not on track to achieve the 2008 core earnings per share forecasted for and by the Company.

90.  As a result of defendants' false statements, The Hartford stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down almost 90% from their Class Period high prior to these disclosures.

- 41 -

## LOSS CAUSATION/ECONOMIC LOSS

91.    By misrepresenting the Company's financial results, investments, investment risks, capital position, securities lending program and hedging program, and by concealing the impact on The Hartford's business from the credit market problems, defendants presented a misleading picture of The Hartford's business and prospects. Thus, instead of truthfully disclosing during the Class Period that The Hartford's business and capital position was not as healthy as represented, defendants misrepresented The Hartford's financial outlook and its actual business prospects going forward.

92.    These claims of profitability, strength of capital position, investment risks, and risk management caused and maintained the artificial inflation in The Hartford's stock price throughout the Class Period and until the truth was revealed to the market in bits and pieces.

93.    Defendants' false and misleading statements had the intended effect and caused The Hartford stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $93.30 per share in December 2007.

94.    As a direct result of defendants' admissions and the public revelations regarding the truth about The Hartford's actual business prospects, capital position and investments, The Hartford's stock price plummeted 76%, falling from $40.99 per share on September 30, 2008 to $9.64 per share on November 18, 2008 – a drop of $31.35 per share. Defendants then made numerous false and misleading statements during the Company's December 5, 2008 Investor Day conference in New York, which had the intended effect again of artificially inflating The Hartford's stock price. As a direct result of defendants' admissions and the public revelations regarding the truth about The Hartford's actual business prospects, capital position and investments, The Hartford's stock price dropped 13%, from $14.59 on December 5, 2008 to $12.68 on February 6,

2009. Both of these drops removed the inflation from The Hartford's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of The Hartford common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and members of their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

96.    The members of the Class are so numerous that joinder of all members is impracticable. The Hartford stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by The Hartford or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Hartford has over 380 million shares of stock outstanding.

97.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

98.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

99.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of The Hartford; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants

101.    Plaintiff incorporates ¶¶1-100 by reference.

102.    During the Class Period, the Company and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103.    These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

- 44 -

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of The Hartford common stock during the Class Period.

104.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for The Hartford common stock. Plaintiff and the Class would not have purchased The Hartford common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

105.    Plaintiff incorporates ¶¶1-104 by reference.

106.    The Company and the Individual Defendants acted as controlling persons of The Hartford within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of The Hartford stock, the Individual Defendants had the power and authority to cause The Hartford to engage in the wrongful conduct complained of herein. The Hartford controlled the Company, the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 31, 2010                  ROBBINS GELLER RUDMAN & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD

                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

- 46 -

ROBBINS GELLER  RUDMAN & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
THEODORE J. PINTAR
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF MONROE EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

      1.     Plaintiff has reviewed a complaint and authorized its filing.

      2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

      3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

      4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

      5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*McCasland v. FormFactor, Inc., et al.*, No. C-07-05545-SI (N.D. Cal.)
*In re Opnext, Inc. Sec. Litig.*, No. 08-920-JAP (D.N.J.)

      6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

**HARTFORD**

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of March , 2010.

CITY OF MONROE EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _____Chairman_____

- 2 -

HARTFORD

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/22/2008 | 700 | $72.78 |