RECEIVED

10 OCT -8 PM 11: 56

U.S. DISTRICT COURT
S.D.N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ---------------------------------------- x | |
| : | Civil Action No.:  10-CV-02835-NRB |
| CITY OF MONROE EMPLOYEES' : | |
| RETIREMENT SYSTEM V. THE HARTFORD : | (ECF CASE) |
| FINANCIAL SERVICES GROUP, INC., *ET. AL.* : | |
| : | Hon. Naomi R. Buchwald |
| : | |
| : | **Jury Trial Demanded** |
| ---------------------------------------- x | |

## AMENDED CLASS ACTION COMPLAINT

**LABATON SUCHAROW LLP**
Joel H. Bernstein (JB-0763)
Ira A. Schochet (IS-2187)
Eric J. Belfi (EB-8895)
Michael H. Rogers (MR-5460)
140 Broadway
New York, New York  10005
(212) 907-0700

**NIX, PATTERSON & ROACH LLP**
Bradley E. Beckworth
Jeffery J. Angelovich
Susan Whatley
Lisa Baldwin
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Class*

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP**
David Kessler, Esq.
Darren Check, Esq.
Sean Handler, Esq.
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*Attorneys for Named Plaintiff*
*Arca S.G.R. S.p.A.*

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................................... 11

III.  PARTIES ................................................................................................................. 12

      A.   Lead Plaintiff .................................................................................................. 12

      B.   Named Plaintiff ............................................................................................... 12

      C.   The Corporate Defendant ............................................................................... 13

      D.   The Individual Defendants ............................................................................. 13

           1.   Defendant Ramani Ayer .......................................................................... 13

           2.   Defendant Thomas M. Marra ................................................................... 14

           3.   Defendant Lizabeth H. Zlatkus ................................................................ 14

IV.   NATURE OF THE FRAUD .................................................................................... 15

      A.   The Structure of the Company ........................................................................ 15

      B.   Life Insurance Companies are Subject to Regulation by State Insurance
           Departments .................................................................................................... 16

      C.   Life Insurance Companies—such as HLIC— Maintain General and Separate
           Accounts .......................................................................................................... 17

      D.   Life Insurance Companies File Financial Statements Regarding Their
           General and Separate Accounts Pursuant to Statutory Accounting Principles ......... 19

      E.   Life Insurance Companies are  Subject to Capital Requirements .................. 20

      F.   RBC Ratios are Dependent on a Number of Factors—Including Valuation of
           Assets in a Life Insurance Company's Separate Accounts ............................. 22

      G.   HLIC Offered MVA FA Products that Were Invested in Overvalued Asset-
           Backed Securities ............................................................................................ 24

      H.   The Importance of Capital Adequacy to Creditors and Investors .................. 27

      I.    Throughout the Class Period, Defendants Knew Material, Yet Undisclosed,
           Facts About The Hartford's Business Operations, Which Led The Company
           To Overstate Its Capital Position .................................................................... 29

V.      DEFENDANTS INFLATED THE HARTFORD'S STOCK PRICE THROUGH
        MATERIALLY FALSE & MISLEADING STATEMENTS AND OMISSIONS ......... 39

VI.     AS THE FRAUD CONTINUED, DUE TO DEFENDANTS' CONTINUING
        MISSTATEMENTS OF THE COMPANY'S CAPITAL POSITION AND
        NON-DISCLOSURE OF MATERIAL FACTS ABOUT ITS ABS
        VALUATIONS, THE TRUTH NONETHELESS BEGAN TO EMERGE
        THROUGH PARTIAL DISCLOSURES OF MATERIAL FACT ................................. 48

VII.    THE TRUTH WAS REVEALED WHEN DEFENDANTS FINALLY
        DISCLOSED THE HARTFORD'S TRUE CAPITAL POSITION,
        DEMONSTRATED THROUGH BADLY MISSED RBC GUIDANCE AND
        LARGE CAPITAL SHORTFALLS .................................................................................. 81

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................................... 91

IX.     CLASS ACTION ALLEGATIONS ................................................................................ 99

X.      PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE FOR
        DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE
        *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER
        THE FRAUD-ON-THE-MARKET DOCTRINE ........................................................... 101

XI.     DEFENDANTS ARE NOT ENTITLED TO THE PROTECTIONS OF THE
        PSLRA'S SAFE HARBOR PROVISION ...................................................................... 103

XII.    CAUSES OF ACTION .................................................................................................... 107

XIII.   PRAYER FOR RELIEF .................................................................................................. 113

JURY TRIAL DEMANDED .......................................................................................................... 113

Lead Plaintiff, Arkansas Teacher Retirement System ("Arkansas Teacher" and/or "Lead Plaintiff"), and named plaintiff, Arca S.G.R. S.p.A. ("Arca") (collectively, "Plaintiffs"), bring this securities fraud class action pursuant to the Securities Exchange Act of 1934 against Defendants The Hartford Financial Services Group, Inc. ("The Hartford" and/or "the Company"), Ramani Ayer, Thomas M. Marra, and Lizabeth H. Zlatkus, (collectively, "Individual Defendants"), on behalf of themselves and all persons and entities who purchased or otherwise acquired The Hartford's common stock during the period July 28, 2008 through and including February 5, 2009 (the "Class" and "Class Period").

Plaintiffs' allegations are based on the investigation conducted by Co-Lead Counsel[1], which included, among other things, review and analysis of The Hartford's and Hartford Life Insurance Company's ("HLIC") public filings with the SEC; HLA's and HLIC's statutory filings with the Connecticut Insurance Department ("CID") and the National Association of Insurance Commissioners ("NAIC"); The Hartford's press releases, transcripts of the Company's conference calls with analysts, analysts' reports, publicly available trading information, and articles in the general and financial press. Plaintiffs believe that substantial additional evidentiary support will exist for its allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      Throughout the Class Period, Defendants told a deceptively simple story, over and over again:  The Hartford's capital position was strong.  Strong enough to satisfy statutory insurance standards.  Strong enough to maintain its credit ratings.  Strong

---

[1] On August 9, 2010, the Court approved Lead Plaintiff's selection of the law firms of Labaton Sucharow LLP and Nix, Patterson & Roach, LLP as Co-Lead Counsel (Dkt. No. 62).

enough to withstand then existing stormy economic conditions and those that may come. Strong enough, therefore, to keep its stock price high.

2.     Unfortunately, due to Defendants' wrongful conduct, unknown to investors, The Hartford's capital position was not strong, a fact Defendants knew. Throughout the Class Period, The Hartford, through and with the knowledge of the Individual Defendants, did not hold asset-backed securities ("ABS") at "fair value" as required.[2]  In fact, the Company actually held ABS at prices that were substantially lower than the value at which Defendants marked those same assets on the Company's books. These book values—grossly inflated over the actual prices they fetched upon disposition—constituted a key element of The Hartford's capital position.

3.     The result of Defendants' overvaluation of their ABS was as simple as the rest of their fraud:  The Hartford's allegedly strong capital position was anything but.  In fact, by the end of the Class Period, after months of misstatements, omissions, and overly-optimistic guidance unfounded by reality, along with a pattern of backing and filling whenever the investment community registered any skepticism as to Defendants' rosy narrative, the truth was revealed:  The Hartford came nowhere near the capital guidance it previously represented and its overall capital position was inadequate.  The

---

[2] The statutory requirements for determining the fair value of the investments is described by the NAIC as follows:

> For purposes of this statement, the fair value of a financial instrument is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.  If quoted market prices are not available, management's best estimate of fair value shall be based on the quoted market price of a financial instrument with similar characteristics or on industry recognized valuation techniques (for example, the present value of estimated future cash flows using a discount rate commensurate with the risks involved).

Accounting Practices and Procedures Manual, as of March 2009:  SSAP 27 - "Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk, Financial Instruments with Concentrations of Credit Risk and Disclosures about Fair Value of Financial Instruments" (para. 9).

result was a final loss of confidence by investors in the ability of Defendants to be transparent and provide straight and honest answers and information.

**The Importance of Adequate Levels of Risk-Based Capital**

4.      The Hartford's life insurance operations are carried out largely through two of its subsidiaries, Hartford Life and Accident Insurance Company ("HLA") and HLIC.  Through HLIC, The Hartford maintained separate accounts for certain life insurance operations that represented almost half of The Hartford's assets in 2008.  As insurance companies, HLA and HLIC filed annual statutory statements for their separate accounts pursuant to standard statutory accounting principles ("SAP").  These annual filings enabled regulators to track and assess the Company's capital adequacy, which is a critically important factor in measuring the financial health of life insurance companies. In fact, life insurance companies like HLA and HLIC are subject to minimum capitalization requirements based on a risk-based capital ("RBC") ratio, used to measure whether insurance companies have adequate net worth to support their business operations, which was applicable to HLA and HLIC throughout the Class Period.

5.      A life insurance company's ability to maintain a sufficient RBC ratio above certain thresholds is highly material for two primary reasons.  <u>First</u>, if the RBC ratio falls below minimum levels, the insurer faces significant remedial action, including restrictions on its ability to operate.  <u>Second</u>, ratings agencies view the RBC ratio as a key indicator of a life insurer's creditworthiness.  If the company's RBC ratio drops below acceptable levels, the company's credit rating also drops, which, in turn, makes its ability to raise additional capital more difficult and expensive, limits its flexibility to pursue alternative business strategies, and negatively impacts its competitive position in the industry.

6.     During the Class Period, The Hartford's RBC ratio materially depended upon several factors, one of which was the fair value of certain market value adjusted fixed annuities ("MVA FAs") held in the Company's separate accounts.  At the beginning of 2008, a significant portion of these annuities were invested in ABS.

**The Market Was Concerned About The Hartford's Capital Position**

7.     By the beginning of the Class Period, analysts and investors were concerned about the Company's potential exposure to the deteriorating market for certain types of investments, including ABS.  They knew the Company had invested a material amount of its funds in ABS, and that further declines in the market for these assets could result in deterioration in the Company's capitalization to the extent the ABS were held in the Company's market value adjusted fixed annuity separate accounts.  For that reason, analysts and investors also knew that further declines in the value of these assets could cause the Company's RBC ratio to decline.

8.     Given the volatile state of the market during 2008, analysts and investors knew that if The Hartford's RBC ratio dropped too low, the Company would be in jeopardy of having its credit rating lowered, which could severely disrupt its ability to carry out its life insurance operations or force it to engage in costly and potentially dilutive efforts to raise capital.  Accordingly, it was highly material to analysts and investors not only that the Company had a sufficient RBC ratio to withstand further market deterioration, but also that Defendants adequately assessed and accurately disclosed that ratio.  Throughout the Class Period, Defendants acknowledged they knew this information was highly material to analysts, rating agencies, and investors alike.

**Defendants Repeatedly, and Falsely, Assured the
Market of the Strength of The Hartford's Capital Position**

9.     During the Class Period, whenever a rating agency or market event called
the Company's capital position into question, its stock price responded with a significant
decline.  Each time that happened, however, during the Class Period, Defendants
responded with a statement or series of statements falsely assuring investors that the
Company had a more than sufficient capital cushion, regardless of possible further
deterioration in market conditions.  Moreover, notwithstanding those conditions,
Defendants presented on certain occasions increasingly higher RBC ratios at different
possible Standard & Poor 500 Index ("S&P 500") levels.  In short, during the Class
Period, Defendants repeatedly painted The Hartford's capital position as one that was
able to sufficiently withstand further market pressure.  While Defendants' statements in
this regard had their intended effect—to either increase the Company's stock price or
slow its slide—they were not accurate.  In fact, they were materially false and misleading
and omitted material information.

**The Hartford Overvalued Its Assets and Therefore Overstated Its Capital Position**

10.     What Defendants knew but did not tell the public, and what analysts and
investors had no way to know until after the Class Period, was the fact that Defendants
were aware that the fair valuations of certain MFA FA assets invested in ABS and held in
separate accounts they booked for statutory reporting purposes[3] were grossly overstated
in comparison to the actual prices received for those securities.  In fact, by July 28, 2008,
the first day of the Class Period, Defendants were aware that ABS assets in the separate
accounts were overvalued by 19.6% in April, 5.1% in May, 32.0% in June, and 33.4% in

---

[3] Referred to herein as Book Adjusted Carrying Value/Fair Value ("BACV / Fair Value").

July.  Although these overvaluations continually mounted as each month passed—
growing to 48.2% in August—Defendants continued to create the illusion that they could
accurately assess and were adequately disclosing the Company's capital position and
RBC ratio.

11.     On September 25, 2008, however, Moody's Investors Service, Inc.
("Moody's") began to raise questions about the Company's capital strength.  Moody's,
which had access to material, non-public information about the Company,[4] downgraded
its outlook on The Hartford from stable to negative.  Although Moody's did not report the
material overvaluations discussed above, it did state that its change was based on the
Company's significant exposure to ABS markets relative to the Company's capital
position.  The Hartford's stock dropped 8.6% in intraday trading after Moody's released
its report.

12.     As they had done throughout the Class Period, Defendants immediately
responded to questions about the Company's capital position by telling the market there
was nothing to be concerned about.  Indeed, that same night, Ayer stepped in to soothe
the market's concerns by stating that, despite Moody's negative outlook, the Company
was "well capitalized."  The Hartford's stock price increased 9.4% after Ayer's
misleading statement.

13.     Four days later, after the market closed on September 29, 2008, Fitch
Ratings, Ltd. ("Fitch") followed Moody's lead and lowered its outlook on The Hartford

---

[4] Moody's  is privy to non-public information from the companies it rates such as The Hartford.
*See* http://v3.moodys.com/sites/products/AboutMoodysRatingsAttachments/2001400000389218.pdf?frame
OfRef=corporatefor (at 5) (visited October 8, 2008) ("*Confidential Non-Public Information*: Moody's  will
use confidential non-public information that issuers provide to Moody's only for the purpose of assigning
ratings.  Moody's will not, without the permission of the issuer, disclose the information in the press
release or other research reports published in connection with the rating, or in discussions between
Moody's analysts and investors, or other issuers."

to negative.  Fitch, which, like Moody's, had access to material, non-public information about the Hartford,[5] attributed its move to a drop in the Company's capital levels due to its exposure to capital markets and deteriorating ABS values.  The Hartford's stock price dropped 18% on Fitch's report—its largest drop in 13 years.  Once again, on October 1, 2008, Defendants responded with an attempt to convince the market that Defendants were able to accurately assess the Company's capital position and that the Company was sufficiently capitalized.  Defendants stated that the Company was financially strong and touted its "strong history of managing through challenging times."

14.     In order to continue the illusion that the Company's capital position was strong, Defendants failed to disclose the known ABS overvaluations in the separate accounts from April to August.  Nor did Defendants reveal that these overvaluations were continuing—and increasing—to 53.5% in September.  Moreover, Defendants did not disclose that the Company's capital position was so perilous that they had deployed Defendants Ayer and Marra to serve as a two-person special committee to seek an emergency infusion of capital.

15.     Instead, Defendants continued to deceive the public into believing the Company's capital position and RBC ratio was sufficient to withstand further market deterioration.  Then, on October 6, 2008, Defendants announced the Company had entered into an agreement with Allianz SE ("Allianz"), providing for a $2.5 billion

---

[5] Fitch is privy to non-public information from the companies it rates, such as The Hartford, which it uses to assign ratings and express its opinions.  *See Understanding Credit Ratings—Limitations and Usage* (visited Sept. 28, 2010), http://www.fitchratings.com/creditdesk/public/ratings_defintions/index.cfm ("Ratings are opinions based on all information known to Fitch, including publicly available information and/or non-public documents and information provided to the agency by an issuer and other parties. Publication and maintenance of all ratings are subject to there being sufficient information, consistent with the relevant criteria and methodology, to form a rating opinion.").  Fitch's knowledge that assets were deteriorating, causing declines in The Hartford's capital, may be attributed to its use of non-public information from Fitch.

capital infusion.  Although Defendants portrayed the Allianz transaction as a positive step

for the Company, Defendants knew, but did not disclose, that the transaction was the

result of an undisclosed need to obtain an emergency capital infusion.

16.     In October 2008, unknown to investors, Defendants overvalued ABS in

the separate accounts by 48%.  On November 3, 2008, the Company again attempted to

persuade analysts and investors that the Company's RBC ratio was more than sufficient.

In fact, Defendants actually *increased* the Company's RBC ratio guidance and claimed

its capital position was "more than sufficient for current market conditions in the event

market conditions deteriorate even further."  In a further effort to mislead investors,

Defendants on more than one occasion told analysts that the Company's RBC ratios,

which they intended investors to rely upon in support of their representations as to the

strength of The Hartford's capital position, were based upon the assumption that the

entire $2.5 billion from Allianz would be passed through to the life operations, failing to

disclose that no such decision had been made and that it was at least as likely, if not more

so, that the full amount of the Allianz funds would not be passed through.  As a result of

these omissions, investors did not and could not know that the RBC ratios Defendants

presented were unreliable and likely inflated, and the extent to which that was so.

17.     Then, on November 14, 2008—less than two weeks after increasing their

RBC ratio guidance and telling investors that their capital levels were "more than

sufficient" to withstand further market deterioration "without tapping public markets or

other capital raising options"—Defendants announced the Company planned to acquire a

thrift, Federal Trust Corporation, so the Company could apply for up to a $3.4 billion

investment from the Troubled Assets Relief Program ("TARP").  That is, despite

repeated assurances that the Company's capital surplus was more than sufficient, including announcing higher RBC ratios at different market levels, the Company now told the market that it had opted to take the extraordinary step of buying a bank, eligibile to receive TARP funds in order to obtain a capital infusion of $5.9 billion.

18.     At no time did Defendants disclose the gross discrepancies between the fair valuations for The Hartford's MVA FA separate account ABS investments and the actual consideration Defendants received for ABS sold from the separate accounts over the course of the prior seven months, or that those overvaluations had climbed to 63.0% by the end of November.  Nor did Defendants disclose that such overvaluations reduced the Company's surplus directly, by generating large losses, and indirectly, by providing evidence that the book values of remaining assets of similar classes held in separate accounts needed to be reduced and that their failure to do so caused the Company's capital position to be overstated.

19.     Rather than admit that they were not able to accurately assess the Company's capital position given the difficult market environment—an admission that would have shocked the market and led to a near certain downgrade of the Company's credit rating—Defendants again increased their RBC guidance less than three weeks later.  Indeed, during a December 5, 2008 Investor Day Conference, Defendants stated their capital position was so strong they were able to raise their RBC ratio guidance to 430% or 535%, depending on whether the S&P finished the year at 800 or 900, respectively—ratios that were dramatically increased from just one month prior. Defendants also reaffirmed that their RBC ratios assumed the entire $2.5 billion from

Allianz would be passed through.  Investors were comforted by this news, and The
Hartford's stock price more than doubled.

**When The Truth Was Finally Revealed, The Hartford's Stock Price Plummeted**

20.     On February 5, 2009, however, that comfort vanished.  That day, the
Company revealed that its actual RBC ratio as of December 31, 2008.  That ratio was
385%, a material amount below the 535% Defendants represented to the market only 20
business days prior.  Defendants also revealed that the full amount of the Allianz capital
infusion had not been fully passed through to the Company's life operations, and that the
impact of the credit-related issues was $1.15 billion ($450 million more than had been
forecasted on December 5).  Both of these facts had a severe negative impact on the RBC
ratio estimates, and on February 6,. 2009, the Company's stock price dropped 16%.
Thus, less than 20 business days after assuring the market—once again—that Defendants
were able to accurately assess and dramatically increase the Company's RBC ratio, The
Hartford had, in fact, widely missed the mark.  As one analyst put it, "the reduction will
call into question the validity of management's projections and guidance leaving
investors feeling like they simply can't own the stock."

21.     While this news was shocking to the market, nothing about this
announcement was a surprise to Defendants.  Defendants knew, and indeed admitted
throughout the Class Period, that their ability to accurately assess the Company's capital
surplus and RBC ratio was highly material to analysts, rating agencies and investors.
Defendants' projected ratios ignored, among other things, the material inflation of ABS
BACV/Fair Values, information known to Defendants because they had sold the same
ABS at significantly lower prices.  Thus, Defendants knew that the forecasted ratios
could not be attained.  Indeed, in the middle of the Class Period, Defendants admitted that

they had been "de-risking" the Company's investment portfolio by selling off certain

"risky" investments, such as ABS, since as early as July 2008—a process The Hartford's

most senior corporate officers were involved in.  This is yet another fact establishing that

Defendants were aware that—for the three months leading up to and during the Class

Period—there were gross discrepancies between Defendants' book values and the actual

consideration Defendants received from sales of ABS contained in the separate accounts.

In light of these facts, Defendants knew that their capital position was anything but

strong, and their RBC guidance was not accurate or attainable.

22.     Although Defendants knew these facts throughout the Class Period, they

also knew these metrics would not be publicly available until *after* the Class Period and

that, as such, analysts and investors had no way of knowing Defendants were grossly

overvaluing ABS throughout the Class Period.  Consequently, investors were led to

believe the Company's life operations surplus was accurate, the Company's capital

position was strong, its RBC ratio statements were reliable, and that there was no reason

to be concerned about asset valuation in the separate accounts—all of which were false.

When investors finally learned the truth, it was too late—the damage was already done.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and

20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated

thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

24.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange

Act, and 28 U.S.C. § 1391(b).  Certain of the acts charged herein, including the

dissemination of materially false and misleading information, occurred in this District.  In addition, The Hartford's stock trades over the New York Stock Exchange ("NYSE"), which is headquartered in the District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, mail, interstate telephone communications, and the facilities of a national securities markets.

## III.    PARTIES

### A.     Lead Plaintiff

27.     Lead Plaintiff, Arkansas Teacher, is a public pension fund established in 1937 for the benefit of the current and retired public school teachers of the State of Arkansas.  Arkansas Teacher, headquartered in Little Rock, Arkansas, provides retirement benefits to thousands of members and their beneficiaries.  Arkansas Teacher has approximately $10 billion in total assets under management.  As set forth in the certification attached as Exhibit 1, Arkansas Teacher purchased publicly traded shares of common stock of The Hartford on the open market at artificially inflated prices during the Class Period and suffered losses as a result of the federal securities law violations alleged herein.

### B.     Named Plaintiff

28.      Plaintiff Arca is an Italian mutual fund manager that was founded in 1983.  Based in Milan, Italy, Arca has approximately $21 billion in assets under management and counts a number of pension funds and other institutional investors as the beneficiaries of its funds.  As set forth in the certification attached as Exhibit 2, Arca purchased publicly traded shares of common stock of The Hartford on the open market at

artificially inflated prices during the Class Period and suffered losses as a result of the federal securities law violations alleged herein.

### C.     <u>The Corporate Defendant</u>

29.     Defendant The Hartford is a diversified insurance and financial services company. The Company provides investment products, individual life, group life and group disability insurance products, and property and casualty insurance products. The Hartford was founded in 1810 and is headquartered and has it principal place of business in Hartford, Connecticut. During the Class Period, The Hartford's shares traded on the NYSE under the ticker symbol "HIG."

### D.     <u>The Individual Defendants</u>

#### 1.     <u>Defendant Ramani Ayer</u>

30.     Defendant Ramani Ayer ("Ayer") was at all relevant times The Hartford's Chairman of the Board and Chief Executive Officer ("CEO"). On October 1, 2009, Ayer resigned his positions with the Company.

31.     As the Company's CEO, Ayer participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and financial statements throughout the Class Period. Ayer certified the Company's SEC quarterly filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") during the Class Period, and was quoted in many of the Company's press releases during the Class Period speaking about The Hartford's financial performance, and discussed the same on conference calls with analysts and investors.

32.     Because of Ayer's senior executive position at The Hartford, he was directly responsible for and involved in the day-to-day management of the Company, and was privy to confidential, proprietary information concerning the Company and its

business, operations, growth, financial statements, internal controls, and financial condition as alleged herein.  In particular, Ayer was responsible for oversight of The Hartford's financials, and was aware that those statements were materially false and misleading in violation of the federal securities laws.

### 2.    **Defendant Thomas M. Marra**

33.    Defendant Thomas M. Marra ("Marra") was at all relevant times The Hartford's President and Chief Operation Officer ("COO") and a Member of the Board of Directors.  On February 25, 2009, the Company announced that Marra was resigning from the Board of Directors, effective immediately, and retiring as President and COO, effective July 3, 2009.

34.    As the Company's COO, Marra participated in the issuance of false and misleading statements, including statements made during quarterly conference calls during the Class Period with analyst and investors.

35.    Because of Marra's senior executive position at The Hartford, Marra was directly responsible for and involved in the day-to-day management of the Company, and was privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, internal controls, and financial condition as alleged herein.  In particular, Marra was responsible for oversight of The Hartford's financials, and was aware that those statements were materially false and misleading in violation of the federal securities laws.

### 3.    **Defendant Lizabeth H. Zlatkus**

36.    Defendant Lizabeth H. Zlatkus ("Zlatkus") was at all relevant times The Hartford's Executive Vice President and Chief Financial Officer ("CFO").

37.     As the Company's CFO, Zlatkus participated in the issuance of false and misleading statements, including the preparation of false and misleading press releases and Company filings throughout the Class Period.  Zlatkus certified The Hartford's 2008 Form 10-Q quarterly filings pursuant to Sections 302 and 906 of SOX during the Class Period.

38.     Because of Zlatkus's senior executive position at The Hartford, Zlatkus was directly responsible for and involved in the day-to-day management of the Company, and was privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, internal controls, and financial condition as alleged herein.  In particular, Zlatkus was responsible for oversight of The Hartford's financials, and was aware that those statements were materially false and misleading in violation of the federal securities laws.

## IV.     NATURE OF THE FRAUD

### A.     The Structure of the Company

39.     The Hartford is organized into two major insurance operations:  (1) life and (2) property and casualty.  As a holding company that is separate and distinct from its subsidiaries, The Hartford has no significant business operations of its own.  Therefore, The Hartford relies on dividends from its subsidiaries as the principal source of cash flow to meet its obligations.[6]  Of primary importance in this matter is The Hartford's life insurance operating segment.

40.     The Hartford's life insurance operating segment is operated by the Company's indirect wholly-owned subsidiary, HLI, through multiple life insurance

---

[6] The Hartford received $2,279 million, $1,668 million and $441 million in dividends from its subsidiaries during 2008, 2007 and 2006, respectively (*see* The Hartford 2008 10-K, p. S-3).

subsidiaries that issue individual life insurance, group life and disability insurance and

investment products such as annuities, including individual variable and market value

adjusted fixed annuities (MVA FAs), described below.  HLA, a wholly-owned subsidiary

of HLI, is an insurance company that owns most of The Hartford's life insurance

companies.[7]  As such, when the Company publicly discussed the performance of its life

operations, it referred to HLA's performance and results.  HLIC is one of the companies

owned by HLA.

      **B.**    **Life Insurance Companies are Subject to**
                **Regulation by State Insurance Departments**

41.      As insurance companies, HLA and HLIC are subject to comprehensive

and detailed regulatory mandates.  These mandates concern the standards of solvency

insurers must meet and maintain state insurance departments generally set these

mandates.  Legislation in all states requires that each insurance company register with the

insurance department of its state of domicile and furnish information concerning the

operations of companies within the holding company system that may materially affect

the operations, management, or financial condition of the insurers within the system.

State insurance regulators and the NAIC, the organization of state insurance regulators

for all 50 states in the U.S., regularly re-examine existing laws and regulations applicable

to insurance companies and their products, and prescribe uniform guidance for the

promulgation of accounting standards and statutory capital and reserve requirements.  As

insurance companies, HLA and HLIC are required to comply with these regulatory

mandates.  HLA and HLIC are domiciled in the State of Connecticut.  Thus, each

---

[7] Two exceptions are Hartford Life Insurance, KK (Japan), a Japan-based life insurance company,
which reinsured a meaningful portion of its business to HLA-owned subsidiaries, and Champlain Life
Reinsurance Company, a relatively small, Vermont-based, reinsurer.

company is required to prepare financial statements in conformity with the statutory accounting practices prescribed or permitted by the CID.  The CID adopted the accounting and valuation procedures and practices published by the NAIC Accounting Practices and Procedural Manual.

### C.   Life Insurance Companies—such as HLIC— Maintain General and Separate Accounts

42.   Life insurance companies often maintain two types of accounts: (1) the general accounts and (2) separate accounts.  The general account is an undivided account in which insurers maintain funds that support the Company's contractual obligations for its general obligations such as life, accident, health and disability benefits, most fixed annuities and guaranteed insurance products.  If an insurance company becomes insolvent, all general account assets back the liabilities of all general account products as well as the claims of creditors.

43.   Life insurance companies also often establish and maintain separate accounts.  Separate accounts are established to hold funds received by the insurance company from counterparties for products such as non-guaranteed individual and group variable annuities, variable life contracts, group pensions, and modified guaranteed contracts, which include MVA FAs.

44.   An MVA FA is a contract between the insurance company and the annuitant or contract holder to provide for future income either as a lump sum or as monthly income.  The insurance company pays the contract holder a fixed rate of return for a specified period of time known as the "guarantee period."  In the event that the contract holder withdraws the money ("surrenders") prior to the end of the guarantee period, the "market value adjusted" feature increases or decreases the cash surrender

value of the annuity as a function of decreases or increases in interest rates.  If current interest rates are higher at the time of surrender than the contract guaranteed rate, the cash surrender value of the annuity decreases.  If current rates are lower, the cash surrender value of the annuity increases.[8]

45.     The value of the separate accounts varies according to the investment experience of those funds.  Insurance companies generate revenues by charging fees on the assets held in separate accounts for investment management and administrative expenses and the mortality and expense risks assumed.

46.     A separate account is created by and under the control of an insurance company, which owns 100% of the assets held in the separate account for the benefit of the annuitants or contract holders.  Separate account obligations are legally insulated from general account obligations and, therefore, are not vulnerable to the claims of creditors.  Generally, consistent with the above, gains or losses resulting from the investment of assets held in the separate accounts accrue for the benefit or detriment of the annuitant or contract holder.  However, for products such as MVA FAs, assets held in separate accounts are typically invested in instruments that seek to replicate the returns promised to the annuitants.  In instances where the replicated returns do not reproduce the promised returns, the company is responsible for the shortfalls.  Conversely, if the replications generate excess returns, the company profits.  For this reason, even though MVA FA assets "reside" in separate accounts and even though they are categorized as separate account products in statutory accounting, for U.S. Generally Accepted

---

[8] This feature exists due to the fact that, when interest rates rise, the market value of bonds fall.  The purpose of the MVA feature is two-fold:  (1) it offers annuitants the upside in the event the interest rates decrease and the annuitant chooses to surrender the annuity, and (2) it protects life insurance companies from losses due to higher interest rates at the time of surrender by shifting that risk to the annuitant.

Accounting Principles ("GAAP") purposes, the value of MVA FAs assets are recorded in the general account.

47.     Separate accounts constituted a significant portion of The Hartford's and HLIC's assets during the Class Period.  For instance, The Hartford's 2008 10-K (at F-4) shows that separate accounts, measured by GAAP, represented $130 billion of the Company's $288 billion of assets.  Most of The Hartford's separate account assets were owned through HLIC and its subsidiaries.  As such, separate accounts represented an even larger percentage of HLIC's assets.  In fact, HLIC's 2008 Form 10-K (at F-4), filed with the SEC on February 12, 2009, shows that separate accounts, measured by GAAP, represented $130 billion of HLIC's $204 billion of assets.

> **D.     Life Insurance Companies File Financial Statements Regarding Their General and Separate Accounts Pursuant to Statutory Accounting Principles**

48.     Life insurance companies are required to file financial statements regarding their general account and separate accounts with insurance regulators.  General account statements are filed both quarterly and annually, while separate account statements are only filed annually.  A primary purpose of the separate accounts annual statement is to account for the investment activities of the separate accounts and the flow of funds to and from the general account.

49.     These statements are filed pursuant to the NAIC's SAP.  In addition to submitting annual statements according to SAP, life insurance companies that issue securities to the public—like HLIC—are *also* required to submit to the SEC financial statements prepared pursuant to GAAP.

50.     SAP varies significantly from GAAP.  GAAP emphasizes earnings and the matching of revenues and expenses.  In contrast, SAP is designed to address regulator

concerns of insurer solvency and ability to pay future claims.  A principal difference

between SAP and GAAP is that SAP requires companies to make more granular

disclosures of their business operations.  For example, Schedule D of the statutory filings

requires information regarding each security in a company's investment portfolio, while

GAAP does not require that financial statements filed with the SEC contain such level of

detail.

51.     SAP contains two requirements that affect the calculation of the general

account and that are relevant in this matter.  First, SAP requires that the assets of the

separate accounts equal or exceed their liabilities.[9]  Thus, the flow of funds between the

general account and the separate accounts include, if necessary, contributions from the

general account to the separate accounts to maintain, at a minimum, the equilibrium

between the separate accounts' assets and liabilities.

52.     Second, SAP states that "[t]he general account shall include the total

assets and liabilities, … and, therefore, the surplus, if any, of its separate accounts

business."[10]  The company's general account surplus (the amount of assets that exceed

the liabilities within the general account) is, therefore, impacted by changes in the assets

and/or liabilities of the company's separate accounts.

### E.     Life Insurance Companies are Subject to Capital Requirements

53.     Capital adequacy is a critically important factor in measuring the financial

health of life insurance companies such as HLA and HLIC.  In fact, capital adequacy is

so important that the NAIC prescribes capital requirements for life insurance companies

---

[9] *See* Accounting Practices and Procedures Manual, as of March 2009: SSAP 56 - "Separate Accounts," (para. 8).

[10] *See* Accounting Practices and Procedures Manual, as of March 2009: SSAP 56 - "Separate Accounts," (para. 6).

that are enforced by the applicable state insurance departments.  The NAIC imposes minimum capitalization requirements based on a risk-based capital ("RBC") ratio, which were adopted by the CID and were in force and applicable to Defendants throughout the Class Period.

54.   The RBC ratio compares the insurance company's surplus, or net worth, with the risk-based capital, or the capital that is "consumed" every time the company assumes risk.  As such, the RBC ratio measures whether the insurance company has sufficient net worth to support its business operations, taking into account its size and risk profile.

55.   For regulatory purposes, the numerator of the RBC ratio, which represents the company's net worth, is the company's Total Adjusted Capital ("TAC").  TAC is calculated from statutory balance sheets as the capital and surplus[11] (*i.e.*, the statutory equivalent of shareholders' equity) adjusted for certain asset valuation reserves and dividend liabilities.

56.   The denominator of the RBC ratio, which represents the "risk-based capital," is referred to as the Company Action Level RBC.  The Company Action Level RBC captures the risk exposure of a company by calculating risk charges for certain risk items included in the specific RBC formula.  Life RBC (the RBC formula specific to life insurance companies) classifies all life insurance company risks into four major categories:  (1) asset risk, (2) insurance risk, (3) interest rate risk, and (4) all other business risks.  A number of risk factors are then applied as multipliers to the assets or liabilities of the insurer to determine the minimum capital needed to bear the risk of loss

---

[11]The capital and surplus component is usually referred to simply as the surplus.

associated with the activity.[12]  Additionally, to determine Company Action Level RBC, the formula adjusts the aggregate sum of the risk charges to account for the unlikely event that all of the categories of risk will be realized simultaneously.[13]

57.    Cumulative risk charges are compared to a company's statutory capital through the RBC ratio to assess whether the company is solvent.  When a company's capital falls below the minimum RBC requirements, state regulators may intervene and take remedial action, including assuming control of the company.  Effectively, the RBC system imposes limits on the amount of risk a company may incur by requiring higher amounts of capital for taking on higher amounts of risk.  As a consequence, deteriorating levels of capital either (a) constrict the company's growth or (b) necessitate capital raises, both of which are detrimental to existing shareholders and/or the price of the company's shares.

**F.    RBC Ratios are Dependent on a Number of Factors—Including Valuation of Assets in a Life Insurance Company's Separate Accounts**

58.    The numerator of the RBC ratio of an insurance company is impacted by a variety of factors and thus may vary during any particular period.  For example, HLA's and HLIC's statutory surplus amounts, and therefore, RBC ratios may increase or decrease depending on items such as:  (1) the amount of statutory income or loss generated by HLA and HLIC or their insurance subsidiaries, (2) the amount of additional

---

[12] For example, when a company invests its funds in an asset-backed security, there is a risk that the security will default prior to maturity and that the company will lose money.  The RBC calculation applies a charge to reflect that risk.  The charge varies with the credit quality of the security—the worse the credit quality, the higher the charge.  Investment risks fall into the "asset risk" category for the purposes of classifying the Life RBC risks.  Using the same principle, risk charges are applied for the risk that the insurance company's reserves will be insufficient to cover future claims.  Such risks constitute the "insurance risk" category of the Life RBC risks.  Each time the company assumes risk, a portion of its capital is "consumed" (or becomes unavailable for other risks).

[13] For purposes of comparing the RBC ratio against the levels that allow or require regulatory action, the NAIC requires calculation of a different denominator, the Authorized Control Level RBC, which is calculated by dividing the Company Action Level RBC by two.

capital the companies or their subsidiaries raise, (3) the value of certain fixed-income and equity securities in the companies' investment portfolio, (4) the value of certain derivative instruments, and (5) changes in interest rates and foreign currency exchange rates.

59.     Importantly, the RBC ratio also depends on the valuation of MVA FA assets held in a life insurance company's separate accounts.  The MVA FA assets that the insurance company invests in are intended to provide income sufficient to pay the guaranteed fixed rate of return.  As such, though not limited by statute to such instruments, fixed income investments are best suited for that purpose.  HLIC's 2008 annual statutory statements disclose that at the end of that year the value of MVA FA assets was $13,314,699,589 and the value of the separate accounts' total assets excluding stock investments was $48,596,156,810.  Thus, MVA FA investments constituted approximately 27.4% of HLIC's separate accounts' fixed income investments in 2008.

60.     For statutory accounting purposes, MVA FA assets are required to be carried at "fair value."  Fair value is equal to the value "at which the instrument could be exchanged in a current transaction between willing parties."

61.     In contrast to the other separate account products, in which assets and liabilities are directly linked, MVA FA separate account reserve liabilities are calculated independently of the MVA FA separate account assets.  Separate account reserve liabilities reflect the moneys that the insurance company expects to pay the annuity contract holders.  The reason for the unique treatment of the MVA FA liabilities is that the insurance company, rather than the contract holders, bears the risk of the investments of the MVA FA assets.  Because an insurance company's surplus is determined as the

difference between its assets and liabilities, and because the surplus of the separate accounts is included in the surplus of the general account, a drop in the value of a separate account asset, without a corresponding drop in the value of a separate account liability, causes the surplus of the general account to decline.  Therefore, if a company's MVA FA assets are overvalued, the value of the company's surplus is falsely inflated. Moreover, because the surplus is the numerator of the RBC ratio, when a company overvalues its MVA FA assets, it also overstates its RBC ratio.

### G.   HLIC Offered MVA FA Products that Were Invested in Overvalued Asset-Backed Securities

62.   HLIC offered MVA FA products.  HLIC stated that it carried all of its separate account investments, including MVA FAs, at fair value.[14]  HLIC invested MVA FA funds in fixed income securities, including ABS.

63.   An ABS is a security issued by a special purpose entity.  The entity raises money by issuing the securities and then invests the proceeds in a portfolio of typically small and illiquid financial instruments, such as mortgage loans, credit card receivables, auto loans, aircraft leases, and movie revenues.  The portfolio of such financial instruments provides the collateral (or backing) for the securities.  Thus the securities are called asset-backed.  The payments from the portfolio are generally the only source of funds for repaying the securities.  A standard feature of virtually all ABSs is "credit tranching."  Credit tranching refers to creating multiple classes (or "tranches," or slices)

---

[14] Notes to HLIC's annual statutory filings (for general accounts) describe the company's separate accounts.  The section titled "General Nature and Characteristics of Separate Account Business" states that:  "Separate accounts held by the Company represent funds for nonguaranteed individual and group variable annuity and variable life contracts, group pension and modified guaranteed contracts. **The assets of these accounts are carried at market value.**"  (Emphasis added).  The table that follows shows that all assets of the separate accounts of HLIC were carried at "fair value" and none at amortized cost."  (HLIC 2008 Statutory Statement (general accounts) Note 33, p. 19.19).  (MVA FAs are a sub-category of "modified guaranteed contracts.").

of securities, each of which has a different seniority relative to the others.  For example, the entity might issue four classes of securities designated as (a) senior debt, (b) mezzanine debt, (c) subordinate debt, and (d) equity.  Each class protects the ones senior to it from losses on the underlying portfolio.

64.     Residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS") are types of ABS that are backed with the pooled cash flows from mortgages.  RMBS and CMBS comprised a large portion, approximately 68%, of HLIC's separate account ABS investments.  Due to the condition of the U.S. real estate industry during the Class Period, HLIC's investments in such ABS caused the Company to be materially exposed to credit market volatility.  As one analyst noted on April 29, 2008, "Hartford has sizable exposure in its investment portfolio to asset classes currently under pressure including sub-prime [RMBS]and CMBS."

65.     Indeed, by the time the Class Period started, the U.S. real estate industry was in its worst slump since the Great Depression.  These market conditions caused serious deterioration in the market for and pricing of ABS.  As credit spreads for ABS widened,[15] the value of those investments dropped.  The Company itself acknowledged that the market pricing for its RMBS and CMBS was "depressed" as of July 29, 2008, and later stated that the third quarter of 2008 was a "period of unprecedented market conditions."  Despite the market crisis, Defendants continually reassured investors throughout the Class Period that the Company was well protected against these conditions due to its strong capital position.

---

[15] "Credit spread" refers to the difference between the yield on the debt securities of a particular issuer and the yield of similar maturity Treasury debt securities (government bonds).  Credit spreads depend on both the risk associated with the specific issuer and the overall market conditions.

66.     Internally, Defendants knew the Company's capital position was tied to ABS assets and that these assets were deteriorating in value due to the declining condition of the real estate market by amounts far greater than they were disclosing and, as such, the Company would not be able to meet or maintain their publicly stated level of capital.  Indeed, by as early as July 2008, the Company had begun ridding itself of risky investments, such as ABS, by selling those assets—a process Defendants referred to as "de-risking" their investment portfolio, and which would have provided Defendants further information as to the extent to which the market prices for those securities had declined.

67.     Nonetheless, unknown to the market until after the Class Period, was the fact that when Defendants sold ABS assets as part of the "de-risking," they were selling them at prices that were materially lower than they were attributing to identical assets that they continued to hold.  Defendants had marked ABS assets held in the separate accounts at much higher values than their true market worth—in other words, Defendants systemically overvalued the assets.  Defendants' overvaluation is evidenced by the discrepancy between the sales proceeds of the ABS in the separate accounts and their BACV/Fair Values—as described in detail below.  The overvaluation of HLIC's MVA FA investments in ABS caused the assets of the separate accounts to be overstated. Because MVA FA separate account liabilities are calculated independently of the assets, the surplus of the separate accounts and, therefore, the surplus of the general account were overstated.  As a result, given that the general account surplus was reflected in the numerator of the RBC ratio that ratio was overstated as well.

68.     HLIC's overstatement of surplus affected not only its own financial statements, but also those of HLA and The Hartford.  This is so because HLA recognizes its investment in HLIC—its wholly-owned subsidiary—as an asset.[16]  Therefore, when HLIC's surplus was overstated due to its overvaluation of MVA FA investments in ABS, HLA's surplus also was overstated, which in turn led to the overstatement of HLA's RBC ratio. Further, HLIC's overstatement of surplus affected The Hartford's financial statements because those statements presented the overstated surplus of HLA in each of The Hartford's SEC Form 10-Qs during 2008.

### H.     The Importance of Capital Adequacy to Creditors and Investors

69.     Capital adequacy is of critical importance to investors such as Class members herein, as an indicator of the financial strength of a company.[17]  Defendants knew from, among other things, their participation in investor and analyst meetings and conference calls that analysts and investors were extremely concerned about Defendants' RBC ratio and the overall capital adequacy of the Company during the Class Period, as evidenced by the numerous questions during conference calls, investor presentations, and published equity research reports, many of which are alleged below.  Defendants responded to these concerns throughout the Class Period with false statements intended to mislead the market by assuring investors that Defendants' capital position was sufficient and more robust than it actually was.

---

[16] SAP required that HLA carry its investment in HLIC as an asset "based on the underlying audited statutory equity [*i.e.*, surplus] of the respective entity's [*i.e.*, subsidiary, controlled or affiliated entity – in this case HLIC's] financial statements, adjusted for any unamortized goodwill…." *See* Accounting Practices and Procedures Manual, as of March 2009:  SSAP No. 88 – "Investments in Subsidiary, Controlled and Affiliated Entities, a Replacement of SSAP No. 46" (para. 8.b.i.).

[17] Capital adequacy is also extremely important to the NAIC and state insurance regulators as well as to customers and creditors.

70.     Also, The Hartford has at various times stressed the importance of financial strength ratings to its operations.  For example, in its 2007 Form 10-K, the Company said that "financial strength ratings . . . are intended to measure [the Company's] ability to meet policyholder obligations."  Additionally, referring to its financial strength rating, the Company stated that a downgrade could affect the Company's:  (i) competitive position in the insurance industry, making it more difficult to market products; (ii) ability to raise additional debt, which would likely increase the cost of capital; and most importantly, (iii) make it difficult to raise capital.

71.     Moreover, rating agencies consider capital adequacy a major factor in assigning credit and/or financial ratings, viewing RBC ratios along with their proprietary models as key factors in making ratings determinations.  In turn, rating agency ratings are also highly material to common stock investors such as Class members who need to know how strong a company's credit is before investing.  According to Moody's September 2006 guide, "Moody's Global Rating Methodology for Life Insurers":[18]

> ***At the heart of Moody's assessment of an insurer's creditworthiness is an opinion about the company's economic capital and its capital adequacy (e.g. solvency) or operational leverage.***  Economic capital is the cushion available to the insurer to absorb unfavorable deviations in its results.  Capital adequacy measures a company's leverage in terms of business volume generated and its risks relative to the company's capital.  ***Capital adequacy is critically important for an insurer because insurance regulators require minimum capital levels or ratios in order for the company to continue to operate.  Capital constraints can also negatively impact a company's ability to grow its business and impact its strategy.***[19]

---

[18] Unless otherwise noted, all emphases have been added.

[19] *See* http://www.moodys.com.br/brasil/pdf/2005800000427794.pdf (last visited August 17, 2010).

In the same vein, Standard & Poor's stated in its "Life:  Revisions to Standard & Poor's Life Insurance Capital Adequacy Model for 2001" that "Standard & Poor's capital adequacy model plays a significant role in the assessment of the capital strength of a life/health insurer."[20]

> **I.**      **Throughout the Class Period, Defendants Knew Material, Yet Undisclosed, Facts About The Hartford's Business Operations, Which <u>Led The Company To Overstate Its Capital Position</u>**

**Defendants Knew That Capital Adequacy Was a Material Issue Affecting Its Stock Price Before and Throughout The Class Period**

72.     During the Class Period, Defendants knew the Company's capital adequacy and RBC ratios were a significant factor in rating agencies' determination of companies' ratings.  They were keenly aware of the importance of capital to analysts, investors, and the Company:

> *[C]apital is a very important topic to all of you and it certainly is a very important topic for The Hartford*.  As we have repeatedly said, we seek capital to provide flexibility to pursue business opportunities while mitigating the likelihood that The Hartford would have to come (inaudible) for capital (inaudible), so ***it's a very important premise that we run our company by***.

Hartford Financial Services at Keefe, Bruyette & Woods, Inc. Insurance Conference, September 3, 2008 (Zlatkus), at 4**.**

73.     Defendants also were aware that analysts and investors had a heightened concern regarding the Company's ability to maintain a sufficient capital "cushion" above the minimum RBC ratios required to maintain a AA level rating so that the Company's capital margin could withstand further dramatic deterioration in the market.

---

[20] *See* http://www.standardandpoors.com/prot/ratings/articles/en/us/?assetID=1245177502797 (last visited July 14, 2010).

Unsurprisingly, throughout the Class Period, Defendants repeatedly insisted that they had a significant capital cushion.

74.     As explained above, HLIC was required to carry the assets in its separate accounts at fair value—the amount at which the instrument could be exchanged in a current transaction between willing parties.  HLIC reported the fair values of its separate account assets in its year-end statutory filings with state regulators under the heading "Book/Adjusted Carrying Value".  According to HLIC's year-end statutory filings for 2007 (signed on February1, 2008), HLIC's ABS portfolio had a fair market value of $9,712 million.[21]

**Defendants Knew the Actual Pricing Data of ABS
in The MVA FA Portion Of Its Separate Accounts**

75.     However, HLIC's 2008 year-end statutory filings—which were not filed with state regulators before February 18, 2009, and thus not available to the public, until *after* the end of the Class Period—disclosed that Defendants actually knew they were using BACV/Fair Values for their separate accounts ABS that were grossly overstated throughout the Class Period.

76.     This fact is demonstrated by examining two key metrics that were known to Defendants but not available to investors until they were finally disclosed after the Class Period in HLIC's 2008 year-end statutory filing:  (1) the prices at which HLIC sold

---

[21] The ABS portfolio consisted of the securities listed under the following subcategories of the Industrial and Miscellaneous (Unaffiliated) category under Long-term Bond investments in HLIC's Schedule D: Single Class Mortgage-Backed/Asset-Backed Securities, Defined Multi-Class Residential Mortgage-Backed Securities, Other Multi-Class Residential Mortgage-Backed Securities, Defined Multi-Class Commercial Mortgage-Backed Securities and Other Multi-Class Commercial Mortgage-Backed / Asset-Backed Securities.  The ABS term, as used in this complaint, does not include asset-backed instruments that are backed by the U.S. Government and/or its agencies.

a large quantity of ABS ("Consideration"); and (2) the values at which HLIC carried these same ABS *on the date of disposition* (BACV/Fair Value).[22]

**Defendants Knew That HLIC Was Carrying ABS at an Overstated Amount**

77.     The comparison of these two metrics reveals that HLIC booked much higher BACV/Fair Values than the actual Consideration they received for the same assets, resulting in large known losses ("Difference") and indicating Defendants knew the Company was grossly and systemically overvaluing these securities.  Defendants did not disclose such overvaluation until after the Class Period had ended in HLIC's year-end 2008 separate accounts statutory filing, and investors relied upon the Company's misleading statements regarding capital and RBC ratios throughout the Class Period—statements that ignored these assets were not properly marked-to-market.

Table 1:      **ABS: JANUARY 2008—DECEMBER 2008**

| Month | Consideration | BACV/Fair Value | Difference | Overvaluation %[23] |
|---|---|---|---|---|
| Jan-08 | 165,987,698 | 171,703,441 | 5,715,743 | 3.4% |
| Feb-08 | 127,933,162 | 135,433,061 | 7,499,899 | 5.9% |
| Mar-08 | 68,037,812 | 71,111,727 | 3,073,915 | 4.5% |
| Apr-08 | 80,264,296 | 95,984,857 | 15,720,561 | 19.6% |
| May-08 | 241,461,526 | 253,645,768 | 12,184,242 | 5.1% |
| Jun-08 | 139,738,427 | 184,487,174 | 44,748,747 | 32.0% |
| Jul-08 | 348,577,221 | 464,936,631 | 116,359,410 | 33.4% |
| Aug-08 | 330,534,842 | 489,857,017 | 159,322,175 | 48.2% |
| Sep-08 | 170,494,938 | 261,634,984 | 91,140,046 | 53.5% |
| Oct-08 | 107,800,908 | 159,218,244 | 51,417,336 | 47.7% |
| Nov-08 | 376,851,483 | 614,342,195 | 237,490,712 | 63.0% |

---

[22]  Schedule D, Part 4 of HLIC's statutory filings listed the securities and information, such as Consideration and BACV/Fair Values on the date of disposal, about the securities that were sold during the preceding period (*i.e.*, in the case of an annual statement, the information referred to the preceding year).

[23] Overvaluation percentages are calculated as:

(BACV/Fair Value − Consideration)

Consideration                           = Overvaluation %

| Month | Consideration | BACV/Fair Value | Difference | Overvaluation %[23] |
|---|---|---|---|---|
| Dec-08 | 466,413,933 | 681,699,604 | 215,285,671 | 46.2% |

78.     The overvaluation of the separate account ABS assets reflected in Table 1

impacted HLIC's (and, therefore, HLA's) surplus to the extent that ABS assets were a

part of the MVA FA portfolio.  As set forth in Table 2 below, Column C shows the dollar

amount of the overvaluation of the separate accounts as a whole, while Column D reflects

the dollar amount overvaluation applicable to the MVA FA assets:[24]

Table 2:     ABS Overvaluation in dollar terms: JANUARY 2008—DECEMBER 2008

| | A | B | C = A x B | D = C x 30% |
|---|---|---|---|---|
| Month | Separate Accounts ABS Balance (1) | Difference / (BACV/Fair Value) (2) | Separate Accounts ABS Overvaluation | MVA FA ABS Overvaluation |
| Jan-08 | 9,712,490,901 | 3.3% | 323,313,858 | 88,587,997 |
| Feb-08 | 9,427,248,123 | 5.5% | 522,054,277 | 143,042,872 |
| Mar-08 | 9,142,005,345 | 4.3% | 395,177,400 | 108,278,608 |
| Apr-08 | 8,856,762,568 | 16.4% | 1,450,575,440 | 397,457,671 |
| May-08 | 8,571,519,790 | 4.8% | 411,745,373 | 112,818,232 |
| Jun-08 | 8,286,277,012 | 24.3% | 2,009,898,605 | 550,712,218 |
| Jul-08 | 8,001,034,234 | 25.0% | 2,002,414,008 | 548,661,438 |
| Aug-08 | 7,715,791,456 | 32.5% | 2,509,501,005 | 687,603,275 |
| Sep-08 | 7,430,548,678 | 34.8% | 2,588,417,413 | 709,226,371 |
| Oct-08 | 7,145,305,901 | 32.3% | 2,307,477,994 | 632,248,970 |
| Nov-08 | 6,860,063,123 | 38.7% | 2,651,944,289 | 726,632,735 |
| Dec-08 | 6,574,820,345 | 31.6% | 2,076,375,872 | 568,926,989 |

(1)   The monthly separate account ABS balance is determined by amortizing
       on a straight-line monthly basis the difference between the beginning and
       ending BACV/Fair Value balances for 2008.
(2)   The ratio of the "Difference" and "BACV/Fair Value", as those terms are
       used in Table 1, is used to calculate the dollar amount of the
       overvaluation.  (The Separate Accounts ABS Balance to which the ratio
       is applied is also expressed in terms of BACV/Fair Value).

---

[24] Making use of all publicly available information, the calculation of the overvaluation of the MVA
FA ABS assets is based on the reasonable assumption that the ratio of (a) MVA FA assets invested in ABS
and (b) all separate account investments in ABS, was proportional to the ratio of (x) total MVA FA assets
and (y) all separate account assets excluding stock investments.

79.     Table 2 shows that from June 2008 through December 2008, the Company's life insurance operations surplus was overstated by between $550 and $725 million.  Further, based on the Company's own estimate of the extent to which approximately $700 million of credit impacts would have on the RBC ratio,[25] the overvaluation of the MVA FA ABS during the Class Period translates into approximately a 40-50% reduction in the RBC ratio.

**Defendants Knew That Due to Discrepancies Between Actual Prices and BACV/Fair Value, the Company Commensurately Overstated Its Capital Position**

80.     The year-end statutory filings for separate accounts reveal that Defendants knew, for every month of the Class Period there were gross discrepancies between Defendants' BACV/Fair Value and the actual consideration Defendants received for the ABS contained in the separate accounts.  Because these metrics were not publicly available until *after* the Class Period, however, investors had no way of knowing that Defendants were overvaluing these securities throughout the Class Period.  Consequently, investors were led to believe HLA's (*i.e.*, the Company's life operations) surplus was accurate, the Company's capital position was strong, its RBC ratio statements were reliable, and that there was no reason to be concerned about asset valuation in the separate accounts—all of which were false.

81.     Although investors could not know about these overvaluations, there is no plausible inference that Defendants were not aware of them during the Class Period. Indeed, as shown in Table 3, the sales proceeds for the years leading up to the Class Period—2005 through 2007—closely, if not precisely, mimicked Defendants' fair value

---

[25] During the December 5, 2008 Investor Day, discussed below, the Company stated that a $700 million credit-related impact reduced the RBC ratio estimates from 585% to 535%, a reduction of 50%.

book valuations—resulting in virtually no overvaluation (and in fact, undervaluation for many months).

**Table 3:      ABS : 2005-2007**

| Month | Consideration | BACV/ Fair Value | Difference | Overvaluation% |
|--------|--------------|------------------|------------|----------------|
| Jan-05 | 1,050,305,313 | 1,049,699,835 | (605,478) | -0.1% |
| Feb-05 | 680,608,130 | 678,270,891 | (2,337,239) | -0.3% |
| Mar-05 | 264,844,985 | 254,351,060 | (10,493,925) | -4.0% |
| Apr-05 | 885,082,495 | 890,719,544 | 5,637,049 | 0.6% |
| May-05 | 649,402,838 | 652,443,166 | 3,040,328 | 0.5% |
| Jun-05 | 158,772,238 | 158,465,501 | (306,737) | -0.2% |
| Jul-05 | 40,813,071 | 40,944,768 | 131,697 | 0.3% |
| Aug-05 | 72,469,907 | 71,644,791 | (825,116) | -1.1% |
| Sep-05 | 77,526,361 | 77,679,171 | 152,810 | 0.2% |
| Oct-05 | 175,069,783 | 177,298,892 | 2,229,109 | 1.3% |
| Nov-05 | 199,794,063 | 201,408,343 | 1,614,280 | 0.8% |
| Dec-05 | 194,790,779 | 197,662,779 | 2,872,000 | 1.5% |
| Jan-06 | 65,421,991 | 66,217,835 | 795,844 | 1.2% |
| Feb-06 | 56,255,289 | 55,870,451 | (384,838) | -0.7% |
| Mar-06 | 51,757,376 | 52,473,004 | 715,628 | 1.4% |
| Apr-06 | 89,486,643 | 91,455,490 | 1,968,847 | 2.2% |
| May-06 | 203,257,518 | 207,718,422 | 4,460,904 | 2.2% |
| Jun-06 | 557,575,814 | 561,819,133 | 4,243,319 | 0.8% |
| Jul-06 | 72,838,461 | 72,359,277 | (479,184) | -0.7% |
| Aug-06 | 52,498,196 | 53,273,928 | 775,732 | 1.5% |
| Sep-06 | 76,851,000 | 77,714,021 | 863,021 | 1.1% |
| Oct-06 | 90,348,558 | 91,470,934 | 1,122,376 | 1.2% |
| Nov-06 | 123,259,731 | 123,811,913 | 552,182 | 0.4% |
| Dec-06 | 122,780,428 | 126,010,977 | 3,230,549 | 2.6% |
| Jan-07 | 37,473,260 | 37,731,347 | 258,087 | 0.7% |
| Feb-07 | 47,128,891 | 46,881,348 | (247,543) | -0.5% |
| Mar-07 | 111,529,500 | 111,869,305 | 339,805 | 0.3% |
| Apr-07 | 45,729,151 | 45,946,015 | 216,864 | 0.5% |
| May-07 | 102,919,957 | 103,374,364 | 454,407 | 0.4% |
| Jun-07 | 157,095,865 | 158,494,372 | 1,398,507 | 0.9% |
| Jul-07 | 75,835,256 | 74,703,601 | (1,131,655) | -1.5% |
| Aug-07 | 48,719,974 | 50,105,794 | 1,385,820 | 2.8% |
| Sep-07 | 215,534,800 | 217,184,136 | 1,649,336 | 0.8% |

| Month | Consideration | BACV/ Fair Value | Difference | Overvaluation% |
|---|---|---|---|---|
| Oct-07 | 630,824,528 | 630,124,563 | (699,965) | -0.1% |
| Nov-07 | 86,301,458 | 86,780,133 | 478,675 | 0.6% |
| Dec-07 | 120,315,497 | 121,083,280 | 767,783 | 0.6% |

82.     Thus, the discrepancies in value did not begin until 2008, months immediately preceding the onset of the Class Period and persisted during the time in which Defendants were carrying out their strategy of "de-risking" their risky investments, including ABS from the separate accounts.  As such, the onset and size of these discrepancies alone constituted a startling and critically important red flag to all Defendants.

83.     Because the Individual Defendants held senior executive positions at the Company and because "de-risking" was a corporate strategy, they knew or had access to the above overvaluation information on at least quarterly, and more likely than not, monthly or weekly, basis throughout the Class Period.  The Individual Defendants, as senior officers and/or directors of the Company repeatedly making representations as to matters of critical importance to investors, each had a duty to monitor and verify this significant and highly relevant market-based information that led their public statements and filings regarding the Company's surplus, capital margin, and RBC ratio to be materially inaccurate.

84.     Indeed, HLA and HLIC filed statutory filings for their general account on a quarterly basis—filings that included the companies' surplus, and thus incorporated the value of the MVA FA separate account assets.  As senior management of The Hartford, the Individual Defendants had a duty and a responsibility to review the surplus figures

contained in the quarterly statutory filings, which necessarily included information reflecting the valuation discrepancies and resulting losses in the separate accounts.

85.     This duty was especially enhanced given that analysts and investors repeatedly questioned Ayer, Zlatkus, and Marra about the Company's exposure to the deteriorating market conditions and the importance of having a sufficient RBC ratio in light of the Company's exposure to these conditions.  Further, the surplus of HLA (which incorporated HLIC's surplus) was disclosed in The Hartford's Forms 10-Q.

86.     Accordingly, every time the Company made public statements regarding its capital margin or RBC ratios, the Company and the Individual Defendants had a duty to inspect and approve the facts and assumptions underlying their statements and guidance, including the facts and assumptions regarding the MVA FA assets in the separate accounts—facts that revealed these assets were grossly overvalued throughout the Class Period.

87.     The 2008 sales of ABS from HLIC's separate accounts represented a significant portion of HLIC's ABS separate account portfolio.  Sales completed during 2008 represented approximately 37% of the portfolio held at the end of 2007 (as measured by BACV/Fair Value as of the disposition dates and as of 12/31/07).  The magnitude of the sales relative to the overall size of the portfolio further demonstrates that Defendants were deliberately ridding the Company's portfolios of risky investments throughout the Class Period—a process Defendants implemented by the beginning of the Class Period.  The fact that sales of such investments was part of a corporate strategy indicates that the Individual Defendants were involved in the decision-making and result

evaluation process and, as such, were made aware of the characteristics of the securities that were sold.

88.     In fact, the Company's Chief Investment Officer made statements during the December 5, 2008 Investor Day demonstrating that the Company was in the process of reducing the risk of its investments and liabilities (*i.e.*, The Hartford was "de-risking" its portfolio), a process which started at least by July of 2008:

> I think it's kind of important to say too that if we looked at our portfolio at the end of July and we compared that portfolio at the end of July to the end of October, our unrealized loss position would have grown by somewhere in the magnitude of $4 billion more than the portfolio that exists today.  So my point, I think in doing that is **we clearly haven't done all the de-risking that we need to in our portfolio, but we have taken specific actions and, I think, prudent actions that have driven our unrealized loss position relative to the market spreads that we've seen down to the level that you're seeing right now.**
>
> That's not to imply in any way that we think we're happy with an $11.6 billion unrealized position.  **The point that I want to make is we're making the changes in our portfolio that we think are prudent in order to de-risk our portfolio in a way that manages capital efficiently and tries to do it in a way that we're going to be able to generate good returns.**

89.     Moreover, Defendants acknowledged that they were aware that the prices provided by third-party pricing services for ABS were unreliable.  Although Defendants used prices received from third party pricing services, such as Interactive Data Corporation ("IDC") and Thompson Reuters EJV, for *92%* of the ABS in the separate accounts at year-end 2008,[26] Defendants conceded that they knew these prices were not accurate and should not be relied upon.  Indeed, in The Hartford's Form 10-Q for the

---

[26] Insurance companies are required to file the source of the valuation in their electronic filings with the NAIC.  Hardcopies of the statutory filings did not contain the pricing source information.

third quarter 2008, Defendants stated they had to make adjustments to the prices received

from third-party pricing services for the purposes of determining the market value for

certain investments, including ABS:

> During the third quarter, the Company made fair value
> determinations which lowered prices received from third
> party pricing services and brokers by a total of $487
> [million]. The securities adjusted had an amortized
> cost and fair value after the adjustment of $4.3 billion
> and $2.8 billion, respectively, and were primarily CMBS
> securities.

90.    Because these statements were made in The Hartford's SEC filings, they

relate to GAAP accounting, as opposed to statutory accounting.  Even if some of these

adjustments were made for statutory purposes, however, the amounts would not have

been nearly sufficient to reflect the actual market values of the ABS portfolio.[27]

91.    Moreover, the fact that Defendants were adjusting prices received from

third party pricing services shows Defendants were aware that the pricing services were

not providing prices that matched true market values and/or sales prices.  Because the

Company had the ultimate responsibility for the accuracy of its financial statements,

including the statutory filings, the Company had the burden to adjust or reject inaccurate

pricing provided by third parties.  And, even if the Company proceeded to use the

inaccurate third-party pricing, it had the responsibility to disclose to investors that it used

prices that did not reflect the actual market prices.  Such disclosure should have been

---

[27] Even if the entirety of the $487 million adjustments that were made relate to the MVA FA portion of the ABS investments (which, as described, are treated as general account assets for GAAP purposes), Table 2 shows the overvaluation for MVA FA ABS in the last month of the third quarter of 2008, September 2008, and therefore the necessary adjustment for those securities, was approximately $709 million.  Moreover, HLIC had substantial investments in ABS from its general account excluding MVA FA investments, which would also likely be subject to the $487 million adjustment.  For instance, as of December 31, 2008, the fair value of the general account ABS investments as presented in the statutory filings (which exclude MVA FAs and which also exclude investments of HLIC's subsidiaries) was $6,586 million of ABS investments.  By comparison, HLIC's total separate accounts ABS was $6,290 million, also measured by fair value, 27.4% of which is ascribed to MVA FAs.

made in connection with (a) determining the statutory surplus of various insurance legal

entities in its portfolio as well as (b) statements and guidance regarding the RBC ratio

and capital margin, which were almost exclusively made for HLA and represented the

Company's life operations as a whole.

92.     Thus, Defendants knew throughout the Class Period that there was a

significant discrepancy between the BACV/Fair Value and the actual market value of

these securities (as evidenced by the sale proceeds/consideration).  That discrepancy had

a material impact on HLIC's and HLA's surplus and, therefore, on The Hartford's life

operations' and RBC ratio.

## V.     DEFENDANTS INFLATED THE HARTFORD'S STOCK PRICE THROUGH MATERIALLY FALSE & MISLEADING STATEMENTS AND OMISSIONS

**When Announcing 2Q08 Results, Defendants Falsely Stated That The Hartford's Capital Position was Strong, and That it had a Capital Cushion of $1.5 Billion**

93.     On July 28, 2008, after the close of trading, The Hartford issued a Form

10-Q for the quarter ended June 30, 2008 ("2Q08").  The Form 10-Q included statutory

surplus figures for the Company, which it described as follows:

> Statutory surplus represents the capital of the insurance
> company reported in accordance with accounting practices
> prescribed by the applicable state insurance department.

94.     As of the end of 2Q08, Defendants were aware that HLIC was overvaluing

the ABS in its separate accounts due to the Company's failure to take into account the

consistency and magnitude by which the actual sales proceeds on those securities

exceeded the BACV/Fair Value.  Despite this knowledge, the Defendants used overstated

BACV/Fair Value to calculate the statutory surplus of the Company's life operations.

The results of such improper calculations as of the end of the second quarter of 2008 were set forth in the Company's Form 10-Q *(in millions)*:

|  | June 30, 2008 | | December 31, 2007 | |
|---|---|---|---|---|
| Life Operations | $ | 5,435 | $ | 5,786 |
| Japan Life Operations | | 1,529 | | 1,620 |
| Property & Casualty Operations | | 8,319 | | 8,509 |
| **Total** | $ | **15,283** | $ | **15,915** |

95.     Also on July 28, 2008, The Hartford issued a press release announcing its 2Q08 financial results.  In that press release, Ayer declared that "The Hartford's capital position remains strong."

96.     The next day, July 29, 2008, the Company hosted a conference call discussing its second quarter 2008 financial results.  Despite possessing knowledge that since as early as April 2008 of that year the Company was selling ABS for far less than BACV/Fair Value, Ayer told analysts that the Company's RMBS and CMBS were performing well and that he was therefore comfortable with the Company's financial position:

> Our portfolio held up well during the quarter and we remain confident in the creditworthiness of our investments . . .
>
> ***Also, our CMBS and RMBS securities continue to perform well.***  While market pricing for these asset classes remains depressed, we are confident that the ultimate economic losses will be a fraction of the mark-to-market losses.
>
> The Hartford has worked diligently over the past five years to fortify its balance sheet. One of the reasons we built our capital position was to address the challenges of market conditions like the ones we face today. Our balance sheet remains in great shape and even after weathering the effects of market volatility over the past year.

97.     Knowing that The Hartford's overvaluation of the ABS in its MVA FA separate accounts necessarily led to a commensurate overstatement of statutory capital, Ayer nevertheless went on to state specifically that The Hartford had a $1.5 billion capital cushion over that required by ratings agencies for AA level rating:

> I know our investors believe capital flexibility is precious. We do too. ***We have the capital necessary to meet our business needs and we have at least $1.5 billion of capital margin.*** Our liquidity is excellent and we have additional debt capacity should it be necessary. All said, I'm very comfortable with the Company's financial position.

98.     Later in the same July 29, 2008 call, Zlatkus too addressed the importance of the Company's capitalization, explaining that:

> We keep capital to provide flexibility to pursue business opportunities or acquisitions while mitigating the risks that we will have to come to you to raise capital in a shock event.  There are three parts to our capital plan.  Number one, ***the capital needed to maintain our AA level ratings under the most constraining rating agency models; our capital margin of at least $1.5 billion above the rating agency requirements***; and three, significant debt capacity.

99.     With these conditions set forth, Zlatkus falsely repeated Ayer's statements of confidence in The Hartford's capital position—despite knowing that the valuations of the ABS in the MVA FA separate accounts belied that assertion—when she responded to an analyst's question about statutory capital:

> I think what is important is, again, I go back to looking at how we plan for our capital and how we stress test it, and ***we feel good about our capital position*** in light of both the equity markets today and under some stress scenarios.

100.    The statements referenced above in ¶¶ 94-99 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    Defendants knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices the Company received at the time of disposition by: (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; and (iv) 33.4% in July 2008;

(b)    Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's life operations surplus would have been materially lower than $5,435 million and the total surplus materially lower than $15,283 million; and

(c)    Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's capital margin as of June 30, 2008 would have been materially lower than $1.5 billion.

101.    Despite knowing that The Hartford's statements regarding the surplus of the Company's life operations was falsely inflated, which also falsely inflated the capital margin, Ayer and Zlatkus also certified, pursuant to Section 302 of SOX, *inter alia*, that the Company's 2Q08 Form 10-Q was free of material misstatement; that they were aware of material information relating to its subsidiaries, including HLIC; and that internal controls over financial reporting provided reasonable assurances over the reliability of financial reporting:

> 1. I have reviewed this Quarterly Report on Form 10-Q of The Hartford Financial Services Group, Inc.;
>
> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements***

*were made, not misleading with respect to the period covered by this report*;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect,

the registrant's internal control over financial
reporting; and

5. The registrant's other certifying officers and I have
disclosed, based on our most recent evaluation of internal
control over financial reporting, to the registrant's auditors
and the audit committee of the registrant's board of
directors (or persons performing the equivalent functions):

a) All significant deficiencies and material
weaknesses in the design or operation of internal
control over financial reporting which are
reasonably likely to adversely affect the registrant's
ability to record, process, summarize and report
financial information; and

b) Any fraud, whether or not material, that involves
management or other employees who have a
significant role in the registrant's internal control
over financial reporting.

102.    The certification in ¶101 was false and misleading for the reasons set forth

in ¶100, and because Ayer and Zlatkus knowingly disregarded that (i) the 2Q08 Form

10-Q contained numerous false and misleading statements relating to, or arising from, the

Company's overstatements of the BACV/Fair Values of ABS in the separate accounts

and of statutory surplus of the Company's life operations; (ii) that internal controls over

financial reporting were inadequate; and (iii) that Defendants knowingly disregarded

material information relating to its subsidiaries, namely that HLIC was overvaluing ABS

in the MVA portion of its separate accounts.

103.    On the evening of July 28, 2008, the financial press reported Defendants'

assurances regarding The Hartford's capital position.  In particular, Bloomberg,

Associated Press, and Datamonitor News and Comment all quoted Ayer's statement that

claimed "We are well positioned to weather the current markets, holding a capital margin

of at least $1.5 billion above and beyond our capital requirements."

104.    Analysts, too, were falsely assured by the Company's misleading statements and omissions concerning its capital position, and its false certifications of the accuracy of the Company's financial statements.  For example, on July 29, 2008, Morgan Stanley stated that despite The Hartford's "aggressive repurchases" of its stock it was heartened that "management continues to state that its *excess capital buffer of $1.5 billion remains in place*."

105.    Also reporting on July 29, 2008, Credit Suisse was even more sanguine. Although it expressed concern over the Company's "above average capital sensitivity to capital markets volatility" and its "ability to manage through the environment if equity markets weaken and credit conditions worsen," it took comfort in Defendants' "reiterat[ion] that *its capital position is strong, with a capital margin of at least $1.5 billion above requirements*."  In fact, it stated that it expected the Company's "stock to trade up on these quarterly results mainly because they beat consensus estimates, reiterated earnings guidance, recorded manageable investment losses, *and reiterated that the company's capital position remains strong*."

106.    Also on July 29 2008, other analysts echoed Morgan Stanley and Credit Suisse:

> Despite potential looming credit losses, [*Hartford] remains confident in its capital position* . . . . *Hartford continues to hold a capital margin of at least $1.5 billion in excess of capital requirements*, according to the company's Q2 earnings press release . . . .  In the face of probable investment losses, Hartford *continues to have at least $1.5 billion of capital margin*.  The company said its liquidity is "excellent" and it has additional debt capacity should it be necessary.  [Wachovia]

107.    The next day, on July 29, 2008, the market responded to the Company's false and misleading statements of its capital position, echoed by the financial press and

the analysts who covered the Company, by sending The Hartford's stock price up to

$62.94—8% higher than the prior day's closing price of $58.26.  Trading volume was 8.3

million, nearly three times greater than the average trading volume over the previous

three months.  Additionally, while The Hartford's stock price rose by 8%, the Dow Jones

U.S. Insurance Index ("DJUSIR") rose only 4.5%, while the S&P experienced a price

increase of only 2.3%.

**In Early September 2008, Defendants Falsely Reiterated That
The Hartford Had a Capital Cushion of $1.5 Billion**

108.    On September 3, 2008, The Hartford participated in the Keefe, Bruyette &

Woods, Inc. Insurance Conference.  Although the discrepancy between actual sales prices

for ABS from the separate accounts and the BACV/Fair Value of the same securities

*increased* during August 2008, which evidenced *increasing* overvaluation of the

Company's ABS portfolio, Zlatkus again stated that the Company's capital margin was

$1.5 billion:

> Now, the first prong of this capital approach is to hold the
> capital necessary to maintain our AA rating. As you can see
> on this slide, we don't calculate the total capital by a single
> (inaudible) rating agency. Rather, we take the most
> constraining Life rating agency capital requirement, we add
> that to the most constraining rating agency for P&C. We
> put those two together, and on top of that, we hold our $1.5
> billion of capital margin. So, some of those three amounts
> is what we call our targeted capital, and it's the amount that
> we charge the line, and we allocate capital out based on
> relative risk. So all of the lines' businesses, all of our
> products have to earn their targeted returns based on the
> sum of those three parts. I think this is a very important
> discipline because, if we only charged the lines for the AA
> capital that's required, then that $1.5 billion, it wouldn't
> keep up the discipline that we always need to keep up.

109.    The statements referenced above in ¶108 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    Defendants knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices the Company received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v) and 48.2% in August; and

(b)    Defendants knew that if The Hartford carried the MVA FA portion of its separate account ABS at actual fair market value, as required by statutory accounting rules, the Company's capital margin as of September 3, 2008 would have been materially lower than $1.5 billion.

110.    On September 3, 2008, The Hartford's stock price increased 0.2% while the DJUSIR increased 1.0% and the S&P decreased 0.2%.  Despite the lack of a stock increase on that date, The Hartford nonetheless misled the market through its omission of the facts referenced in ¶¶100 and 102.  Due to Defendants' failure to disclose, on September 3, 2008, or at any time previously, The Hartford's overvaluation of the ABS in its separate accounts and the resulting overstatement of its capital margin, the market had no reason to suspect that the $1.5 billion figure was overstated.  In fact, the Company maintained that its capital margin was $1.5 billion ever since it had announced at The Hartford's Investor Day, on December 11, 2006, that it was raising its margin from $1.0 billion to $1.5 billion.  Had Defendants revealed on September 3, 2008, that the

Company's capital margin was, indeed, materially lower than $1.5 billion, due to the facts referred to in ¶ _, the stock price would have declined.

## VI.   AS THE FRAUD CONTINUED, DUE TO DEFENDANTS' CONTINUING MISSTATEMENTS OF THE COMPANY'S CAPITAL POSITION AND NON-DISCLOSURE OF MATERIAL FACTS ABOUT ITS ABS VALUATIONS, THE TRUTH NONETHELESS BEGAN TO EMERGE THROUGH PARTIAL DISCLOSURES OF MATERIAL FACT

**In Late September, 2008, Based In Part on Non-Public Information Supplied by The Hartford, Moody's and Fitch Expressed Concerns Regarding The Hartford's Capital Position in Light of the Company's Deteriorating Asset Values**

111.   On the afternoon of September 25, 2008, shortly before the end of the trading day, Moody's changed its outlook on Hartford's life insurance operations from stable to negative.  Moody's, like Fitch and other ratings agencies, is privy to non-public information from the companies it rates.  Based on the mix of public information and proprietary, non-public facts in its possession, Moody's explained its change in outlook:

> The negative outlook on the life insurance operations considers the segment's significant investment exposure to both ***structured securities (including non prime RMBS*** and CRE CDO) and preferred stock in financial institutions ***relative to life capitalization***. ***The Hartford, particularly in its life operations, has experienced notable variability in earnings and capital from the volatility in the capital markets***.  ***Over the last several quarters, widening credit spreads have caused an increase in its unrealized loss position and net income has been hampered by realized losses due to increased credit related impairments.*** Additional price declines on structured securities and impairments in the financial institutions sector, particularly given material positions in Fannie Mae, Freddie Mac and Lehman Brothers, are expected to lead to higher impairments in the third quarter of 2008 compared to previous quarters.

112.   The statements in ¶111 were a partial disclosure of falsity of Defendants' July 28, 2008 and September 3, 2008 misstatements and omissions of the truth concerning the overall strength of its capital position.  This partial disclosure caused a

decline in The Hartford's stock price.  Nonetheless, the statements in ¶111 did not fully reveal The Hartford's true capital position, because Moody's did not report that The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices HLIC received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v) 48.2% in August; and (vi) 53.5% in September.

113.    For the day of September 25, 2008, The Hartford's stock price declined by 0.3% from $51.90 to $51.75, although the market and industry indices were up 2%.  The Company's intraday stock prices movement, however, is far more revealing.  Before reports of Moody's change in outlook, The Hartford's stock price reached an intraday high of $56.62.  In the short time between Moody's change in outlook and the close of trading, the Company's stock price dropped to $51.75, a decline of 8.6% in just a few hours.

114.    Later that evening, after the close of trading, Bloomberg News reported on Ayer once again repeating the Company's mantra that "***We are well capitalized in both our life*** and property and casualty operations," and that he was working with Moody's "to resolve the outlooks favorably."  As on previous occasions, Ayer made this statement despite knowledge of the overvaluation of the MVA FA portion of the Company's separate accounts as evidenced by the discrepancies between actual ABS prices and BACV/Fair Value of the same securities on the disposition date, as well as the resulting overstatement of statutory capital.

115.    Ayer's statements in ¶114 were materially false and misleading when made because they failed to disclose and/or misrepresented that The Hartford knowingly

overvalued ABS in the MVA FA portion of its separate accounts as evidenced by

BACV/Fair Values that exceeded the actual prices HLIC received at the time of

disposition by: (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008;

(iv) 33.4% in July 2008; (v) 48.2% in August; and (vi) 53.5% in September.

116.    Ayer's misstatements assuaged the market's concerns of the prior

afternoon, and on September 26, 2008, The Hartford's stock price recovered the loss

relating to Moody's change in outlook, increasing 9.5% to $56.64.

117.    Fours days after Moody's changed its outlook, after the close of trading

day on September 29, 2008, Fitch joined suit, also changing The Hartford's outlook to

negative from stable. With both public, as well as non-public, proprietary information at

its disposal, Fitch issued a press release attributing its change of outlook to negative in

part to a drop in The Hartford's capital levels relating to asset deterioration:

> Fitch Ratings has revised the Rating Outlook on the Issuer
> Default Ratings (IDRs), senior debt and Insurer Financial
> Strength (IFS) ratings for the Hartford Financial Services
> Group, Inc. (HFSG) and its primary life and
> property/casualty insurance subsidiaries to Negative from
> Stable. A full rating list is shown below. The Negative
> Outlook reflects concerns that Fitch has related to the
> company's financial profile given the extraordinarily
> challenging credit market environment. HFSG has
> disclosed material exposure to troubled credits in its asset
> portfolio.
>
> *    *    *
>
> Hartford's life insurance operations have ***experienced a
> drop in capital levels caused by a deterioration in asset
> values*** and a decline in earnings, both of which are ***driven
> by weakened capital market conditions.*** Fitch notes that
> the company maintains a meaningful exposure to overall
> unrealized and realized losses as well as specific losses in
> distressed credits, and ***above average exposure to sub-
> prime residential mortgage-backed securities and
> commercial real estate CDOs***

118.    Throughout the next day, September 30, 2008, the financial press reported on Fitch's negative outlook, relating to, among other things, concerns about the Company's capital position.  MarketWatch, for example, said that "Fitch Ratings revised its outlook on Hartford (HIG, US) to negative from stable late Monday because of *worries that losses on credit-market exposures may be eating into capital, especially at the company's life insurance operations*."

119.    Similar to Moody's report of September 25, 2008, Fitch's September 30, 2008 statements in ¶117 were a partial disclosure of the falsity of Defendants' July 28, 2008 and September 3, 2008 misstatements and omissions of the truth concerning the overall strength of its capital position.  This partial disclosure caused a decline in The Hartford's stock price.  Nonetheless, the statement in ¶117 did not reveal The Hartford's true capital position because Fitch did not report that The Hartford knowingly overvalued the ABS in the MVA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices HLIC received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v) 48.2% in August; and (vi) 53.5% in September.

120.    At the end of the trading day on September 30, 2008, in the immediate wake of Fitch's negative outlook and concerns about The Hartford's capital position, following only four days after Moody's similar announcement, The Hartford's stock price plummeted to $40.99, an *18.0%* decline from the prior day's close of $50.00.  This drop occurred on the back of a trading volume of 15.9 million shares, the largest of the Class Period to that point.

121.    Later that day, after the markets closed, Bloomberg reported that The

Hartford's stock price "dropped the most since December 1995 amid concerns the

company *may need to seek to raise capital after Fitch Ratings lowered its outlook*."

The next morning, the Wall Street Journal reported in a piece titled "Hartford Shares

Tumble After Fitch's Warning" that The Hartford's stock dropped 18% "even as a

number of other major insurers closed up along with broader indexes, which rebounded

from the prior day's sharp declines.  *Hartford's share-price drop came a day after Fitch*

*Ratings shifted the outlook on the firm's ratings to negative from stable.  Moody's*

*Investors Service took a similar action last week on some Hartford ratings*."

122.    Analyst coverage on October 1, 2008 left little doubt that Fitch's exposure

of concerns regarding The Hartford's capital adequacy, following so shortly on the heels

of Moody's similar announcement four days earlier, caused the very substantial

September 30 stock drop.  Credit Suisse, for example, reported:

> The HIG stock has experienced substantial pressure *due*
> *mainly to concerns over a potential capital raise*, in our
> view.  *Both the Moody's announcement from last week*
> *and the Fitch Ratings announcement from this week*
> (both put ratings on negative outlook) have telegraphed that
> *HIG will likely use up a considerable portion of its $1.5*
> *billion capital cushion this quarter due to elevated fixed*
> *income investment losses* and equity market related capital
> pressure (mainly from "DAC" known as CARVM and VA
> reserves).
>
> While we estimate that HIG will still likely have some
> portion or its capital cushion left if markets remain at
> current levels ($500 to $750 million), the main risk is that
> the company will need to raise capital to preserve its Aa3
> insurance financial strength rating, if both the equity and
> credit markets deteriorate much further due to its above
> average sensitivity to both equity and credit markets.

123.    Also, on October 1, 2008, Fox-Pitt Kelton reported:

> ***Hartford shares traded down 18%, we believe, on
> concerns that the company may be forced to raise capital***
> to maintain its AA category rating from the rating agencies,
> largely due to acceleration in ***realized investment losses***
> and continued downturn in equity markets, which ***impacts
> both earnings and statutory capital. Both Moody's and
> Fitch*** reaffirmed Hartford's rating, which would
> incorporate knowledge of Q3 activity, but ***did lower the
> outlook from stable to negative***.  Based on what we know
> today, while not a certainty, we believe a capital raise is a
> distinct possibility particularly if the downturn continues....

> ***We anticipate that Hartford has eaten into the $1.5 billion
> capital margin, <u>which was reiterated as recently as
> Sept. 3</u>***.

124.    In light of this stock market reaction, at 11:30 am on the morning of

October 1, 2008, Defendants once again sought to renew investor confidence with press

release containing a similar set of false and misleading statements, despite their protests

that "[i]t is not the company's policy to generally comment on fluctuations in its share

price."  Repeating prior assurances of "financial strength," "liquidity remain[ing] strong,"

and a commitment to "strong ratings," Defendants also noted The Hartford's "strong

history of managing through challenging times," "the strength of the operating businesses

that form the foundation of our company," and "198 years [of] successfully navigat[ing]

through many different business cycles and challenging climates":

> We are disappointed with our recent stock performance but
> recognize we are living through a period of unprecedented
> market conditions.  The Hartford's core operating
> businesses are performing well and ***our liquidity remains
> strong***.

> The Hartford has a strong history of managing through
> challenging times.  We were pleased that both Moody's and
> Fitch maintained our excellent insurance financial strength
> ratings at a AA level following their review. However, both
> agencies did change our outlook, largely due to market
> conditions.

> ***We are confident in our financial strength*** and in our ability to meet our commitments to customers. Nothing is more important to us than honoring those promises and maintaining our strong ratings.
>
> Our financial position, our long history and the strength of the operating businesses that form the foundation of our company give us confidence. For 198 years, The Hartford has successfully navigated through many different business cycles and challenging climates.

125.    In the face of revelations, issued by ratings agencies possessing non-public, material information, about the Company's capital position and likely decline in its $1.5 billion capital cushion, Defendants' statements in ¶124 were materially false and misleading when made because they failed to disclose that:

(a)     The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices HLIC received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; and (iv) 33.4% in July 2008, (v) 48.2% in August; and (vi) 53.5% in September; and

(b)     Defendants knew that if The Hartford carried the MVA FA portion of its separate account ABS at actual fair market value, as required by statutory accounting rules, the Company's capital margin as of September 29, 2008 would have been materially lower than $1.5 billion.

126.    Although The Hartford's stock price closed down 7% from the previous day, Defendants' omissions prevented an even greater stock price decline.  Indeed, from the September 30, 2008 close of $40.99, the Company's stock price continued to plummet on the morning of October 1, 2008, dipping as low as $35.00 in the first hour of trading, and settling at $35.94 before Defendants' statements.  Shortly after those

- 54 -

statements, the stock price rallied to $39.74 at 12:35 pm, eventually closing at $38.11,

down from the previous day, but 6% higher than the moments before the statement.

**The Hartford Used the Announcement of an Infusion of
Capital from Allianz to Estimate a $3.5 Billion Capital Cushion**

127.    Less than a week later, on October 6, 2008, The Hartford announced in a

press release a binding agreement with Allianz for a $2.5 billion investment confirming

analysts' concerns regarding capital raises and demonstrating as false the Company's

earlier positive statements about its financial strength and capital position.  Meanwhile, at

this time, Defendants knew that HLIC was overvaluing the ABS in the MVA FA portion

of its separate accounts by failing to consider actual prices far lower than BACV/Fair

Values.  These discrepancies had been increasing dramatically since June 2008, and in

September 2008, BACV/Fair Value exceeded the actual sales prices by a whopping

53.5%.  Despite this publicly undisclosed fact, Defendants' press release provided an

estimated year-end capital margin of $3.5 billion:

> The Hartford … today announced a binding agreement with
> Allianz SE, which provides for a $2.5 billion capital
> investment.
>
> "We are pleased that Allianz, one of the world's leading
> insurers and financial services providers, will make such a
> significant investment in The Hartford," said The
> Hartford's chairman and chief executive officer Ramani
> Ayer. ***"We are taking decisive action to ensure that The
> Hartford remains well capitalized for long-term success.***
> This investment strengthens our ability to weather volatile
> markets and continue to invest and vigorously compete in
> our businesses. We are dedicated to honoring our
> commitments to customers."
>
> "We believe in the fundamental strength of the U.S.
> economy and its insurance industry and respect The
> Hartford as a great insurance brand," said Michael
> Diekmann, chairman of the Board of Management and

chief executive officer of Allianz SE. "We anticipate a favourable return on our investment."

\* \* \*

"With this investment by Allianz SE, we project that we *will finish the year with a capital margin of about $3.5 billion in excess of our modeled rating agency requirements to maintain AA level ratings*," said Ayer. This estimate assumes year-end market levels are the same as the end of the third quarter, rating agency models remain unchanged and the company's operations perform as planned for the remainder of the year.

128.   Further, Defendants never disclosed the extent to which its capital position was precarious in the absence of the capital infusion.  As disclosed after the Class Period in The Hartford's Definitive Proxy Statement filed with the SEC on Form DEF 14A on February 9, 2009 (the "Proxy"), despite Defendants' repeated assurances that the Company was sufficiently capitalized to withstand further market deterioration, Defendants were in fact desperately scrambling to close a deal as quickly as possible:

In late September 2008, *in light of unprecedented volatility in global debt and equity markets and the resulting impairments in our investment portfolio, our senior management determined that it would be prudent to seek significant additional debt or equity funding in order to strengthen our capital margin*, particularly in light of the possibility of further market volatility and/or declines in the near term.

\* \* \*

[I]t was important that any process to raise additional capital be executed *quickly* and with a high degree of certainty of completion.

[I]n light of the unprecedented market volatility and the dramatic declines in the Company's share price, it was important to strengthen the Company's capital position *as promptly as possible* and our Board of Directors believed that the transaction with Allianz provided a high level of certainty of closing *on an expedited basis* . . . .

129.    The Company also did not disclose until the time it filed the Proxy that it appointed Ayer and Marra to serve as a two-person Special Committee of the Board of Directors to negotiate and close the transaction.  Moreover, the Proxy revealed that the Company did not obtain a fairness opinion for this transaction prior to the October 17 closing date.  And, critically, the Proxy revealed the Company was so desperate to obtain this capital infusion that it essentially forced the Company's shareholders to approve the transaction because, if they did not, the Company would have to pay a $125 million fee.

130.    This information—none of which was available to analysts or investors during the Class Period—reveals Defendants did not in fact believe they had a full understanding of, or control over, their capital position.  To the contrary, this information reveals that the Allianz transaction was essentially rescue financing that had to be obtained on an emergency timeframe, under onerous conditions to the Company's shareholders, demonstrating the extent to which Defendants lacked any faith in their own public statements as to the purported strength of The Hartford's capital position.

131.    The statements referenced above in ¶127 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices the Company received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; and (iv) 33.4% in July 2008; (v) 48.2% in August; and (vi) 53.5% in September; and

(b)      Defendants knew that if The Hartford carried the MVA FA portion

of its separate accounts ABS at actual fair market value, as required by statutory

accounting rules, the Company's capital margin estimate would have been materially

lower than $3.5 billion.

132.    Defendants' statements assuaged the markets lingering concerns about

The Hartford's financial health, and on October 6, 2008, The Hartford's stock price

increased 12.8% from the prior day close of $27.40 to close at $30.90 per share on a high

volume.  In comparison, the DJUSIR decreased 3.7% and the S&P decreased 3.9%.

133.    Throughout the day on October 6, 2008, analysts reacted positively to the

Company's alleged $3.5 billion capital margin, leaving no doubt that Defendants'

misstatements in this regard inflated the stock price.  Morgan Stanley, for example,

issued a "buy" recommendation based in part on the $3.5 billion capital cushion:

> ***We recommend investors buy Hartford stock after the
> announcement of a $2.5 billion capital infusion by
> Allianz SE.*** To be clear, results for the third quarter were
> significantly worse than the Street expected, with escalated
> capital losses, larger than expected DAC write-offs, and
> large catastrophe losses all driving results well below our
> prior expectations.  However, in our view, these factors
> were more than incorporated in the stock, and ***the ability of
> the company to establish <u>a capital margin of $3.5 billion
> above rating agencies minimums</u> following the capital
> injection well positions the company for a return to more
> normal profitability looking forward.***

134.    Credit Suisse stated that "***[The] Hartford's comments that its capital***

***margin will be at around $3.5 billion by year-end 2008,*** positions it well to weather a

continuing difficult market."

135.    Other analysts were explicit in their belief that *even in the absence of the*

*Allianz deal*, The Hartford was adequately capitalized.  Deutsche Bank's report, for

example, demonstrates that the market was misled by Defendants' misstatements

concerning its capital position, as well as omissions of fact regarding ABS BACV/Fair

Values in the MVA FA portion of HLIC's separate accounts that far exceeded actual

prices received at disposition:

> By raising capital and cutting the dividend, management strengthened the company's capital base and helped to instill some confidence for the market. ***Even though we believe the company's capital position remained strong prior to the capital raise, it's prudent for management to increase its capital margin to $3.5 billion in this volatile environment.*** The risk of additional credit deterioration has increased, and the rating agencies may put further pressure on all of the life insurers to raise capital. Thus, moving sooner rather than later to address capital concerns leaves the company and shareholders in a better position to weather these difficult market conditions.

**The Hartford's Stock Price Experienced an Enormous Drop on October 30, 2008, in the Wake of Market Confusion and Concern About the Company's Reduced RBC Guidance and Defendants' Refusal to Provide Specific Year-End Capital Margin Guidance**

136.    On October 29, 2008, after the close of trading, Defendants made a series

of disclosures that had the cumulative effect of causing confusion and creating the

impression that the Company did not have a sufficient basis to determine whether it

would be able to maintain sufficient capital in light of a badly deteriorating economic

environment. As a result, the market punished The Hartford's stock price, which

coughed up half its market capitalization in one day.

137.    Shortly after markets closed on October 29, 2008, The Hartford filed its

Form 10-Q for the quarter ended September 30, 2008 ("3Q08"), and simultaneously

issued a press release announcing third quarter results, down sharply from the same

quarter the previous year largely in connection with the uncertainty in the financial

sector.

138.     Also after the close of trading, The Hartford held its 3Q08 conference call.

Analysts focused during the call primarily on the Company's capital adequacy, pressing

Defendants for an estimate of HLA's year-end capital margin.  While Zlatkus insisted the

Company was "very adequately capitalized at a level for a AA minus company," she

attempted to avoid giving analysts a year-end capital margin estimate.  Analysts were

concerned, however, as to how Zlatkus could be confident about HLA's capital position

while, at the same time, was unwilling to provide a capital margin estimate.

139.     After equivocating in response to further probing by analysts, Zlatkus

eventually provided lowered year-end 2008 RBC ratio guidance of 300%, based on an

S&P level of about 815, and 400% if the S&P closed at about 900:

> The S&P [500] is above 900 right now.  The numbers that I
> am talking about with a risk-based capital in the 300%
> range was looking at an S&P [500] of 815 and also
> assuming a variety of other factors, including like I said,
> some further deterioration in the credit market.
>
> *     *     *
>
> I gave a range, so it was a 300% range at 800; you'd
> probably be in the 400 plus range at 900.
>
> *     *     *
>
> So, let's just stick with RBC numbers 300% range in that
> 800 to 815 and [well about][28] 400% in that 900 range.

140.     Zlatkus otherwise managed to avoid giving analysts a year-end capital

margin estimate.  Even as she insisted that The Hartford was "capitalized at levels that

are consistent with the standards that rating agencies have historically used for AA minus

level companies," she nonetheless declined to quantify that capital level in the form of

quantitative year-end guidance:

---

[28] Reads "well above" in Bloomberg version of transcript.

Given the current markets, ***projecting a year-end capital margin is extraordinarily difficult.***  Credit spreads, currency rates and interest rates are fluctuating day-to-day, and the sensitivity of these various assumptions in our capital models is much more acute in the tail.  In this environment, ***we are not comfortable providing a forecast of our year-end capital margin***.

141.    Defendants' statements on October 29, 2008, in ¶¶138-140 were a partial disclosure of the falsity of Defendants' July 28, 2008, September 3, 2008, September 25, 2008, October 1, 2008, and October 6, 2008 misstatements and omissions of the truth concerning the overall strength of The Company's capital position.  In particular, Defendants' lowered year-end RBC guidance raised concerns that The Hartford did not have an adequate capital position, while their refusal to provide specific guidance for The Hartford's year-end capital margin created confusion and an impression that the Company did not have a sufficient basis to determine whether it would be able to maintain sufficient capital in light of a badly deteriorating economic environment.

142.    This partial disclosure on October 30, 2008 hammered the Company's stock price, removing over half its market capitalization as it dropped ***51.6%*** on extremely high volume of 67.0 million shares, almost eighteen times the average daily volume from the beginning of the Class Period through October 29, 2008.  Perhaps even more dramatically, this enormous drop came in comparison to a 1.4% decrease in the DJUSIR and a 2.6% increase in the S&P.

143.    The financial press reported on The Hartford's stock drop stating, without qualification that concerns over the Company's capital position as well as confusion springing from Defendants' unwillingness to provide specific capital margin guidance caused the decline.

144.    Reuters News stated:

Shares of Hartford Financial Services Group Inc plunged nearly 52 percent on Thursday [October 30, 2008], a day after the property and life insurer posted a larger than expected quarterly loss, ***stoking concerns it may need to raise even more capital to survive***. But with Hartford's share price having declined to all-time low levels, ***raising capital would be difficult and expensive***, analysts said."

145.    MarketWatch similarly reported:

Hartford Financial Services Group lost more than half its market value Thursday on concern the insurer may need to raise more capital. The company reported a big third-quarter loss late Wednesday and said that it couldn't gauge the amount of extra capital it has because of market volatility.

146.    Analyst coverage, too, left no doubt that The Hartford's stock drop was directly related to concerns about The Hartford's capitalization and confusion about Defendants' inability and unwillingness to provide comfort to the investing public that the Company understood its capital position.

147.    On October 30, 2008, Sterne Agee, for example, offered a scathing report about The Hartford's "Capital Burn":

We see no other way to put this. In our view, ***Hartford Life's … ability to maintain its ratings is almost entirely outside of management's control at this point, depending instead on a hope that equity markets rally (thus alleviating pressure on VA business from a statutory capital perspective)***, credit markets improve (thus reversing significant negative marks on the company's general account portfolio) and TARP is made available by the U.S. Treasury. ***Management seemed very uneasy in responding to the onslaught of capital, RBC, and other sensitivity types of questions repeatedly asked on the call.*** While we recognize that rating agency models are changing on the fly (we could take a shot at the agencies here easily since we view them as entirely complicit in this credit mess), ***we expected management to be more forthcoming with respect to their current view of capital***. ***Unfortunately, we believe most investors and analysts walked away from the call confused, and we expect this***

*will have a meaningfully negative impact on the stock in
coming days.*

148.   Also on October 30, 2008, Fox-Pitt Kelton downgraded The Hartford, in

part, because Defendants would not state the Company's capital position:

> We are downgrading HIG to In Line from Outperform.
> The risk of a rating agency downgrade and ***the inability of
> management to provide comfort on the level of their
> capital cushion*** make it very difficult to assess the
> downside or to argue that there is significant upside in the
> near term.

149.   Wachovia Capital Markets also questioned The Hartford's capital

adequacy:

> Breaking with recent precedent, the company held a
> conference call soon after reporting results after the market
> close on October 29. ***Investor interest centered on
> Hartford's ability to maintain its capital margin in the
> face of increased capital requirements in the variable
> annuity business.*** Hartford recently implemented actions
> to enhance its capital position, including an investment
> from Allianz, suspending share repurchases and cutting the
> dividend. However, the company had difficulty sizing the
> necessary capital margin Hartford would need. On a visit
> to HIG headquarters last month, CEO Ramani Ayer told us
> the capital margin has increased with the growth of tail risk
> from the VA product, and is likely to grow more over time.
> On the conference call, the company could not rule out the
> possibility of a future capital raise to address that tail risk.

150.   Deutsche Bank specifically looked to concerns about the lowered RBC

guidance, as well as sharing the other analysts' confusion over Defendants' refusal to

state specific year-end capital margin estimates:

> With the S&P 500 at 900, The Hartford appears to have
> adequate capital for a AA-/Aa3 financial strength rating, as
> its risk-based capital ratio would still be above 400%.
> Should the S&P 500 decline to 815, the RBC ratio would
> fall to the 300% range, and the company would be at risk of
> having to raise additional capital. . . . This tail-event
> scenario, however, of severe credit and equity market

- 63 -

deterioration we are experiencing today seems to have exceeded management's worst expectations . . . . *Management was not comfortable providing a year-end capital margin estimate given the volatility in the capital markets and the changing rating agency methodologies.*

**Notwithstanding the Effects of the Partial Disclosure on The Hartford's Stock Price, Defendants' Misstatements and Omissions Regarding The Hartford's Capital Position on October 29, 2008 Continued to Mislead the Market**

151.    As was the case at the end of 2Q08, Defendants were aware as of the end of 3Q08 that HLIC was overvaluing the ABS in its separate accounts due to the Company's failure to take into account the consistency and magnitude by which the actual sales proceeds on those securities exceeded the BACV/Fair Value which for separate accounts reflects the fair market value.  Despite this knowledge, evidenced by *increasing* discrepancies between BACV/Fair Value and actual price (reaching 48.2% in August, 53.5% in September, and on its way towards 47.7% for October), The Hartford's 3Q08 Form 10-Q overstated the statutory surplus figures for the Company, for the same reasons described in ¶100 *(in millions)*:

|  | September 30, 2008 | December 31, 2007 |
|---|---|---|
| Life Operations | $        4,691 | $        5,786 |
| Japan Life Operations | 1,546 | 1,620 |
| Property & Casualty Operations | 6,883 | 8,509 |
| **Total** | $        13,120 | $        15,915 |

152.    Although Defendants knew HLIC overvalued the ABS in its separate accounts by failing to take into account the consistency and magnitude by which actual sales proceeds exceeded the BACV ABS, they nonetheless stated in the 3Q08 Form 10-Q that The Hartford's "*[s]tatutory separate account assets supporting the fixed MVA annuities are recorded at fair value*."

153.    Moreover, despite four consecutive months of increasing double-digit discrepancies between the actual sale prices and BACV/Fair Values for ABS in the MVA FA portion of HLIC's separate accounts (the discrepancy for October would be 47.7%), in the October 29, 2008 press release, Ayer once again stated that the Hartford was adequately capitalized:

> This was an extremely difficult quarter for the company. Volatile credit and equity markets and the largest catastrophe in the past three years significantly affected our results," said Ramani Ayer, The Hartford's chairman and CEO.  "Earlier this month, we took decisive action to fortify our capital by securing a $2.5 billion investment from Allianz.  ***The Hartford is financially strong with the liquidity and capital to meet our commitments to our customers***.

154.    On that same evening of October 29, 2008, after the markets closed, Defendants hosted a conference call to discuss The Hartford's 3Q08 results.  Even as she answered questions concerning the Company's losses and volatile financial markets Zlatkus said nothing about the discrepancies in sales proceeds and BACV/Fair Value that undermined The Hartford's alleged capital position, and joined Ayer in yet again falsely stating that the Company was adequately capitalized:

> What we can say is that ***as we sit here today, The Hartford is capitalized at levels that are consistent with the standards that rating agencies have historically used for AA minus level companies.***

155.    Indeed later in the call, in direct response to Morgan Stanley analyst Nigel Dally's question of whether The Hartford would later need additional capital based upon where it stood that day, Zlatkus said "[a]s we stand here today with market levels, ***we feel very well-capitalized***."

156.    Defendants' statements in ¶¶151-155 were materially false and misleading when made because they failed to disclose that:

(a)    The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices HLIC received at the time of disposition by:  (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v) 48.2% in August; and (vi) 53.5% in September;

(b)    Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's life operations surplus would have been materially lower than $4,691 million and the total surplus materially lower than $13,120 million; and

(c)    Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's RBC guidance would have been materially lower than 400%, assuming an S&P year-end close of 900; or 300%, assuming an S&P close of approximately 815.

157.    Despite knowing that The Hartford's statements regarding its capital positions falsely inflated the RBC ratio, on October 29, 2008, Ayer and Zlatkus also certified, pursuant to Section 302 of SOX, *inter alia*, that the Company's 3Q08 Form 10-Q was free of material misstatement; that they were aware of material information relating to its subsidiaries, including HLIC; and that internal controls over financial reporting provided reasonable assurances over the reliability of financial reporting:

1. I have reviewed this Quarterly Report on Form 10-Q of The Hartford Financial Services Group, Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

> b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

158.    This certification was false and misleading for the reasons set forth in ¶156, because Ayer and Zlatkus knowingly disregarded that (i) the 3Q08 Form 10-Q contained numerous false and misleading statements relating to, or arising from, the Company's overstatements of the BACV/Fair Value of ABS in the separate accounts and of statutory capital of the Company's life operations; (ii) that internal controls over financial reporting were inadequate; and (iii) that Defendants knowingly disregarded material information relating to its subsidiaries, namely that HLIC was overvaluing ABS in the MVA portion of its separate accounts.

159. Although much of the fallout from the October 29, 2008 call was negative, many analysts still continued to believe Defendants' statements that the Company was well-capitalized. On October 30, 2008, Morgan Stanley reported that:

> *Hartford believes that its capital position, even taking into consideration the recent equity market meltdown, remains solid*, and that even if markets were to decline 12% from current levels, it would have an RBC ratio of roughly 300%. However, we believe the possibility exists that rating agencies may want life insurers to hold more capital against the backdrop of today's highly volatile environment. If equity markets have indeed found a bottom, the company's capital position could well be sufficient, but management and investors must be aware of the minimal margin for error.

> \*  \*  \*

> *Management's view was that its current capital position is strong*; however, the company did not provide an update on capital margin based on current market conditions, citing uncertainty as to how rating agencies may change their view of capital in the future.

160. The continuity of Defendants' insistence that The Hartford had a strong capital position—even as they sowed doubts and confused the market through lowered RBC estimates and a refusal to offer specific capitalization guidance for year's end—permitted the Company's stock price to rebound upon a new array of misleading statements, engineered to mitigate the tremendous harm of October 29 and October 30, 2008.

**On November 3, 2008, in Order to Repair the Damage of the October 29, 2008 Disclosures, Defendants Retracted Certain Statements and Offered Optimistic RBC Guidance Without Any Foundation to Do So**

161. Shortly after the negative market reaction to the October 29, 2008 disclosures, on November 3, 2008, Defendants did as they had done throughout the Class Period: they issued misstatements specifically designed to mitigate the harm of a

previous partial disclosure.  As with prior examples, Defendants were largely successful in this effort, and the Company's stock price recovered.

162.    In a November 3, 2008 8-K, Defendants provided *increased estimates for year-end RBC*, ranging from 345% to 440% depending on the year-end S&P levels. They rationalized these higher estimates by explaining that the prior RBC estimates included "credit-related impacts," while the newer, higher numbers did not:

> On its October 29, 2008 earnings call, management indicated RBC figures in the range of 400% and 300% assuming year-end S&P 500 levels of 900 and 800, respectively.  In addition to the assumptions set forth in the preceding paragraph, these estimates included an estimated provision for HLA's fourth quarter statutory credit-related impacts of $500 million, after-tax, in the S&P 500 at 900 scenario and $750 million, after-tax, in the S&P 500 at 800 scenario.

163.    Defendants further represented to investors that the updated number "assume the Company [would] contribute the net proceeds from the $2.5 billion Allianz" deal to HLA, despite knowing and failing to disclose that they had made no such decision at that time and that, in fact, The Hartford retained for itself the flexibility to keep a substantial portion of the capital infusion at the corporate level, regardless of the impact of that decision on its ability to attain the RBC ratios.  Accordingly, Defendants presented a higher RBC ratio that they intended investors to rely on, without disclosing uncertainty regarding a central assumption underlying that guidance, or any facts from which investors could infer such uncertainty or its degree:

> The Company estimates that the year-end risk-based-capital ("RBC") ratio at Hartford Life and Accident Insurance Company ("HLA") would be approximately 440% assuming the S&P 500 closed the year at 900 and approximately 345% assuming the S&P 500 closed the year at 800.  ***These estimates reflect the Company's contribution to HLA of $1 billion provided by the property***

*and casualty subsidiaries, which was completed in October, and assume the Company contributes the net proceeds from the $2.5 billion Allianz SE investment to HLA by the end of 2008*.

164.     The Hartford also issued two press releases on November 3, 2008.  In the first, concerning Moody's decision to affirm the Company's ratings, Defendants continued to trumpet the Company's overstated capital position, while failing to disclose the overvaluation of the ABS in the MVA FA portion of HLIC's separate accounts, by means of BACV/Fair Values that exceeded actual prices, which, in turn facilitated an overstated capital position and RBC ratio:

> "The Hartford is pleased that Moody's affirmed the Aa3 insurance financial strength (IFS) ratings of the company's property and casualty and life insurance operating companies," said … Ayer.  **"The Hartford remains well capitalized.**  In fact, earlier today we provided additional information that demonstrates we are more than sufficiently capitalized to meet our commitments to our customers."
>
> Earlier today in a Form 8-K filing with the Securities and Exchange Commission, ***the company said that its capital margin, the capital in excess of modeled rating agency requirements to maintain AA level ratings, would be approximately $2 billion at year end, assuming a year-end S&P 500 level of 900.  This compares to an estimate of $3.5 billion, which was disclosed by the company on October 6, 2008, following the announcement of the Allianz transaction.***  This prior estimate assumed a year-end S&P 500 market level at a September 30, 2008 level, which was 1165.
>
> ***The company also outlined additional details on the company's estimated year-end risk-based capital (RBC) ratio for Hartford Life and Accident Insurance Company (HLA) at various S&P 500 levels.  The life insurance company's RBC ratio, including a number of provisions, is estimated to be above 400 percent at year-end S&P 500 levels of 900.***  An RBC ratio of 325 percent or higher has historically been associated by various rating agencies with AA level ratings.

In its news release today, Moody's affirmed the Aa3 insurance financial strength (IFS) ratings for the company's lead property and casualty and life insurance operating companies. ***They also affirmed a stable outlook on the property and casualty business and a negative outlook on the life insurance business.*** In addition, Moody's downgraded the senior unsecured debt rating of The Hartford to A3 from A2 and its short-term debt rating to Prime-2 from Prime-1, with a stable outlook. The downgrade concludes a review for possible downgrade initiated on October 8, 2008.

165. The Hartford's second press release on November 3, 2008 was titled "The Hartford Comments on Capital Position." In the press release, Ayer stated that the Company was well capitalized and would not need to raise additional funds in the capital markets, further stating that "[o]ur capital position is more than sufficient for current market conditions and in the event markets deteriorate further."

166. The statements referenced above in ¶¶162-164 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a) The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices the Company received at the time of disposition by: (i) 19.6% in April 2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v) 48.2% in August; (vi) 53.5% in September; and (vii) 47.7% in October 2008;

(b) Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's capital margin as of November 3, 2008 would have been materially lower than $2.0 billion;

(c)     Defendants knew that if The Hartford carried the MVA FA portion of its separate accounts ABS at actual fair market value, as required by statutory accounting rules, the Company's RBC guidance would have been materially lower than 440%, assuming an S&P year-end close of 900; or 345%, assuming an S&P close of 800; and

(d)     Defendants knew they had made no decision at that time to contribute the net proceeds from the $2.5 billion Allianz deal to HLA, and knew that it was just as possible, as in fact happened, that they would keep a substantial portion of the capital infusion at the corporate level.

167.    The Company's efforts to mitigate the harm of the October 29, 2008 disclosure were successful.  Based upon falsely optimistic statements of its capital position, as well as overstated RBC ratios and capital margins, the Company's stock price rose **57.8%** on November 3, 2008 on volume of 70.9 million shares.  Meanwhile, the DJUSIR dropped 2.2% and the S&P dropped 0.3%.

168.    Throughout the day on November 3, 2008, news articles attributed this increase to The Hartford's optimistically stated capital guidance.  For example, a Bloomberg reported that, "[t]he insurer will have $2 billion more than required to qualify for an AA rating if the Standard & Poor's 500 Index is at 900 on Dec. 31, the company said in a statement.  Hartford, based in the Connecticut city of the same name, climbed $3.52 to $13.84 at 10:39 a.m. in New York Stock Exchange composite trading."

169.    Analyst coverage was similarly impressed by Defendants' updated guidance, with any previous concerns pacified by the explanation that the earlier guidance included credit impacts.  Credit Suisse, for instance, reported:

> This morning Hartford (HIG) gave some further information regarding estimates for its excess capital position for year-end 2008 that ***portrays a less negative picture of its capital position than that which was presented during its earnings call last week*** . . . . The bottom line is that is [sic] was not clear from last week's call that HIG was also incorporating an assumption of credit losses in its estimates for capital levels at year-end 2008, so the disclosure today is a positive.

170. On November 14, 2008, less than a month after receiving the Allianz capital infusion, and only two weeks after Defendants once again assured the market that the Company was sufficiently capitalized and had the ability to withstand further market deterioration, The Hartford issued a press release announcing that it had entered into an agreement to acquire Federal Trust Corporation and its insured depository, Federal Trust Bank.  The press release stated The Hartford acquired these entities in order to become a thrift holding company, which would enable the Company to apply for TARP funds of approximately $3.4 billion under the U.S. Treasury's Capital Purchase Program ("CPP"). Ayer assured investors that the purpose of this capital request was to allow the Company "to further supplement our existing capital resources" given "the continued uncertainty in the economic markets."

**During Its December 5, 2008 Investor Day, Defendants Successfully Misled the Market One Last Time, Artificially Doubling Its Stock Price By Falsely Touting a Strong Capital Position and Offering Increased RBC Guidance, Despite Knowing Undisclosed Facts Rendering Those Numbers Impossible**

171. In a November 20, 2008 press release, The Hartford again acknowledged the "de-risking" of its investment portfolio, stating the Company was "taking a series of actions aimed at ***repositioning the portfolio*** in light of current economic outlooks." When these statements are considered in light of the sales data set forth in Table 1 (reflecting substantial overvaluation of its ABS assets), it is clear Defendants were aware

of results of sales of their separate account ABS and, thus, knew that their positive statements regarding capital and RBC ratios were false.

172.     On December 5, 2008, following ABS sales in November 2008 resulting in a peak 63.0% discrepancy between actual sales prices and BACV/Fair Value for ABS held in HLIC's MVA FA separate accounts, facts of which investors were not aware and could not have been aware until after the end of the Class Period, The Hartford hosted a 2008 Investor Day.

173.     In advance of the Investor Day, Defendants issued a press release highlighting issues to be covered, in which Ayers falsely stated that the Company was well-capitalized:

> **"The Hartford is well capitalized and has ample liquidity. Our statutory surplus exceeded $13 billion as of September 30, 2008** and we hold more than $12 billion in cash, short-term investments and Treasuries, as of November 30, 2008. Our property and casualty operations are capitalized at levels higher than those historically associated with a AA level rated company," said Ayer.
>
> **"In addition, the capital outlook for our life operations through year-end indicates more than sufficient capital in current market conditions, and even assuming significant additional market deterioration."**

174.     Ayer repeated those misstatements during his opening remarks at the Investor Day, stressing the strength of the Company's capital position: "**The Hartford is well capitalized, has ample liquidity . . . we feel very strong and very positive about our capital position**."

175.     Zlatkus also said the Company's capital was "significantly increased" and provided *increased* RBC estimates for year-end 2008, including a ratio of 535% for the life companies:

What's important to not[e] is, as you can see, the capital has significant—***our capital has significantly increased***. First, we have been proactive. As I had mentioned on our call, we have secured both internal and external reinsurance, which has definitely improved the ratio. Our hedging program, as we had mentioned, has performed exceedingly well relative to the statutory liabilities, and we did put some additional hedging on.

And then finally and importantly, as we know, these are estimates and they [sic] highly reliant on estimates and assumptions and forecasts for the year-end. We have one more month, or actually a little over that, of actuals and refinements to our calculations. So, we feel that this new estimate of ***420% [with S&P 500 index at 800] and 535% [with S&P 500 index at 900] is our new best estimate.***

Now, I want to take a moment talk [sic] just mention those credit-related impacts and what that means. As Greg McGreevey said, we do not anticipate any significant statutory impairments where we think we have a credit event in the fourth quarter. What that represents is both some trading flexibility, a small amount of statutory impairments, some provision for a change that we're going to have in terms of statutory impairments lining up with GAAP and also ***some mark-to-market impacts on our Life portfolio. And that comes from our market value adjusted fixed annuity [which] is marked to market for statutory purposes.***

So, we think that that $700 million is a conservative estimate, and we hope it proves to be such. And once again, I want to remind you, even including that $700 million, 420% [with S&P 500 index of 800] and 535% [with S&P 500 index of 900], ***we are very pleased with our capital position.***

176.   The Company summarized the differences between its November 3, 2008 and December 5, 2008 estimates in a table, as shown below[29]:

|  | December 5 Estimates | | November 3 Estimates | |
|---|---|---|---|---|
| Year-end S&P 500 levels | 900 | 800 | 900 | 800 |

[29] Notwithstanding the titles in the table, the RBC ratio estimates of 410% and 300% were actually the estimates from the October 29, 2008 call, not from the November 3 SEC filings or press releases.

| | December 5 Estimates | | November 3 Estimates | |
|---|---|---|---|---|
| Life Company RBC ratio, excluding credit-related Impacts | 585% | 470% | 440% | 345% |
| Estimated 4Q credit-related Impacts | -50% | -50% | -30% | -45% |
| 2008 estimated RBC ratio | 535% | 430% | 410% | 300% |

The new estimates, considerably higher than the ones offered only a month prior on November 3, 2008, also again failed to adequately include provisions for the impact of credit-related issues, for the reasons stated above.

177.    When Zlatkus spoke, she repeated the misleading impression that she gave on November 3, 2008, that The Hartford would transfer the full $2.5 billion Allianz capital infusion to HLA to support the estimated year-end RBC:  "So one thing I want to remind everybody, *we are assuming <u>in all of our scenarios</u> that we, [ ] downstream [ ] the full $2.5 billion from the Alliance investment*."

178.    Marra echoed Ayer's and Zlatkus's sentiments:

> So, what you've heard from Ramani [Ayer], Greg [McGreevey] and Liz [Zlatkus] is that *we're well capitalized.  In fact, our capital position has improved*. We've got a good liquidity position, a very strong liquidity position, and Greg did a nice job showing that—showing why we believe in the long-term economic—economic value of our investment performance.

179.    The statements referenced above in ¶¶173-178 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Hartford knowingly overvalued the ABS in the MVA FA portion of its separate accounts as evidenced by BACV/Fair Values that exceeded the actual prices the Company received at the time of disposition by:  (i) 19.6% in April

2008; (ii) 5.1% in May 2008; (iii) 32.0% in June 2008; (iv) 33.4% in July 2008; (v)

53.5% in September 2008; (vi) 47.7% in October; and (vii) 63.0% in November 2008;

       (b)    Defendants knew that if The Hartford carried the MVA FA portion

of its separate accounts ABS at actual fair market value, as required by statutory

accounting rules, the Company's statutory surplus as of September 30, 2008 would have

been materially lower than $13 billion;

       (c)    Defendants knew that if The Hartford carried the MVA FA portion

of its separate accounts ABS at actual fair market value, as required by statutory

accounting rules, the Company's RBC guidance would have been materially lower than

420% with an S&P close of 800, or 535% with an S&P close of 900;

       (d)    Defendants knew they had made no decision at that time to

contribute the net proceeds from the $2.5 billion Allianz deal to HLA, and knew that it

was just as possible, as in fact happened, that they would  keep a substantial portion of

the capital infusion at the corporate level; and

       (e)    Defendants knew that Investor Day data presented financial

information as of October 31, 2008, rather than as of a more recent date, which served to

hide the severe distress that ABS experienced in November.

       180.    Following the Investor Day, The Hartford's stock price rose ***102.4%*** on

December 5, 2008 on volume of 119.9 million shares, as compared to a DJUSIR increase

of 10.9% and an S&P increased of 3.7%.

       181.    News articles throughout the day attributed the tremendous stock price

increase to Hartford's updated guidance.  Bloomberg News reported that The Hartford's

stock "soared as much as 44 percent in New York trading after the insurer lifted its 2008

forecast for operating profit and said ***the capital outlook at its insurance units was 'strong.'***

182.    Analyst coverage, too, left little doubt that the Company's falsely optimistic RBC guidance and sanguine comments about its capital position caused the upward swing in the Company's stock price.  On December 7, 2008, Deutsche Bank analysts reacted positively to Defendants' news:

> **Life capital strength improvement was a positive surprise**
>
> Management now projects the ***year-end risk-based capital (RBC) ratio to be 535% with the S&P [500] at 900 and 420% at 800, up from the company's November estimate of 410% and 300%, respectively***.  This was driven by the hedge assets appreciating at a faster rate than the variable annuity liabilities, internal and external reinsurance, and refinements to the calculations given an additional month of data.  Should the S&P [500] decline to 700, management estimates that the RBC ratio could still be at 325%, assuming the holding company and P&C business downstreams $650 million of additional capital into the life insurance business.

183.    On December 8, 2008, Wachovia associated the 102.4% surge in The Hartford's stock price with "the equity market appear[ing] more comfortable with the ***sustainability of the company's capital*** and competitive position," while Fox-Pitt Kelton noted that The Hartford "held its investment day ***emphasizing that it has sufficient capital*** and the operating subs are still performing in a challenging environment."

184.    Also on December 8, Morgan Stanley stated in explicit terms that the content of Defendants' December 5, 2008 misstatements directly caused the large share price increase.  The analyst increased its price target, effusively noting the "surprise announcement" of the "dramatic improvement" in The Hartford's capital position, a

"game-changer" in light of the market's previous "foregone conclusion" that Defendants

would need to raise additional capital:

> Hartford's **surprising announcement of dramatic improvement in its capital position points** to further upside in the stock.  Previously we believed investors expected an additional capital raise.  Based on the information provided, this now looks much less likely, and without a highly dilutive equity offering, we believe the valuation remains compelling.  Even after the rally of 102% in the stock on Friday, the stock is only trading at 2.4 times earnings and 45% of reported book value.  We are increasing our price target $1 to $21, while reiterating our Overweight rating.

*   *   *

> ***We believe Hartford's investor day was potentially a game changer for how investors will view the company. Previously it was almost a foregone conclusion among investors that the company would need to raise incremental capital***, which given the stock price, would have been significantly dilutive, and potentially highly challenging to complete. However, ***in the aftermath of its analyst day, where the company provided new data showing the capital position of the company has significantly improved, the chances of a capital offering now appear much less likely***. Without an equity offering, the valuation multiple of the stock looks exceptionally low, even after the dramatic doubling of the stock following the release of this information. We are increasing our price target to $21 while reiterating our Overweight rating.

*   *   *

> ***The key news event was a substantial improvement in the capital position of its life and annuity operations***.  In our view, ***most investors heading into the meeting were of the view that a substantial capital raise was highly likely*** given the recent declines in equity markets and continued challenging environment in credit markets.  ***Based on the substantial improvement in risk-based capital ratios announced by the company, this now appears significantly less likely***.

> In terms of the details, the company provided an update on where it expects the risk-based capital ratios will end the

- 80 -

year under a range of different equity market assumptions…. [T]he company now expects the RBC ratio under the scenario of the S&P500 ending the year at 800 would be 420%, 120 percentage points above the level it previously estimates at the beginning of November. ***At the current level of the S&P500 of 876, we estimate the current RBC ratio is over 500%, which stands out as one of the highest among its peers.***

## VII. THE TRUTH WAS REVEALED WHEN DEFENDANTS FINALLY DISCLOSED THE HARTFORD'S TRUE CAPITAL POSITION, DEMONSTRATED THROUGH BADLY MISSED RBC GUIDANCE AND LARGE CAPITAL SHORTFALLS

185. The myth foisted on the investing public was short lived, however. In fact, exactly two months later, on February 5, 2009, Defendants could no longer hide the truth: far from being "well capitalized," far from having a "strong capital position," The Hartford's capital position was far more precarious than Defendants had led investors to believe. In fact, just two months after surprising the market with dramatic announcements of unexpected capital margin increases, Defendants revealed that even though the S&P was at 900, RBC was not at 535% but, instead was 150 percentage points lower, at 385%. In fact, the actual RBC of 385% was lower than the 420% estimated for an S&P close of 800, a much more substantial market drop than actually occurred, and only 65 percentage points higher than the 320% forecasted for an S&P of 700—an extraordinarily steep market decline that never occurred.

186. In short, the Company's capital position as of February 5, 2009 was disastrous by any metric, and Defendants' credibility was in tatters. The market reacted accordingly, pulling out over 16% of the Company's artificially-inflated share price.

187. After the close of the market on February 5, 2009, The Hartford issued a press release announcing fourth quarter ("4Q08") and full year ("FY08") results:

> ***At year-end 2008, The Hartford's life company had a
> preliminary risk-based capital (RBC) ratio of 385%*** and
> the property and casualty subsidiaries were capitalized at
> levels consistent with those historically associated with AA
> level property and casualty insurers.

188.     That same evening, The Hartford filed a Form 8-K with the SEC

disclosing that it did not meet the expected RBC ratio it announced during its December

5, 2008 Investor Day.  Defendants explained that part of the cause of the big RBC miss

was the fact that The Hartford had not transferred all of the $2.5 billion of proceeds from

the Allianz deal, despite telling investors and analysts on November 3, 2008 and

November 5, 2008 that the increased RBC ratio guidance was predicated on a full

transfer:

> On December 5, 2008, in the course of a public investor
> event, the Company estimated HLA's year-end 2008 RBC
> ratio to be 535%, assuming the S&P 500 Index finished the
> year at 900. The S&P 500 Index was 903 at the end of
> 2008. ***The estimated 535% RBC ratio was calculated on
> the assumption that the Company would contribute the
> net proceeds from the $2.5 billion Allianz SE October
> 2008 investment to its life insurance subsidiaries. In fact,
> the Company retained $1 billion of the net proceeds at the
> holding company level and contributed the balance to its
> life insurance subsidiaries.***

189.     That is, as to this central assumption, Defendants knew on both dates, but

did not disclose to investors, that (1) they had, in fact, not made a  decision to contribute

the full net proceeds from the $2.5 billion Allianz deal to HLA and (2) the decision they

ultimately made, to keep a substantial portion of the capital infusion at the corporate

level, was at least as likely a possibility.  Nonetheless, Defendants gave investors RBC

ratio guidance that, in reality, Defendants knew was unreliable because of  those

undisclosed material facts, and failed to correct that misleading impression by, *inter alia*,

providing alternate guidance based on less than a full transfer of the funds.

190.    Defendants further explained that the failure to put all of the Allianz

capital to HLA was but one cause of the RBC miss.  Also causing the miss, Defendants

purported, was that credit spreads had widened on certain asset classes, particularly

CMBS which statutory accounting rules required Defendants to mark to market:

> ***Excluding the $1 billion that was not contributed to the
> life insurance subsidiaries, the estimated RBC ratio of
> 535% would have been 465%. HLA's preliminary 2008
> RBC ratio of 385% differs from the estimate of 465% for
> the following reasons:***
>
> • The cash-flow testing required under NAIC Actuarial
> Guideline 39 ("AG39") reduced statutory capital by $600
> in comparison with the December 5th estimate, which used
> a number of assumptions about year-end book of business,
> projected market conditions and other valuation inputs in
> the place of year end cash-flow testing.
>
> • ***Credit-related impacts on the Company's life insurance
> subsidiaries were $450 higher than assumed for the
> December 5th estimate, primarily due to continued spread
> widening on certain asset classes, particularly commercial
> real estate investments, that are marked to market under
> statutory accounting rules.*** This impact was largely related
> to the surplus required for the Company's market value
> adjusted fixed annuity products.
>
> • Additional Yen strengthening in December resulted in a
> $150 reduction in surplus. The December 5th estimate
> assumed a year-end Yen/$ level of 93. The actual year-end
> level was just under 91.
>
> • The net effect of other items was an increase of $50 in
> statutory capital.

191.    Defendants' reference to "continued" CMBS spread widening is belied,

however, by the facts.  During the Investor Day, Defendants managed to present a picture

of the Company's financial health that was much rosier than reality, in part by relying on

financial information as of October 31, 2008, rather than as of a more recent date.  Table

4 demonstrates the extent to which this decision created a material misimpression.  The

table sets forth monthly credit spreads for ABS in which The Hartford had a substantial

investment, CMBS.  As indicated by the CMBS spreads, while ABS values widened in

September, they did so to a far greater extent, and in fact experienced severe distress, in

November.  By presenting the status of the Company as of October 31, Defendants were

able to avoid disclosing to investors the meaningfully lower value of their ABS assets as

of the presentation date or the prior month-end.

**Table 4:  CMBS Spread to Swap Rates**

| Date | Super Senior AAA | Junior AAA | AA | A | BBB | BBB- |
|---|---|---|---|---|---|---|
| 25-Jul-08 | 212 | 488 | 695 | 1055 | 1813 | 2170 |
| 22-Aug-08 | 293 | 640 | 913 | 1388 | 2228 | 2725 |
| 26-Sep-08 | 310 | 695 | 863 | 1333 | 2200 | 2400 |
| 31-Oct-08 | 593 | 1200 | 1532 | 2037 | 3075 | 3425 |
| 28-Nov-08 | 1100 | 3150 | 3975 | 4600 | 5750 | 6275 |
| 26-Dec-08 | 893 | 2963 | 4013 | 4775 | 7170 | 7915 |

Source: The Mortgage Bankers' Association

192.    In addition, the fact that the forecasts were missed by a large margin

proved extremely disconcerting to investors.  As of December 31, 2008, only three weeks

after the Investor Day forecasts were made, the Company's credit-related impact on the

RBC ratio was $450 million greater than the impact of $700 million that the Company

publicly forecasted.  Investors were disappointed with the size by which the forecasts

were missed in such a short timeframe.  That, in turn, caused investors to lose confidence

in the Company and its officers, to either question the quality of the Company's internal

controls or the sincerity of Defendants' forecasts.

193.    Further, to the extent that ABS credit spreads provided an explanation for

the revised RBC ratios, the impact of those credit events was largely related to the surplus

required for the Company's MVA FA assets, and Defendants knew since the second quarter of 2008 that those very same ABS in HLIC's MVA FA separate accounts were booked at values far in excess of their actual price.

194.    The financial press picked up the story of The Hartford's RBC ratio guidance miss, leaving no doubt the news was serious, and would adversely affect the Company's stock price.   Reuters, for example, reported that "concerns over capital adequacy could be well founded.  Hartford projected Thursday it will end 2008 with a risk-based capital ratio, a key metric used by regulators, of 385 percent, much lower than it forecasted at an investor meeting in December," and quoted a Sterne Agee analyst who said the news "calls into question the validity of management's estimates," and added that "The stock is going significantly lower tomorrow."

195.    The Wall Street Journal reported that "*[t]he company's life-insurance unit finished the quarter with a closely watched capital level below the company's estimate in early December, hit by factors including losses on commercial-real-estate holdings*.  Mr. Ramani said capital preservation and risk mitigation would be priorities this year, including de-risking variable-annuity products."

196.    Analysts, too, immediately reacted to the February 5, 2009 disclosure of the missed RBC guidance, opining on its importance.  That same evening, Credit Suisse observed that:

> The big issue this quarter was not GAAP earnings, but rather a *reduction in statutory capital estimates that HIG had previously disclosed at its December 2008 investor day*.  In an 8-K filing, HIG gave a variance of items that created downward pressure on its estimate of capital by about $1.3 billion….

197.    Also on February 5, 2009, Deutsche Bank explained that:

The Hartford's life insurance risk-based capital ratio ended the year at 385% versus its previous estimate of 535%. ***The ratio would have been 465%, but the holding company retained $1 billion of the Allianz proceeds.*** The difference between 385% and 465% reflects $600 million of additional AG 39 reserves, ***$450 million of credit-related impacts***, $150 million surplus reduction from a stronger yen, and a $50 million benefit from other items.

198.     On the morning of February 6, 2009, because of "reduced capitalization," in connection with "investment losses," Moody's downgraded The Hartford's senior debt from A3, and also downgraded the insurance financial strength ratings of The Hartford's property and casualty and life insurance operating subsidiaries to A1 from Aa3.  Moody's also placed a negative outlook on the ratings:

> Moody's Investors Service lowered the credit ratings of The Hartford … and its key operating subsidiaries and placed a negative outlook on the ratings because of continued weakness in earnings and ***reduced capitalization resulting from investment losses*** and substantial business exposure to variable annuities.  Moreover, the risk of further investment losses and diminished earnings is meaningful in view of unsettled markets and deteriorating economic conditions.  These rating actions follow The Hartford's recent release of full year results, which included a $2.7 billion net loss.

> \*   \*   \*

> ***According to Moody's, the downgrade of the life insurance subsidiaries and the negative outlook reflect the entities' diminished stand-alone credit profile due to the potential for further losses from the investment portfolio and the variable annuity business.***

> ***The life insurance subsidiaries hold material levels of structured securities relative to capital.***  The expectation of higher investment losses for the life insurance subsidiaries is consistent with Moody's recent upward revision to cumulative expected loss rates on a variety of asset backed securities.

"Given the company's large variable annuity business, further deterioration in equity markets could have a magnified impact on capital and profitability at The Hartford vis-à-vis other highly rated insurers," said Moody's Vice President/ Senior Credit Officer Scott Robinson.

199.    Shortly after Moody's issued its statement, the Company held a conference call to discuss earnings.  Zlatkus reiterated the causes of the capital shortfall and RBC miss outlined in the previous evening's press release:

> … In December, we provided estimated year-end Life RBC ratios at different market levels.  Given the fact that the market ended the year at 903, I will focus on the comparison to Investor Day projections at a 900 S&P [500].  As the slide shows, ***our preliminary 2008 year-end RBC ratio is 385%.  That compares to a December projection of 535%.  Again, the 535% reflected all of the Allianz capital being contributed to the Life company.  Retaining $1 billion at the holding company results in a 70 point reduction in the RBC ratio.***
>
> * * *
>
> Another market change unrelated to VA was the effect of spread widening and certain investments holding.  This reduced surplus by about $450 million and was largely related to the surplus required in the market value adjusted fixed annuity.  Again, this amount was more than the amount that we had forecasted.  To be clear, these are not impairments, but rather the impact of marking to market the assets supporting the fixed annuity liability. To the extent that credit markets recover, we expect to recapture that capital.

200.    The Hartford's stock fell 16% on February 6, 2009 on the news of he Company's RBC ratio miss, as compared to a 2.3% increase in the DJUSIR and a 2.7% increase in the S&P.

201.    Analysts made clear that the price drop was directly caused by The Hartford's updated RBC guidance and the revelation that the Company was not well

capitalized.  JP Morgan's February 6, 2009 report expressed concern over the impact on

capital from The Hartford's investment portfolio and CMBS holdings:

> We remain concerned about the high-risk profile of
> Hartford's portfolio.  HIG has below-average allocation to
> below-investment-grade bonds (4.4% of portfolio versus
> the 6% industry mean), BBB bonds (18.7% versus 23%),
> and commercial mortgage loans (5% versus 9%).  However,
> ***the company has significantly more exposure than other
> life insurers to CMBS (10% of portfolio, 98% of equity
> versus 4% of portfolio, 41% of equity for the group) and
> RMBS/Alt-A investments (2% of the portfolio, 18% of
> equity).  Additionally, a significant proportion of HIG's
> CMBS and RMBS holdings are of recent vintage, which
> are relatively more susceptible to losses.  These factors,
> coupled with the weak equity market, should further
> impair Hartford's already fragile capital position.***

202.   Moreover, analysts and investors lost all remaining confidence in

management's ability to forecast The Hartford's RBC ratio and speak accurately as to its

capital position in general.  On February 6, 2009, Sterne Agee reported that:

> Unfortunately, for the time being we don't think it's critical
> to analyze the company's results beyond the fact that the
> Risk-Based Capital ratio is estimated to end '08 at 385%.
> ***Just 60 days ago, management highlighted the dramatic
> improvement in their outlook for capital, citing an
> expectation that RBC would be 535% assuming the S&P
> [500] closed 2008 at 900.  THAT estimate followed about
> 30 days after capital adequacy was called into question on
> the company's 3Q08 earnings release and conference
> call***.
>
> *         *         *
>
> ***We simply do not understand management's insistence on
> setting a level of guidance that we believe most analysts
> and investors, including us, will openly view as a stretch***,
> without even beginning to scrutinize other more
> fundamental operating assumptions (underwriting
> expectations, expense levels, growth rates, etc.).  Detailed
> guidance was provided with the earnings release, which we
> will evaluate as it relates to our estimates and price target in
> short order.

\* \* \*

Despite management's efforts to provide the math behind the dramatic reduction in the year-end RBC ratio, *we expect the reduction will call into question the validity of management's projections and guidance leaving investors feeling like they simply can't own the stock.* In our view, there is no reason to step in from a trading perspective in front of the conference call, as our view on the stock will be heavily influenced by answers to the above key issues. A better approach, for those interested in trading what will likely be a very volatile and liquid day for HIG shares, will be to watch for opportunities in peer company stocks that might be down in sympathy with HIG.

203.  Similarly, Morgan Stanley's February 6, 2009 report noted:

The key investment debate for Hartford revolves around capital. Concerns of its capital adequacy began to dissipate following its investor day in December, but are likely to be reignited following news of a sizable reduction in its risk-based capital that they reported in yesterday's earnings report. Even based on these downwardly revised numbers, the company's capital still appears adequate, but *investors will be questioning whether they can trust these numbers given the volatility in the RBC ratio from quarter to quarter.*

204.  A February 6, 2009 article on www.financialweek.com titled "The Hartford's results spook investors, analysts" also demonstrated the loss of confidence in the accuracy of the prior representations by Defendants:

*"The Hartford has again painted a picture of its life company's capital position that is quite a bit different from the picture it drew . . . on December 5,"* Barclays Capital analysts Eric Berg and Jay Gelb said in a research note. *"That is a problem in our view."*

Chief Executive Ramani Ayer was already unpopular with investors after Hartford posted a $2.63 billion third-quarter loss in October. The latest earnings report could further undermine confidence in his leadership, analysts said.

Questions over capital sufficiency, a hot-button issue for investors concerned about companies' weaker financial

> health, will reduce "confidence in Hartford's management,"
> Barclays said.  Sterne Agee analyst John Nadel raised a
> similar concern.

205.    Defendants Marra and Ayer departed the Company during or shortly after the end of the Class Period, providing circumstantial evidence that  the  Company and its directors, having assigned  those defendants the responsibility to properly keep investors abreast of the truth concerning The Hartford's capital position during the Class Period, considered them to have failed in properly discharging that responsibility,  and did not consider them  mere victims of circumstances beyond their control meriting continuation in their positions,  thereby strengthening further the numerous inferences of these Defendants' knowledge of the fraud.

206.    Defendant Marra served as President and COO of The Hartford and also as a Member of the Board of Directors.  On February 25, 2009, immediately following the Class Period, The Hartford announced that Marra would retire on July 3, 2009, and also that he had resigned from the Board of Directors, effective immediately.

207.    Defendant Ayer served as Chairman of the Board of Directors and CEO of The Hartford from February 1, 1997 until October 1, 2009.  In June 2009, shortly after the end of the Class Period, Ayer announced his retirement from The Hartford and on October 1, 2009, Ayer officially resigned his positions with the Company.  Ayer received $4.5 million in compensation for 2008, even though The Hartford reported a net loss of $2.75 billion for the year.

208.    In addition to the foregoing, Defendants Ayer and Zlatkus also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), which were attached and filed as exhibits to The Hartford's 2Q08 and 3Q08 quarterly filings filed with the SEC.  Pursuant to Section 302, executive officers of SEC registrants are

required to certify that appropriate internal controls have been implemented to ensure the registrant's regulatory filings do not contain any untrue material facts or omit to state a material fact.

209.   These SOX certifications not only concerned The Hartford's GAAP-based financial statements, but addressed all "material information relating to the registrant." These certifications were critical to investors because they provided assurance that The Hartford's disclosures were complete and accurate, particularly as those disclosures related to material considerations such as statutory capital.  Further, the SOX Certifications made assurances that all material information relating to The Hartford was made known to the Individual Defendants charged with certifying the quarterly reports.

210.   By virtue of these sworn certifications, Ayer and Zlatkus are charged with knowing at the time they signed them that in actuality, The Hartford's internal controls were inadequate because they failed to properly value ABS in the MVA FA separate accounts resulting in the overstatement of The Hartford's and its life operating segment's statutory surplus and RBC and even worse, that The Hartford did not follow the internal controls already in place as described above.  Accordingly, Ayer and Zlatkus filed false certifications in violation of Section 302 of SOX, which is further evidence that they acted knowingly.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

211.   During the Class Period, Defendants engaged in a course of conduct that artificially inflated The Hartford's stock price and operated as a fraud or deceit on Plaintiffs and  members of the Class who purchased The Hartford's stock, by misrepresenting or omitting material facts concerning the Company's business, operations, and financial results.  When Defendants' prior misrepresentations and

omissions were slowly revealed and digested by the market, the price of The Hartford stock fell significantly, as the artificial inflation was removed from the stock's price. As a result of their purchases of The Hartford stock during the Class Period, Plaintiffs and other members of the Class suffered direct economic loss, *i.e.*, damages, under the federal securities laws.

212.    Throughout the course of the Class Period, as detailed herein, Defendants made numerous misrepresentations and omissions that artificially inflated the value of The Hartford stock.  Specifically, these false and misleading statements either misrepresented or failed to disclose, *inter alia*, (i) The Hartford's true capital position; (ii) The Hartford's true capital margin; (iii) The Hartford's need to raise additional capital; (iv) The Hartford's RBC and RBC forecasts; (v) that as early as April 2008, The Hartford was selling ABS for far less than their recorded BACV/Fair Values; (vi) Defendants' inability to accurately assess the Company's capital position, capital margin and RBC ratio; and (vii) The Hartford's overvaluation of the ABS in its separate accounts led to a commensurate overstatement of statutory capital.

213.    During the Class Period, in reliance on Defendants' misstatements and omissions, Plaintiffs and the Class purchased The Hartford's stock at artificially inflated prices, and suffered economic loss when the artificial inflation was removed from The Hartford's stock price from September 25, 2008 through the end of the Class Period, as investors learned the truth through a number of partial corrective disclosures.

214.    Late on September 25, 2008, shortly after reaching an intraday high of $56.62, The Hartford's stock price dropped to $51.75, a decline of 8.6% in just a few hours.  This precipitous fall came directly on the heels of Moody's change in outlook on

The Hartford's life insurance operations.  Based on the mix of public information and proprietary, non-public facts in its possession, Moody's changed its outlook on Hartford's life insurance operations from stable to negative.  Among the facts Moody's focused on were:

- The Hartford's life insurance operations' significant investment exposure to both ***structured securities (including non prime RMBS and CRE CDO) and preferred stock in financial institutions relative to life capitalization***;

- ***The Hartford's variability in earnings and capital from the volatility in capital markets***;

- widening credit spreads that have caused an increase in the Company's unrealized loss position; and

- additional price declines on structured securities and impairments in the financial institutions sector that are expected to lead to higher impairments.

215.   Four days later, after the close of trading on September 29, 2008, based on the mix of public information and proprietary, non-public facts in its possession, Fitch changed its outlook on The Hartford from stable to negative.  Among the facts Moody's focused on were:

- Hartford's life insurance operations have experienced a ***drop in capital levels*** caused by a deterioration in asset values and a decline in earnings, both … driven by weakened capital market conditions;

- the company's meaningful exposure to overall unrealized and realized losses as well as specific losses in distressed credits, and

- above average exposure to sub-prime residential mortgage-backed securities and commercial real estate CDOs

216.    In response, on September 30, 2008 The Hartford's stock price suffered a decline of *18%* from the prior day's close of $50.00 to $40.99.  This fall came on a reported volume of 15.9 million shares, over five times the average daily volume of 3.1 million shares from the beginning of the Class Period through September 29, 2008.

217.    Financial press coverage later that day reported that The Hartford's stock price "dropped the most since December 1995 amid concerns the company *may need to seek to raise capital after Fitch Ratings lowered its outlook*" (Bloomberg), and the next morning, the Wall Street Journal reported that The Hartford's stock dropped 18% "even as a number of other major insurers closed up along with broader indexes, which rebounded from the prior day's sharp declines.  *Hartford's share-price drop came a day after Fitch Ratings shifted the outlook on the firm's ratings to negative from stable. Moody's Investors Service took a similar action last week on some Hartford ratings*."

218.    On October 1, 2008, analysts' coverage made clear their belief that Fitch's exposure of concerns regarding The Hartford's capital adequacy, following so shortly on the heels of Moody's similar announcement four days earlier, caused the significant September 30 stock drop:

●    The HIG stock has experienced substantial pressure *due mainly to concerns over a potential capital raise*, in our view.  Both the *Moody's announcement from last week and the Fitch Ratings announcement from this week (both put ratings on negative outlook) have telegraphed that HIG will likely use up a considerable portion of its $1.5 billion capital cushion this quarter* due to elevated fixed income investment losses and equity market related capital pressure . . . (Credit Suisse)

●    *Hartford shares traded down 18%, we believe, on concerns that the company may be forced to raise capital to maintain its AA category rating from the rating agencies, largely due to acceleration in*

> *realized investment losses and continued downturn in equity markets, which impacts both earnings and statutory capital*. Both Moody's and Fitch reaffirmed Hartford's rating, which would incorporate knowledge of Q3 activity, but did lower the outlook from stable to negative. Based on what we know today, while not a certainty, we believe a capital raise is a distinct possibility particularly if the downturn continues. . . . We anticipate that Hartford has eaten into the $1.5 billion capital margin, which was reiterated as recently as Sept. 3. (Fox-Pitt Kelton)

219.    On October 1, 2008, the Company's share price continued to fall from the previous day's closing price of $40.99, dropping to $35.00 in the first hour of trading, and settling only as high as $35.94, before Defendants' false statements about the Company's capital staunched the bleeding. For the day, The Hartford's stock closed at $38.11, down 7%, nearly twice that of the DJUSIR (3.5%), and 14 times the S&P, which dropped only 0.5%.

220.    A month later, after markets closed on October 29, 2008, Defendants issued the Company's 3Q08 10-Q and hosted an earnings conference call with analysts, in which they lowered RBC guidance and demonstrated an unwillingness to offer year-end capital margin guidance. The lowered RBC guidance and refusal to offer capital margin guidance caused confusion and created an impression that The Hartford did not have a sufficient basis to determine whether it would be able to maintain sufficient capital

221.    The market responded by sending the Company's stock price down *51.6%* on extremely high volume of 67.0 million shares, almost eighteen times the average daily volume from the beginning of the Class Period through October 29, 2008. This significant drop came on the same day the DJUSIR fell only 1.4%, and the S&P increased by a modest 2.6%.

222.    Analyst coverage was unequivocal in its conclusion that concerns about

The Hartford's capitalization and confusion about Defendants' inability and

unwillingness to provide comfort to the investing public that the Company understood its

capital position directly caused the Company's stock drop:

- Hartford Life's … ability to maintain its ratings is *almost entirely outside of management's control at this point*, depending instead on a hope that equity markets rally (thus alleviating pressure on VA business from a statutory capital perspective) . . . . Management seemed very uneasy in responding to the onslaught of capital, RBC, and other sensitivity types of questions repeatedly asked on the call . . . we expected management to be more forthcoming with respect to their current view of capital. Unfortunately, *we believe most investors and analysts walked away from the call confused, and we expect this will have a meaningfully negative impact on the stock in coming days*. (Sterne Agee)

- We are downgrading HIG to In Line from Outperform.  The risk of a rating agency downgrade and *the inability of management to provide comfort on the level of their capital cushion* make it very difficult to assess the downside or to argue that there is significant upside in the near term. (Fox-Pitt Kelton)

- Breaking with recent precedent, the company held a conference call soon after reporting results after the market close on October 29.  *Investor interest centered on Hartford's ability to maintain its capital margin in the face of increased capital requirements in the variable annuity business . . . the company had difficulty sizing the necessary capital margin Hartford would need*. (Wachovia Capital Markets)

- *Management was not comfortable providing a year-end capital margin estimate* given the volatility in the capital markets and the changing rating agency methodologies*.  (Deutsche Bank)

223.   On February 5, 2009, Defendants acknowledged that The Hartford missed its year-end 2008 RBC guidance due primarily to two conditions:  (i) despite telling investors and analysts on November 3 and December 5, 2008 that increased RBC guidance was predicated on the transfer of all of the $2.5 billion of proceeds from the Allianz deal to HLA, The Hartford had, in fact, *not transferred* $1.0 billion of the capital; and (ii) a widening of credit spreads on certain asset classes, particularly CMBS, for which statutory accounting rules required Defendants to mark to market, despite knowing since 2Q08 that the ABS in HLIC's MVA FA separate accounts were booked at values *far in excess* of their actual price.

224.   On the morning of February 6, 2009, because of "reduced capitalization," in connection with "investment losses," Moody's downgraded The Hartford's senior debt and also downgraded the insurance financial strength ratings.

225.   On February 6, 2009, The Hartford's stock price fell by 16%, from $15.09 to $12.68 per share on a trading volume of 70.4 million, compared to a 2.3% increase in the DJUSIR and a 2.7% increase in the S&P 500.

226.   Analysts opined on the February 5, 2009 disclosure of the missed RBC guidance, leaving no doubt that it caused the stock drop:

- The big issue this quarter was not GAAP earnings, but rather a *reduction in statutory capital estimates that HIG had previously disclosed at its December 2008 investor day*.  (Credit Suisse)

- The Hartford's life insurance risk-based capital ratio ended the year at 385% versus its previous estimate of 535%. *The ratio would have been 465%, but the holding company retained $1 billion of the Allianz proceeds.* The difference between 385% and 465% reflects $600 million of additional AG 39 reserves, *$450 million of credit-related impacts*, $150 million surplus reduction from a stronger yen,

and a $50 million benefit from other items.
(Deutsche Bank)

227. Analysts also reported that a lack of confidence in management's ability to

forecast its RBC ratio was a further cause of the stock drop:

- Risk-Based Capital ratio is estimated to end '08 at 385%. Just 60 days ago, management highlighted the dramatic improvement in their outlook for capital, citing an expectation that RBC would be 535% assuming the S&P closed 2008 at 900. THAT estimate followed about 30 days after capital adequacy was called into question on the company's 3Q08 earnings release and conference call . . . . *We simply do not understand management's insistence on setting a level of guidance that we believe most analysts and investors, including us, will openly view as a stretch . . . we expect the reduction [in RBC guidance] will call into question the validity of management's projections and guidance leaving investors feeling like they simply can't own the stock.* (Sterne Agee)

- The key investment debate for Hartford revolves around capital. Concerns of its capital adequacy began to dissipate following its investor day in December, but are likely to be reignited following news of a sizable reduction in its risk-based capital that they reported in yesterday's earnings report. Even based on these downwardly revised numbers, the company's capital still appears adequate, but *investors will be questioning whether they can trust these numbers given the volatility in the RBC ratio from quarter to quarter.* (Morgan Stanley)

228. Each of the declines in The Hartford's stock price described in above were

significant after taking into account changes on the same days in the overall stock market

and in relevant industry indices. Furthermore, as set forth above, each of these stock

price declines was caused by the disclosure of previously concealed information relating

to the materially false or incomplete statements alleged herein.

229.     In sum, as the truth about Defendants' fraud was revealed, the Company's stock price declined, the artificial inflation came out of the stock, and Plaintiffs and other Class members suffered damages.  Had Plaintiffs and the Class known of the material adverse information alleged herein, they would not have purchased The Hartford's stock at artificially inflated prices.

## IX.     CLASS ACTION ALLEGATIONS

230.     Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired The Hartford's common stock from July 28, 2008 through February 5, 2009, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of The Hartford and all of its subsidiaries during all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

231.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were hundreds of millions of shares of The Hartford common stock outstanding that were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by The Hartford or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

232.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

233.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained Co-Lead Counsel, who are competent and experienced in class and securities litigation.

234.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements and omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of The Hartford;

(c)    whether Defendants made those statements despite knowing of their falsehood, or knowingly omitted to state facts so that other statements made by Defendants would not be misleading;

(d)    whether Plaintiffs and the Class are entitled to the fraud-on-the-market presumption to establish reliance;

(e)    whether Plaintiffs and the Class are entitled to a presumption of reliance under the *Affiliated Ute* doctrine to establish reliance;

(f)    the extent to which the price of The Hartford common stock was artificially inflated during the Class Period; and

(g)     the extent to which the members of the Class have sustained damages when the truth was disclosed and the appropriate measure of such damages.

235.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this case as a class action.

**X.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER THE FRAUD-ON-THE-MARKET DOCTRINE**

236.    Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are primarily predicated upon omissions of material fact of which there was a duty to disclose.

237.    In the alternative, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because:

(a)     The Hartford's publicly-traded securities were actively traded in an open, well-developed, and efficient market, the New York Stock Exchange, at all relevant times in which Plaintiffs and other Class members bought and/or sold The Hartford's securities;

(b)     As a regulated issuer, The Hartford filed periodic public reports with the SEC;

(c)     The Hartford regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d)     The market reacted promptly to public information disseminated by The Hartford;

(e)     The Hartford's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(f)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of The Hartford's securities; and

(g)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased The Hartford's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

238.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of The Hartford's stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material

adverse information and misrepresented the truth about the Company, its business and operations.

239.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about The Hartford's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of The Hartford and its business, prospects and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

240.    In addition to the foregoing, Plaintiffs and the Class are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding The Hartford's business, operations, and financial results throughout the Class Period.

## XI.    DEFENDANTS ARE NOT ENTITLED TO THE PROTECTIONS OF THE PSLRA'S SAFE HARBOR PROVISION

241.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by the PSLRA's safe harbor provision. Rather, as set forth herein, Defendants had actual, contemporaneous and/or historical knowledge of the facts and conditions belying their false and misleading statements.

242.    To fall within the protections of the PSLRA's safe harbor provision, forward looking statements must be accompanied by meaningful cautionary language tailored to the relevant risks.  Cautionary language cannot be meaningful when, as here, Defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false.  In other words, Defendants' contemporaneous knowledge of present risks belies the effectiveness of any relevant purported risk disclosures.  The safe harbor also does not insulate statements based on historical or current facts that are misrepresented.  Accordingly, if Defendants know specific risks and uncertainties stated to be "potential" in cautionary language have already been realized, as they did here, then their forward-looking statements are not protected by the safe harbor.

243.    Defendants' statements regarding the Company's, HLA's and/or HLIC's statutory surplus, capital position, capital margin, and/or RBC ratios made throughout the Class Period in press releases, SEC filings and conference calls were not accompanied by meaningful cautionary language and are therefore not protected by the PSLRA's safe harbor provision.  All warnings or other cautionary language contained in Defendants' SEC filings and incorporated into their press releases, earnings calls, and other public statements described herein were generic, "boilerplate" statements of risk that would affect any similar company, and misleadingly contained no factual disclosure of any of the problems currently affecting the Company, HLA, and/or HLIC during the Class Period:[30]

---

[30] The Hartford's conference call transcripts provided cautionary language that incorporates by reference the risk factors from the Company's SEC filings ("In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks

- **2Q08 Form 10-Q/3Q08 Form 10-Q**: *[A]ctual results can differ materially* from those expected by the Company, ***depending on the outcome of various factors, including***, but not limited to," factors such as "changes in financial and capital markets, including ***changes in […] credit spreads***.

- **2Q08 Form 10-Q**: Fluctuations in interest rates affect the Company's return on, and the fair value of, fixed maturity investments, which comprised approximately 57% and 61% of the fair value of its invested assets as of June 30, 2008 and December 31, 2001 respectively.  Other events beyond the Company's control, including ***changes in credit spreads***, a downgrade of an issuer's credit rating or default of payment by an issuer, ***could also adversely impact the fair value of these investments***.

- **3Q08 Form 10-Q**: Our statutory surplus is also impacted by widening credit spreads as a result of the accounting for the assets and liabilities on our fixed market value adjusted ("MVA") annuities.  Statutory separate account assets supporting the fixed MVA annuities are recorded at fair value.  In determining the statutory reserve for the fixed MVA annuities we are required to use current crediting rates in the U.S. and Japanese LIBOR in Japan.  In many capital market scenarios, current crediting rates in the U.S. are highly correlated with market rates implicit in the fair value of statutory separate account assets.  As a result, the change in the statutory reserve from period to period will likely substantially offset the change in the fair value of the statutory separate account assets.  However, in periods of volatile credit markets, such as we are now experiencing, actual credit spreads on investment assets may increase sharply for certain sub-sectors of the overall credit market, resulting in statutory separate account asset market value losses.  ***As actual credit spreads are not fully reflected in current crediting rates in the U.S. or Japanese LIBOR in Japan, the calculation of statutory reserves will not substantially offset the change in fair value of the statutory separate account assets resulting in reductions in statutory surplus.  This has resulted and may continue to***

---

and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.").  Similarly, the Hartford's press releases filed on Form 8-K provided cautionary language that incorporates by reference the risk factors from the Company's SEC filings ("Some of the foregoing statements should be considered forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. We caution investors that these forward-looking statements are not guarantees of future performance, and actual results may differ materially. Investors should consider the important risks and uncertainties that may cause actual results to differ. These important risks and uncertainties include those discussed in our Quarterly Reports on Form 10-Q, our 2007 Annual Report on Form 10-K and the other filings we make with the Securities and Exchange Commission. We assume no obligation to update this release, which speaks as of the date issued.").

> *result in the need to devote significant additional capital to support the product*.[31]

244.   Although Defendants labeled the foregoing statements as potential risks, they were in reality *concrete facts* that Defendants knew already occurred, making their statements regarding capital and RBC ratios materially false and misleading. Additionally, none of these disclosures identified the actual risk and/or conduct alleged as fraudulent herein.

245.   For example, the cautionary language in the 3Q08 Form 10-Q identified a risk that the Company's statutory reserve calculation may not mirror its fair valuation of the statutory separate account assets, because current credit ratings in the U.S. (and Japanese LIBOR in Japan) no longer were highly correlated with market rates implicit in the fair value of statutory separate account assets.  Significantly, however, Defendants failed to disclose and/or warn that its "fair valuation" of assets was, and consistently had been since before the Class Period began, materially overvalued, as evidenced by sales prices that materially differed from the BACV/Fair Values at the time of disposition.

246.   Indeed, none of Defendants' cautionary statements identified or disclosed that at the time these statements were made, Defendants:  (1) had been grossly overvaluing ABS contained in the Company's MVA FA separate accounts since the beginning of the Class Period, as evidenced by the discrepancies between the BACV/Fair Values at which the Company carried the assets and the actual consideration the Company received for the assets; and (2) were overstating the Company's true capital

---

[31] Defendants specifically incorporated their third quarter Form 10-Q into their December 5, 2008 Investor Day presentation ("Investors should consider the important risks and uncertainties that may cause actual results to differ, including those discussed in the press release issued on December 5, 2008, our quarterly report on Form 10-Q for the third quarter of 2008, our 2007 10-K and other filings we make with the Securities and Exchange Commission. We assume no obligation to update this morning's presentation, which speaks as of today's date.").

position by relying on the overvaluations of ABS in the MVA FA separate accounts in the calculation of capital margin and RBC ratios.

247.   These statements further failed to explain why Defendants overvalued the MVA FA investments in ABS in the first instance.  To the contrary, Defendants' cautionary language actually demonstrates the Company *understood*, but did not disclose, the precise and material impact of overvaluing the MVA FA investments in ABS.  This understanding highlights Defendants' conduct in grossly overvaluing ABS contained in the Company's MVA FA separate accounts since the beginning of the Class Period. Defendants also failed to advise of the risk that proper valuation of the MVA FA assets in the separate accounts would have resulted in a much higher need for additional capital.

248.   Accordingly, the safe harbor provisions of the PSLRA do not protect Defendants' material misstatements.

## XII.   CAUSES OF ACTION

### FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (a), (b), and (c) PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

249.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.

250.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of The Hartford's stock; and (iii) cause Plaintiffs and other members of the Class to purchase The Hartford's stock at artificially

inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, each of them, took the actions set forth herein.

251.    Defendants, individually and in concert, directly and indirectly by the use of means and instrumentalities of interstate commerce, the mails, the facilities of national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially inflated market prices for The Hartford's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of The Hartford, as alleged below.

252.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's stock would be based on truthful, complete and accurate information.

253.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of The Hartford's

value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about The Hartford and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of The Hartford's stock during the Class Period.

254.    The Individual Defendants' primary liability, and controlling person liability, also arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, forecasts and/or reports; (iii) Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendants were aware of the Company's dissemination of information to the investing public that they knew was materially false and misleading.

255.    Defendants had actual knowledge of the contemporaneous and/or historical material facts belying their forward looking misrepresentations of material fact concerning The Hartford's operating condition and future business prospects from the

investing public and supporting the artificially inflated price of its stock, including its (i) statutory surplus, (ii) capital margin, and (iii) RBC ratios.  These material misrepresentations were made knowingly and for the purpose and effect of concealing The Hartford's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its stock.

256.    Defendants had actual knowledge of, and/or recklessly failed to discover, then-current facts concerning the misrepresentations and omissions of material fact set forth herein as to, inter alia,  the strength of the Company's then-current capital position. Such Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and had the effect of concealing The Hartford's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its stock.

257.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of The Hartford's stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of The Hartford's publicly-traded stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired The Hartford stock during the Class Period at artificially high prices and suffered an economic loss when the artificial inflation was removed from The Hartford's stock price.

258.     At the time of said misrepresentations and omissions, Plaintiffs and other

members of the Class were ignorant of their falsity, and believed them to be true.  Had

Plaintiffs and the other members of the Class and the marketplace known of the true

financial condition and business prospects of The Hartford, which were not disclosed by

Defendants, Plaintiffs and other members of the Class would not have purchased or

otherwise acquired their The Hartford stock, or, if they had acquired such stock during

the Class Period, they would not have done so at the artificially inflated prices which they

paid.

259.     As a direct and proximate result of Defendants' wrongful conduct,

Plaintiffs and the other members of the Class suffered damages in connection with their

respective purchases and sales of the Company's stock during the Class Period.

260.     By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM**

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST INDIVIDUAL DEFENDANTS**

261.     Plaintiffs incorporate by reference and reallege each and every allegation

contained above as if fully set forth herein.

262.     This claim is asserted against the Individual Defendants.  Throughout the

Class Period, the Individual Defendants by virtue of their positions, stock ownership

and/or specific acts described above, were controlling persons of The Hartford within the

meaning of Section 20(a) of the Exchange Act.

263.     The Individual Defendants had the power to, and did, directly and

indirectly, exercise control over The Hartford, including the content and dissemination of

statements that Plaintiffs allege are false and misleading.  The Individual Defendants were each provided with and/or had access to reports, filings, press releases and other statements alleged to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance or correct the statements.  The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and engaged in the acts constituting violations of the federal securities laws, as set forth in Count One above.

264.    The Individual Defendants culpably participated in the matters alleged herein because, among other things, they knew that the statements set forth above were materially false and misleading, or omitted material information.  Facts giving rise to the Individual Defendants' culpable participation are set forth in detail above.

265.    The Individual Defendants acted as controlling persons of The Hartford within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: New York, New York
       October 8, 2010

**LABATON SUCHAROW LLP**

By: _Joel H. Bernstein / MHR_

Joel H. Bernstein

Joel H. Bernstein (JB 0763)
Ira A. Schochet (IS-2187)
Eric J. Belfi (EB-8895)
Michael H. Rogers (MR-5460)
140 Broadway
New York, New York  10005
(212) 907-0700

**NIX, PATTERSON & ROACH LLP**
Bradley E. Beckworth
Jeffery J. Angelovich
Susan Whatley
Lisa Baldwin
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Class*

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK LLP**
David Kessler, Esq.
Darren Check, Esq.
Sean Handler, Esq.
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*Attorneys for Named Plaintiff*
*Arca S.G.R. S.p.A.*

Exhibit 1

## CERTIFICATION

I, George Hopkins, as Executive Director of Arkansas Teacher Retirement System, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of the Arkansas Teacher Retirement System ("Arkansas Teacher"). I have reviewed the  Complaint filed against Hartford Financial Services Group Inc. ("Hartford") alleging violations of the federal securities laws;

2.    Arkansas Teacher did not purchase securities of Hartford at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Arkansas Teacher is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Arkansas Teacher's transactions in Hartford during the class period are reflected in Exhibit A, attached hereto;

5.    Arkansas Teacher sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years:

*In re Ambac Financial Group, Inc. Securities Litigation*, No. 1:08-cv-00411-NRB (S.D.N.Y.)
*In re Schering-Plough Corp./Enhance Securities Litigation,* No. 2:08-cv-00397-DMC-MF (D.N.J.)
*In re Colonial Bancgroup, Inc. Securities Litigation*, No. 2:09-cv-00104-MHT-WC (M.D. Ala.)
*In re MGM Mirage Securities Litigation*, No. 2:09-cv-01558-RCJ-LRL (D. Nev.)
*Plichta v. Sunpower Corporation et al,* No. 3:09-cv-05473-RS (N.D. Cal.)

6.    Beyond its pro rata share of any recovery, Arkansas Teacher will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 26th day of May, 2010.

George Hopkins
Executive Director of Arkansas Teacher Retirement System

**EXHIBIT A**

**TRANSACTIONS IN**
**HARTFORD FINANCIAL SERVICES GROUP INC.**

| Transaction Type | Trade Date | No. of Shares | Price | Cost/Proceeds |
|---|---|---|---|---|
| BUY | 12/27/07 | 32,000.00 | $88.62 | ($2,835,817.60) |
| SELL | 03/12/08 | -12,200.00 | $70.46 | $859,512.26 |
| SELL | 03/12/08 | -100.00 | $69.87 | $6,987.00 |
| SELL | 06/25/08 | -51,000.00 | $69.40 | $3,537,360.57 |
| BUY | 09/12/08 | 11,238.00 | $60.70 | ($682,606.23) |
| BUY | 09/12/08 | 40,162.00 | $60.96 | ($2,449,793.64) |
| BUY | 09/19/08 | 5,214.00 | $61.34 | ($320,012.38) |
| BUY | 09/19/08 | 46,186.00 | $61.25 | ($2,830,624.48) |
| BUY | 09/30/08 | 54,477.00 | $37.33 | ($2,034,231.10) |
| BUY | 09/30/08 | 3,768.00 | $37.86 | ($142,803.43) |
| BUY | 09/30/08 | 11,110.00 | $38.98 | ($433,252.23) |
| BUY | 10/01/08 | 1,845.00 | $36.00 | ($66,449.34) |
| SELL | 10/09/08 | -15,900.00 | $22.90 | $363,408.36 |
| BUY | 10/17/08 | 5,969.00 | $28.49 | ($170,146.35) |
| BUY | 10/17/08 | 39,031.00 | $29.67 | ($1,159,493.92) |
| SELL | 04/20/09 | -50,700.00 | $9.33 | $472,658.87 |
| SELL | 04/21/09 | -36,576.00 | $9.92 | $362,725.84 |
| SELL | 04/22/09 | -40,538.00 | $9.95 | $402,795.47 |
| SELL | 04/23/09 | -75,286.00 | $9.72 | $731,362.09 |

Exhibit 2



## CERTIFICATION OF DR. ATTILIO PIERO FERRARI IN SUPPORT OF ARCA S.G.R. S.P.A.'s MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL

Arca S.G.R. S.p.A. ("Arca" or "Plaintiff") on behalf of the funds listed in Schedule A (collectively referred to herein as the "Arca Funds"), declares, as to the claims asserted under the federal securities laws, that:

1.      Arca did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Arca is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Attached in Schedule A are the Arca Funds' transactions in The Hartford Financial Services Group, Inc. common stock during the Class Period.

4.      Arca has full power and authority to bring suit to recover for investment losses on behalf of itself and its funds.

5.      Arca has fully reviewed the facts and allegations of the complaint filed in this action and has authorized the filing of the motion for appointment as lead plaintiff on its behalf in this action.

6.      I, Dr. Attilio Piero Ferrari, Managing Director, am authorized to make legal decisions on behalf of Arca.

7.      Arca intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP which has extensive experience in securities litigation and in the representation of institutional investors, to represent Arca in this action.

8.      Arca will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.



ARCA Società di Gestione del Risparmio S.p.A. - 20149 Milano - Via Mosè Bianchi, 6 - Tel. 02/48087.1 r.a. - www.arcaonline.it

Capitale Sociale euro 50.000.000 i.v. - Codice Fiscale - Partita IVA - Registro Imprese di Milano: 07155880155
Iscritta al n. 6 dell'Albo della Banca d'Italia e al Fondo Nazionale di Garanzia - cod. SGR 0014 - Codice ABI n. 016468



9.    Arca has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re UBS AG Securities Litigation*, No. 07-11225 (S.D.N.Y.)

10.    Arca will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and

expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of May, 2010.

Arca S.G.R. S.p.A.

By: _____

Dr. Attilio Piero Ferrari
*Managing Director*

2



Arca S.G.R. S.p.A.

## SCHEDULE A

| Fund | Buy/Sell | Type | Date | Quantity | Price |
|---|---|---|---|---|---|
| Arca 27 Azioni Estere | Buy | Com Stk | 9/19/2008 | 5,093 | $61.13 |
| Arca 27 Azioni Estere | Buy | Com Stk | 12/9/2008 | 7,997 | $15.77 |
| Arca 27 Azioni Estere | Sell | Com Stk | 10/30/2008 | 2,484 | $9.58 |
| Arca 27 Azioni Estere | Sell | Com Stk | 11/11/2008 | 2,609 | $10.98 |
| Arca Azioni America | Buy | Com Stk | 9/19/2008 | 6,699 | $61.13 |
| Arca Azioni America | Buy | Com Stk | 12/9/2008 | 6,844 | $15.77 |
| Arca Azioni America | Sell | Com Stk | 10/30/2008 | 3,291 | $9.58 |
| Arca Azioni America | Sell | Com Stk | 11/11/2008 | 3,408 | $10.98 |
| Arca BB | Buy | Com Stk | 9/19/2008 | 7,191 | $61.13 |
| Arca BB | Buy | Com Stk | 12/9/2008 | 10,393 | $15.77 |
| Arca BB | Sell | Com Stk | 10/30/2008 | 3,533 | $9.58 |
| Arca BB | Sell | Com Stk | 11/11/2008 | 3,658 | $10.98 |
| Arca TE | Buy | Com Stk | 9/19/2008 | 3,299 | $61.13 |
| Arca TE | Buy | Com Stk | 12/9/2008 | 4,785 | $15.77 |
| Arca TE | Sell | Com Stk | 10/30/2008 | 1,615 | $9.58 |
| Arca TE | Sell | Com Stk | 11/11/2008 | 1,684 | $10.98 |
| Optima Azionario America | Buy | Com Stk | 9/19/2008 | 490 | $61.13 |
| Optima Azionario America | Buy | Com Stk | 12/9/2008 | 563 | $15.77 |
| Optima Azionario America | Sell | Com Stk | 10/30/2008 | 242 | $9.58 |
| Optima Azionario America | Sell | Com Stk | 11/11/2008 | 248 | $10.98 |
| Optima Azionario Internazionale | Buy | Com Stk | 9/19/2008 | 554 | $61.13 |
| Optima Azionario Internazionale | Buy | Com Stk | 12/9/2008 | 872 | $15.77 |
| Optima Azionario Internazionale | Sell | Com Stk | 10/30/2008 | 269 | $9.58 |
| Optima Azionario Internazionale | Sell | Com Stk | 11/11/2008 | 285 | $10.98 |
| Arca Previdenza Alta Crescita | Buy | Com Stk | 9/19/2008 | 5,802 | $61.13 |
| Arca Previdenza Alta Crescita | Buy | Com Stk | 12/9/2008 | 9,106 | $15.77 |
| Arca Previdenza Alta Crescita | Sell | Com Stk | 10/30/2008 | 2,837 | $9.58 |
| Arca Previdenza Alta Crescita | Sell | Com Stk | 11/11/2008 | 2,965 | $10.98 |
| Arca Previdenza Crescita | Buy | Com Stk | 9/19/2008 | 1,668 | $61.13 |
| Arca Previdenza Crescita | Buy | Com Stk | 12/9/2008 | 2,613 | $15.77 |
| Arca Previdenza Crescita | Sell | Com Stk | 10/30/2008 | 817 | $9.58 |
| Arca Previdenza Crescita | Sell | Com Stk | 11/11/2008 | 851 | $10.98 |
| Pop Emilia Linea Alta Crescita | Buy | Com Stk | 9/19/2008 | 628 | $61.13 |
| Pop Emilia Linea Alta Crescita | Buy | Com Stk | 12/9/2008 | 1,032 | $15.77 |
| Pop Emilia Linea Alta Crescita | Sell | Com Stk | 10/30/2008 | 291 | $9.58 |
| Pop Emilia Linea Alta Crescita | Sell | Com Stk | 11/11/2008 | 337 | $10.98 |

