UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
CITY OF MONROE EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

THE HARTFORD FINANCIAL SERVICES GROUP, INC., et al.,

Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

10 Civ. 2835 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This is an unusual securities fraud case. In the six plus months of the Class Period, The Hartford filed two Form 10-Qs and at least one Form 8-K with the Securities and Exchange Commission ("SEC"), as well as one statutory insurance report with the State of Connecticut. Plaintiffs do not allege that defendants violated Generally Accepted Accounting Principles ("GAAP") in any SEC filing or Standard Statutory Accounting Principles ("SAP") in the insurance filing. Indeed, plaintiffs conceded at oral argument that none of The Hartford's regulatory filings during the Class Period contained a misstatement or material omission. Moreover, the amended class action complaint ("CAC") does not include a single allegation of a self-interested motive or opportunity by any individual whose statements are challenged. Instead, plaintiffs base their entire

complaint on a unilateral, and ultimately unsupported, interpretation of The Hartford's insurance filing, and their belief about what this document reveals about defendants' state of mind and valuations of assets throughout the Class Period. Again, unlike many securities class actions, plaintiffs do not rely on a single confidential witness or internal document in order to support their allegations. Rather, they make an unfounded assumption about the year-end insurance filing and follow that with a series of equally unfounded extrapolations based on this flawed assumption.

Plaintiffs are investors in The Hartford Financial Services Group, Inc. ("The Hartford" or "the Company") who purchased or otherwise acquired The Hartford's common stock from July 28, 2008 through and including February 5, 2009 ("the Class Period"). Defendants are The Hartford and three of its officers and directors during the Class Period (the "Individual Defendants"): Ramani Ayer, The Hartford's Chairman of the Board of Directors and Chief Executive Officer ("CEO"); Thomas M. Marra, The Hartford's President and Chief Operation Officer ("COO") and member of the Board of Directors; and Lizabeth H. Zlatkus, The Hartford's Executive Vice President and Chief Financial Officer ("CFO"). Plaintiffs allege violations of Sections 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

§§ 78j(b) and 78t(a) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against all defendants. They also allege violations of Rule 20(a) of the Exchange Act against the Individual Defendants.

Lead plaintiff Arkansas Teacher Retirement System, appointed pursuant to an order of this Court on July 14, 2010, and named plaintiff Arca S.G.R. S.p.A. (collectively, "plaintiffs") filed the CAC on October 8, 2010.[1] Before the Court is defendants' motion to dismiss the CAC. For the following reasons, the motion is granted and the case is dismissed with prejudice.

**FACTS**

The following facts are taken from the CAC, written instruments attached to the CAC, statements or documents incorporated into the CAC by reference, public disclosure documents required to be filed with regulatory agencies, and documents upon which plaintiffs relied in bringing the suit. The Court may consider such documents on a motion to dismiss. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). The Court assumes all alleged facts to be true for

[1] On November 5, plaintiffs filed a Corrected Amended Class Action Complaint in order to fix a minor typographical error in the CAC which they had sought to bring to the Court's attention immediately after the initial filing.

the purpose of deciding the motion to dismiss, and construes all alleged facts in the light most favorable to the plaintiffs. See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

A. Structure of The Hartford

The Hartford is an insurance and financial services company which is publicly traded on the New York Stock Exchange ("NYSE"). CAC ¶ 29. The Hartford itself is actually a holding company that is separate and distinct from its subsidiaries and has no significant business operations of its own. Id. ¶ 39. Its primary source of cash flow is dividends from its subsidiaries, which offer investment products, individual and group life and disability insurance products, and property and casualty insurance products. Id. ¶¶ 29, 39. The Company is organized into two major insurance operations: (1) life and (2) property and casualty. Id. According to the CAC, the life insurance operation is the most significant source of cash for the Hartford. Id. ¶ 39.

The Hartford's life insurance operation is run by HLI, which is an indirect, wholly-owned subsidiary of the Hartford. Id. ¶ 40. Hartford Life and Accident Insurance Company ("HLA"), a wholly-owned subsidiary of HLI, owns most of the Hartford's

life insurance companies. Id.[2] Thus, when The Hartford publicly discussed the performance of its life operations during the Class Period, it was referring to the performance of HLA. Id. The largest life insurance company owned by HLA is the Hartford Life Insurance Company ("HLIC"). HLIC contained separate accounts[3] for certain life insurance operations that represented half of The Hartford's assets in 2008. Id. ¶ 4.

B. Regulatory Framework and RBC Ratios

As insurance companies, HLA and HLIC file annual statutory statements for their separate accounts pursuant to SAP. Id. ¶ 4. SAP is established by the National Association of Insurance Commissioners ("NAIC"), which is the organization of state insurance regulators for all 50 states.[4] Id. ¶¶ 41, 49.

[2] This is the only reference to HLI in the CAC or any of the parties' submissions. The remaining allegations discuss the financial results of either HLA, the Hartford Life Insurance Company ("HLIC"), or The Hartford itself.

[3] Life insurance companies typically maintain two types of accounts: general and specific. The general account is an "undivided account in which insurers maintain funds that support the Company's contractual obligations for its general obligations such as life, accident, health and disability benefits, most fixed annuities and guaranteed insurance products." CAC ¶ 42. The separate accounts are "established to hold funds received by the insurance company from counterparties for products such as non-guaranteed individual and group variable annuities, variable life contracts, group pensions, and modified guaranteed contracts, which include [Market Value Adjusted Fixed Annuities ("MVA FA")]." Id. ¶ 43. The definition and significance of MVA FA will be addressed below.

[4] HLA and HLIC are both domiciled in Connecticut and therefore must comply with the regulations of the Connecticut Insurance Department ("CID"). Id. ¶ 41. CID has adopted the accounting and valuation procedures and practices established by the NAIC.

Of primary importance to insurance regulators and investors is a life insurance company's capital position. Id. ¶ 4. Therefore, SAP is "designed to address regulator concerns of insurer solvency and ability to pay future claims." Id. ¶ 50. As a result, a "principal difference between SAP and GAAP is that SAP requires companies to make more granular disclosures of their business operations." Id.

Reflecting the importance of capital adequacy, NAIC establishes capital requirements for life insurance companies. These "minimum capitalization requirements" are based on an insurance company's risk-based capital ("RBC") ratio. Id. ¶ 53. The RBC ratio compares an insurance company's net worth with its "risk-based capital," which "captures the risk exposure of a company by calculating risk charges for certain risk items included in the specific RBC formula."[5] Id. ¶ 56. RBC ratios are extremely important to insurance companies not only because an insurer faces regulatory restrictions and penalties if it falls below certain minimum levels, but also because ratings agencies view the RBC ratio as a "key indicator of a life insurer's

[5] For life insurance companies, the categories of risk are (1) asset risk, (2) insurance risk, (3) interest rate risk, and (4) all other business risks. Id. ¶ 56. "A number of risk factors are then applied as multipliers to the assets or liabilities of the insurer to determine the minimum capital needed to bear the risk of loss associated with the activity." Id. Then, the "formula adjusts the aggregate sum of the risk charges to account for the unlikely event that all of the categories of risk will be realized simultaneously." Id.

creditworthiness.” Id. ¶ 5. Thus, an insurance company must maintain a strong RBC ratio in order to enjoy flexibility in its business practices and low borrowing costs. Id.

C. MVA FA and Asset-Backed Securities (“ABS”)

An MVA FA is an “investment product that is a contract to provide future income in return for an initial investment by the contract holder.” Mem. of Law in Supp. of Mot. at 49 (glossary of acronyms). Pursuant to an MVA FA, an insurance company pays the contract holder a fixed rate of return for a specified time period, known as the “guarantee period.” CAC ¶ 44. If the contract holder withdraws, or surrenders, the money prior to the conclusion of this period, the “‘market value adjusted’ feature increases or decreases the cash surrender value of the annuity as a function of decreases or increases in interest rates.” Id. If interest rates at the time of withdrawal are higher than the contract rate, the “cash surrender value of the annuity decreases.” Id. If the interest rates at withdrawal are lower than the contract rate, the value increases.

Insurance companies typically invest the funds received from purchases of MVA FA. Id. ¶ 46. The goal is to replicate the returns that the insurance company is obligated to pay to the MVA FA contract holders. Of course, if the returns are ultimately insufficient to cover the cost of annuity payments,

the insurance company is required to pay the difference. However, if the returns are greater than the annuity payments, the company profits. Id.

HLIC often invested funds from MVA FA in fixed income securities, such as asset-backed securities ("ABS"). Id. ¶ 62. An ABS is issued by a "special purpose entity," which sells the security and invests the proceeds in a financial instrument. Id. ¶ 63. The portfolio of these financial instruments, which can include mortgage loans, credit card receivables, auto loans, aircraft leases, or movie revenues, serves as collateral, or "backing," for the security. Id. Two common types of ABS are residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS"). Id. ¶ 64. According to the CAC, approximately 68% of HLIC's investments in ABS held in its separate account were RMBS or CMBS. Id.

As noted above, the numerator of the RBC ratio is the company's "net worth" or "surplus." This figure is determined by a number of factors, including the value of the assets held in a life insurance company's separate account. For most investment products offered by insurance companies, the value of the company's asset and the amount of the corresponding liability are directly linked. Id. ¶ 61. MVA FA differ, however, because the insurance company invests the funds received in an asset and

bears the risk of that investment. Id. Thus, the value of the asset is calculated independently from the liability.[6] As a result, management's decision as to the value of an MVA FA asset[7] has greater impact on the numerator of the company's RBC ratio, which measures the difference between the company's assets and liabilities, than typical assets in which a decision to value the asset at a certain amount is offset by the corresponding liability.

SAP requires that MVA FA be accounted for at "fair value," which it defines for these purposes as:

> "[T]he fair value of a financial instrument is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. If quoted market prices are not available, management's best estimate of fair value shall be based on the quoted market price of a financial instrument with similar characteristics or on industry recognized valuation techniques (for example, the present value of estimated future cash flows using a discount rate commensurate with the risks involved)."

CAC ¶ 2 n.2.

Since HLIC heavily invested the funds from MVA FA in ABS, and specifically mortgage-backed securities, it was exposed to

---

[6] The MVA FA separate account reserve liabilities reflect the moneys that the insurance company expects to pay the annuity contract holders. Id. ¶ 61.

[7] By "MVA FA asset," we mean the asset in which the insurance company has invested the funds received from the contract holder in exchange for an MVA FA.

serious financial harm as a result of the slumping real estate market at the start of the Class Period. According to the CAC, The Hartford itself acknowledged that market prices for RMBS and CMBS were "depressed" as of July 29, 2008. Id. ¶ 65. Furthermore, analysts were concerned about The Hartford's ability to maintain strong capital levels during this period of instability in the real estate market. Id. ¶ 64. However, plaintiffs claim that The Hartford "continually reassured investors throughout the Class Period that the Company was well protected against [market] conditions due to its strong capital position." Id.

During the Class Period, defendants engaged in a "de-risking" process in which they sold certain ABS. Id. ¶ 66. According to plaintiffs, defendants sold these ABS at prices far lower than the amounts at which they internally valued them. Therefore, plaintiffs surmise that defendants also overvalued the ABS that they continued to hold. The crux of this case is whether defendants intentionally and artificially valued the MVA FA assets above their actual fair value, thereby falsely inflating HLIC's capital and, in turn, its projected RBC ratio for year-end 2008.[8]

[8] While the key issue in this case is whether the assets owned by HLIC were falsely inflated, such overvaluation would impact The Hartford because HLA, a wholly-owned subsidiary of The Hartford, recognizes its investment in HLIC as an asset. CAC ¶ 68.

D. The Allegations in the CAC

In the CAC, plaintiffs attribute to defendants a litany of false and misleading statements. With scant exception, all of them stem from plaintiffs' primary allegation: that the defendants knowingly and intentionally misstated their capital position by valuing the ABS backing the MVA FA held in HLIC's separate accounts at "fair values" well above the prices received for the "same"[9] ABS that the defendants were selling as part of their de-risking strategy beginning in July 2008. CAC ¶ 66.

Plaintiffs base this allegation on Schedule D – Part 4 of HLIC's 2008 year-end statutory filing, which was released on the final day of the Class Period, February 5, 2009, and purportedly revealed the fraud that defendants had engaged in for the latter half of 2008. Schedule D - Part 4 lists the long-term bonds and stocks which were sold, redeemed, or otherwise disposed of by HLIC during 2008. According to plaintiffs, column 16 of that

[9] In the CAC, plaintiffs use the word "identical" to describe the ABS sold and retained by defendants. CAC ¶ 67. However, in the memorandum of law, the term used is "similar." Mem. of Law in Opp'n to Mot. at 14. At oral argument, the Court pressed plaintiffs on whether the ABS sold by defendants were truly identical to those retained, i.e., whether defendants sold a part of a position in a certain asset but not the entire asset, yet valued the retained portion at an amount greater than what it received for the sold portion. Plaintiffs were unable to point to any instance in which an asset was retained at one price and sold at another. Tr. of Oral Argument at 8-9. As far as we can tell, the sold and retained assets are only "identical" inasmuch as they are of the same class of assets, namely, ABS.

Schedule, which is titled "Book/Adjusted Carrying Value at Disposal Date," reflects management's determination of the "fair value" of those assets on the date on which they were disposed.[10] Plaintiffs further note that column seven of this form provides the consideration received for each security. By subtracting the number listed as consideration from the number listed as the "Book/Adjusted Carrying Value at Disposal Date," which plaintiffs refer to in their complaint as "Book-Adjusted Carrying Value/Fair Value" ("BACV/Fair Value"),[11] plaintiffs provide the Court with what they interpret to be the "difference" between the amount defendants were able to obtain for an asset on the free market and the value they ascribed to the asset for accounting purposes:

[10] Plaintiffs do not allege that on February 5, 2009, management retroactively determined fair values for all of the assets sold during the Class Period. Rather, they claim that whenever defendants sold an asset during the Class Period, they would ascribe it a fair value separate from the sale price. In other words, plaintiffs believe that the numbers in column 16 reflect management's determinations *on the day they sold them*. However, as will be discussed in further detail below, plaintiffs' assumption that "Book/Adjusted Carrying Value at Disposal Date" is equivalent to "fair value at disposal date" is unsupportable, and cannot be the basis of a claim under Rule 10b-5.

[11] It is worth noting that the phrase "BACV/Fair Value" cannot be found in any of The Hartford's publicly-filed financial statements. Rather, it is a creation of plaintiffs' counsel.

| Month | Consideration | BACV/Fair Value | Difference | Overvaluation % |
|---|---|---|---|---|
| Jan-08 | 165,987,698 | 171,703,441 | 5,715,743 | 3.4% |
| Feb-08 | 127,933,162 | 135,433,061 | 7,499,899 | 5.9% |
| Mar-08 | 68,037,812 | 71,111,727 | 3,073,915 | 4.5% |
| Apr-08 | 80,264,296 | 95,984,857 | 15,720,561 | 19.6% |
| May-08 | 241,461,526 | 253,645,768 | 12,184,242 | 5.1% |
| Jun-08 | 139,738,427 | 184,487,174 | 44,748,747 | 32.0% |
| Jul-08 | 348,577,221 | 464,936,631 | 116,359,410 | 33.4% |
| Aug-08 | 330,534,842 | 489,857,017 | 159,322,175 | 48.2% |
| Sep-08 | 170,494,938 | 261,634,984 | 91,140,046 | 53.5% |
| Oct-08 | 107,800,908 | 159,218,244 | 51,417,336 | 47.7% |
| Nov-08 | 376,851,483 | 614,342,195 | 237,490,712 | 63.0% |
| Dec-08 | 466,413,933 | 681,699,604 | 215,285,671 | 46.2% |

CAC ¶ 77, Table 1 (hereinafter, “Table 1”).

Before we embark on a discussion of the events pled in the CAC, it is worth stressing the significance of Table 1 to plaintiffs’ causes of action as well as plaintiffs’ failure to support the interpretation of The Hartford’s insurance filings that Table 1 reflects. Plaintiffs essentially claim that during the Class Period, *every* statement made by defendants that in any way quantified the Company’s statutory capital, capital margin, or RBC ratios was skewed by defendants’ knowing overvaluation of the MVA FA assets held in HLIC’s separate account. And plaintiffs’ theory that defendants were knowingly overvaluing the MVA FA assets is entirely based on the figures presented in Table 1. However, the CAC fails to address three significant issues. First, there is no basis for concluding that defendants understood “Book/Adjusted Carrying Value at Disposal Date” as

equivalent to "fair value at disposal date." Second, it is unclear how the Company could be fraudulently "overvaluing" assets during the Class Period when plaintiffs concede that it was under no SAP obligation to revalue the assets until the end of the year and that it did not commit any GAAP violations.[12] Third, even if plaintiffs properly supported their contention that defendants were overvaluing *sold* ABS, they do not adequately justify the further assumption that defendants were similarly overvaluing *retained* ABS.

With these understandings in mind, we will now summarize the events pled in the CAC in chronological order.

1. July 28 Release of Form 10-Q for 2nd Quarter of 2008

On July 28, 2008, The Hartford issued a Form 10-Q for the second quarter of 2008 ("2Q08"), which ended on June 30, 2008. Id. ¶ 93. The Form 10-Q was certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 et seq. ("SOX"). As required by law, the certification was signed by both Ayer and Zlatkus. It declared, inter alia, that Ayer and Zlatkus were "aware of material information relating to [The

[12] While certain allegations in the CAC imply that the Company's regulatory filings during the Class Period included material misstatements based on valuations of the ABS, such contentions are fundamentally flawed since plaintiffs do not identify any legal obligation that the defendants neglected in filing these reports. Indeed, plaintiffs admitted as much at oral argument when they represented to the Court that they are "not making any allegation with respect to [the] filings" and "would not have filed the complaint" had The Hartford not discussed their capital position in public but simply let the regulatory filings speak for themselves. Tr. of Oral Argument at 30-31.

Hartford's] subsidiaries, including HLIC," that the Form 10-Q was "free of material misstatement," and that "internal controls over financial reporting provided reasonable assurances over the reliability of financial reporting." Id. ¶ 101.

The Form 10-Q included "statutory surplus" figures for The Hartford's insurance companies, which it defined as "represent[ing] the capital of the insurance company reported in accordance with accounting practices prescribed by the applicable state insurance department." Id. ¶ 93; Ex. L to Bernstein Decl. Specifically, the Form 10-Q reported that the Company held $5,435 million in statutory surplus from its "Life Operations" and $15,283 million in total statutory surplus. CAC ¶ 94; Ex. L to Bernstein Decl. Plaintiffs contend that these figures were overstated because defendants were overvaluing the ABS in HLIC's separate accounts.[13] Id. ¶ 94.

Plaintiffs also take issue with several statements made by defendants in a press release and conference call announcing the Form 10-Q. Some of the challenged statements were general references about the Company's financial position. For example,

[13] This is one of the several instances in the CAC in which plaintiffs suggest that a regulatory filing was fraudulent as a result of overvaluation of assets without claiming that defendants committed a violation of GAAP or had an obligation to re-value the assets under SAP. As noted above, plaintiffs conceded at oral argument that there was no basis for finding that any statements in The Hartford's regulatory filings were fraudulent. Tr. of Oral Argument at 30-31. Apparently, plaintiffs' position in this litigation is that defendants' statements which discussed the regulatory filings were fraudulent even though the filings themselves were not.

in the press release, defendants stated that "The Hartford's capital position remains strong." Id. ¶ 95. On the conference call, both Ayer and Zlatkus maintained their confidence in The Hartford's capital position, and Ayer stated that the Company's "CMBS and RMBS securities continue to perform well." Id. ¶ 96.

Defendants also provided some specific calculations and projections. In particular, Ayer stated on the call that The Hartford had "the capital necessary to meet our business needs and...at least $1.5 billion of capital margin."[14] Id. ¶ 97. Zlatkus concurred that The Hartford was working to ensure it had the capital necessary to maintain the AA rating even "under the most constraining rating agency models" and that it had a "capital margin of at least $1.5 billion above the rating agency requirements." Id. ¶ 98.

The market reacted positively to the Form 10-Q and the corresponding press release and conference call.[15] Id. ¶ 107.

2. Keefe, Bruyette & Woods, Inc. Insurance Conference

---

[14] The CAC uses the phrase "capital margin" to refer to the amount of capital held by The Hartford above what would be necessary to maintain their credit rating. See, e.g., CAC ¶¶ 73, 97, 103.

[15] On July 29, The Hartford's stock rose 8% from the previous day's close on a trading volume of 8.3 million shares. Id. ¶ 107. This volume was nearly three times greater than the stock's average volume over the prior three months. In contrast, the Dow Jones U.S. Insurance Index ("DJUSIR") only increased 4.5% on July 29, and the S&P 500 ("S&P" or "S&P 500") rose 2.3%. Id. In order to demonstrate causation, plaintiffs cite to several reports from the financial press and investment analysts which placed the 2Q08 results and conference call in positive light immediately prior to the increase in the stock price. Id. ¶¶ 103-106.

On September 3, 2008, The Hartford participated in the Keefe, Bruyette & Woods, Inc. Insurance Conference. Id. ¶ 108. At this conference, Zlatkus again assured the public that The Hartford "hold[s]...$1.5 billion of capital margin." Id. ¶ 108. The Hartford's stock price did not increase following this statement.[16] However, plaintiffs contend that had defendants revealed that the actual capital cushion was far lower, the stock price would have decreased.[17] Id. ¶ 110.

3. Moody's and Fitch Express Concerns Regarding The Hartford's Capital Position in Late September 2008 and Defendants Attempt to Control the Damage

On September 25, the rating agency Moody's, which had access to non-public information regarding The Hartford,[18] changed its outlook on The Hartford's life insurance operations from stable to negative. Id. ¶ 111. Citing increased credit spreads[19] over the past several quarters as well as exposure to financial harm presented by The Hartford's "material positions

[16] The Hartford's stock price rose 0.2% on September 3. The DJUSIR increased 1.0% and the S&P decreased 0.2% on that date.

[17] According to the plaintiffs' faulty assumptions reflected in Table 1, the discrepency between actual sales prices of ABS in the separate accounts and their reported fair value increased in August 2008. See Table 1.

[18] Rating agencies typically have access to non-public information regarding the companies that they rate. Id. ¶ 111.

[19] "'Credit spread' refers to the difference between the yield on the debt securities of a particular issuer and the yield of similar maturity Treasury debt securities (government bonds). Credit spreads depend on both the risk associated with the specific issuer and the overall market conditions." Id. ¶ 65 n. 15. Credit spreads are higher when the market is skeptical about a particular company or general economic conditions and lower when the market is confident.

in Fannie Mae, Freddie Mac and Lehman Brothers," Moody's declared that The Hartford was likely to experience "higher impairments in the third quarter of 2008 compared to previous quarters." Id. The Hartford's stock price dropped after Moody's statement.[20]

Following the close of trading on September 25, reports came out that Ayer had once again assured that The Hartford was "well capitalized in both our life and property and casualty operations." Id. ¶ 114. On September 26, the stock price recovered the loss relating to Moody's change in outlook and increased 9.5%, back up to $56.64. Id. ¶ 116.

A few days later, on September 29, Fitch joined Moody's as the second rating agency to change its outlook on The Hartford from stable to negative. Id. ¶ 117. In announcing its decision, Fitch explicitly referred to a "drop in capital levels caused by a deterioration in asset values." Id. On September 30, the day following Fitch's decision, The Hartford's stock dropped 18.0% to $40.99 on a trading volume of 15.9 million shares, the largest of the Class Period to that point.[21] Id. ¶ 120.

---

[20] On September 25, the stock declined by 0.3% despite the fact that "market and industry indices were up 2%." Id. ¶ 113. Following the report of Moody's change in outlook, the price dropped 8.6% in a few hours after reaching its daily peak of $56.62. Id.

[21] Plaintiffs cite to contemporaneous news reports and analyst coverage to demonstrate that the drop in stock price was a result of Fitch's concern

On October 1, defendants issued a press release at 11:30 AM once again assuring the public that The Hartford's "liquidity remains strong" and that defendants are "confident in [The Hartford's] financial strength." Id. ¶ 124. The Hartford's stock price rose 6% following defendants' statement. Id. ¶ 126. Nonetheless, The Hartford's stock price closed 7% below the previous day's close.

Plaintiffs view the actions taken by the rating agencies as partial disclosures of the alleged misstatements made on July 28 and September 3. Id. ¶¶ 112-13, 119. However, plaintiffs claim that Moody's and Fitch did not "fully reveal The Hartford's true capital position" since they did not report that The Hartford was overvaluing the ABS in the MVA FA portion of its separate accounts.[22] Id. ¶ 112, 119. According to plaintiffs' dubious calculations, the discrepancy between actual sales prices and reported fair value was 53.5% in September. Id. ¶ 112; Table 1.

4. Capital Infusion from Allianz SE

On October 6, The Hartford announced an agreement with Allianz SE ("Allianz") in which Allianz would provide a $2.5 billion investment in The Hartford. Id. ¶ 127. In making this announcement, The Hartford asserted that it was now projecting

---

regarding capital adequacy, particularly following Moody's decision a few days earlier. Id. ¶¶ 121-23.

[22] Of course, this assumes that The Hartford was engaged in such overvaluation, which we conclude it was not.

that it would "finish the year with a capital margin of about $3.5 billion in excess of our modeled rating agency requirements to maintain AA level ratings." That projection "assume[d] year-end market levels are the same as the end of the third quarter, rating agency models remain unchanged and the company's operations perform as planned for the remainder of the year." Id.

This infusion appears to have relieved market concerns regarding the Company's finances.[23] However, plaintiffs take issue with a number of aspects of the transaction and its announcement. Primarily, plaintiffs believe that the projection of a $3.5 billion capital margin was materially false and misleading because defendants knew that HLIC was overvaluing the ABS in the MVA FA portion of its separate accounts above the actual prices received for such securities.[24] Id. ¶ 127.

[23] On October 6, The Hartford's stock price increased 12.8% on a "high" volume, as compared to decreases in the DJUSIR and S&P of 3.7% and 3.9%, respectively. Id. ¶ 132. Plaintiffs cite to numerous analyst reports, including a "buy" recommendation from Morgan Stanley, in order to demonstrate that the rise in stock price was unmistakably the result of defendants' statements surrounding the Allianz investment. Id. ¶¶ 133-35. However, plaintiffs also stress that at least one analyst report stated that The Hartford appeared to be well-capitalized even in the absence of the Allianz investment. Id. ¶ 135. Plaintiffs reference this report in an effort to demonstrate that defendants had convinced the market of the Company's strong capital position even without this capital infusion.

[24] Again, this allegation appears to ignore the fact that defendants were under no SAP obligation to re-value their ABS or MVA FA until the end of the year.

Plaintiffs also complain that defendants did not disclose the extent to which The Hartford's capital position was "precarious" in the absence of the Allianz investment. They argue that The Hartford's Definitive Proxy Statement ("Proxy"), filed with the SEC after the Class Period on February 9, 2009, demonstrates that The Hartford was "desperately scrambling" to finish the deal with Allianz and ensure its investment.[25] Id. ¶ 128. In addition, The Hartford did not reveal until the Proxy that they had appointed Ayer and Marra to a two-person "Special Committee of the Board of Directors to negotiate and close the transaction" and did not obtain a fairness opinion for the transaction prior to its closing date of October 17. Lastly, plaintiffs argue that the Proxy "revealed the Company was so desperate to obtain this capital infusion that it essentially forced the Company's shareholders to approve the transaction because, if they did not, the Company would have to pay a $125 million fee." Id. ¶ 129.

According to plaintiffs, these facts reflect that defendants were not in control over the Company's capital

[25] Apparently, plaintiffs' view of "desperate scrambling" is The Proxy's relatively tempered acknowledgment that given the volatility in the market in late September 2008 and resulting impairments in the Company's portfolio, senior management had determined that "it would be prudent to seek significant additional debt or equity funding in order to strengthen our capital margin" and that any capital raise must be "executed quickly and with a high degree of certainty of completion." Further, defendants were particularly interested in the Allianz deal because they believed it "provided a high level of certainty of closing on an expedited basis." Id. ¶ 128.

position and that they "lacked any faith in their own public statements as to the purported strength of The Hartford's capital position." Id. ¶ 130.

5. October 29 Release of Form 10-Q for 3rd Quarter of 2008

Following the close of the markets on October 29, 2008, The Hartford released its Form 10-Q for the third quarter of 2008 ("3Q08"). Id. ¶ 137. Just as for 2Q08, the Form 10-Q for 3Q08 was certified pursuant to SOX. This certification assured that the report was accurate and that appropriate internal controls were in place to ensure reliable financial reporting. Id. ¶ 157.

For 3Q08, the Form 10-Q stated that the Company held $4,691 million in statutory surplus from its Life Operations and $13,120 million in total statutory surplus. Id. ¶ 151. These numbers were down significantly from the Form 10-Q for 2Q08, and even further from the numbers reported at the end of 2007.[26] Once again, The Hartford asserted that "[s]tatutory separate account assets supporting the fixed MVA annuities are recorded at fair value." Despite the drastic decline in the Company's statutory

[26] To review, in 2Q08 the Company asserted surplus from its Life Operations of $5,435 million and total statutory surplus of $15,283 million. Id. ¶ 94. Thus, the statutory surplus numbers reported in the 3Q08 were $2.1 billion less than those reported on June 30, 2008, and $2.8 billion less than those reported on December 31, 2007. Id. ¶ 94, 151. Plaintiffs themselves note that the announced 3Q08 results were "down sharply from the same quarter the previous year largely in connection with the uncertainty in the financial sector." Id. ¶ 137.

surplus, Ayer reiterated in a press release announcing the results that The Hartford was financially strong and possessed the liquidity and capital to meet its commitments to customers. Id. ¶ 153.

On a conference call discussing the Form 10-Q, defendants made a series of statements which plaintiffs argue sowed market confusion and concern regarding The Hartford's management and capital. According to plaintiffs, unlike in past quarters Zlatkus "attempted to avoid giving analysts a year-end capital margin estimate," and would only offer that The Hartford was "very adequately capitalized at a level for a AA minus company." Id. ¶ 138. Ultimately, Zlatkus was pushed into providing a year-end RBC ratio estimate of 300% if the S&P finished the year at 815, and 400% if the S&P finished around 900. Id. ¶ 139. Zlatkus further noted that "[g]iven the current markets, projecting a year-end capital margin is extraordinarily difficult," and that The Hartford was "not comfortable providing a forecast of our year-end capital margin." Id. ¶ 140.

Plaintiffs contend that these statements were a partial disclosure of the defendants' previous misstatements. They note that the stock price lost almost half of its market capitalization the following day, October 30, when it dropped

51.6% on a volume of 67 million shares.[27] Id. ¶ 142. Plaintiffs cite to a bevy of media and analyst reports which pointed to the statements of October 29 as creating new doubts regarding The Hartford's management and capital, thus leading to the drop in stock price. Id. ¶¶ 143-150.

However, plaintiffs also cite to a Morgan Stanley report as evidence that that "many" analysts continued to "believe" defendants' claims that their capital position remained strong.[28] Id. ¶ 159. Plaintiffs claim that such reports reflect that the market had been successfully duped by defendants' consistent position regarding the Company's capital, and allowed the stock price to recover its losses when defendants retracted their October 29 statements and provided new guidance on November 3.

6. November 3 Retractions and New Guidance

On November 3, defendants released a Form 8-K in which they increased their year-end RBC ratio estimates from the October 29 conference call. Specifically, they estimated an RBC ratio of 440% if the S&P closed the year at 900 and 345% if it closed at

[27] This volume is nearly 18 times greater than the average daily volume during the Class Period up until that point. Furthermore, the DJUSIR only fell 1.4% on the same date. The S&P 500 rose 2.6%. Id. ¶ 142. We note that even if the CAC were to survive this motion to dismiss, it is questionable whether plaintiffs can continue the Class Period after such a precipitous drop in stock price.

[28] In our view, the Morgan Stanley report is more fairly read as simply reciting management's claims. It clearly expresses skepticism about management's continued optimism. See Id. ¶ 159.

800. Id. ¶ 163. Defendants explicitly noted that these figures assumed that the $2.5 billion from Allianz would be passed on to HLA. Id. According to plaintiffs, the only explanation for the increased estimate was that the October 29 estimate included "credit-related impacts" whereas the new numbers did not. Id. ¶ 162.

The Hartford also issued two press releases on November 3. In the first, The Hartford emphasized Moody's affirmation of the Company's financial strength. Ayer reiterated management's confidence that The Hartford remained well-capitalized, and recited its projections from the Form 8-K, including a year-end capital margin of approximately $2 billion[29] at an S&P level of 900. Id. ¶ 164. The second press release was titled "The Hartford Comments on Capital Position" and quoted Ayer as stating that the "capital position is more than sufficient for current market conditions and in the event markets deteriorate further." Id. ¶ 165.

Plaintiffs argue that the November 3 statements were an attempt to restore the confidence and market capitalization that The Hartford lost following the partial disclosures of October 29, and that defendants' consistent misstatements throughout the

[29] It is worth noting that despite plaintiffs' contention that the November 3 numbers were overly optimistic, the $2 billion projection is actually $1.5 billion *less* than the Company projected on October 6.

Class Period allowed them to succeed. Indeed, on the heels of positive news and analyst coverage, the stock price rose 57.8% on November 3 following the new projections on a volume of 70.9 million shares. Id. ¶¶ 167-69. In contrast, the DJUSIR dropped 2.2% and the S&P 500 dropped 0.3%. Id. ¶ 167.

7. November 14 and November 20 Press Releases

In between the Company's filing of the Form 8-K on November 3 and the Investor Day on December 5, The Hartford made two announcements that plaintiffs reference in the CAC. First, on November 14, The Hartford issued a press release informing the public that it had entered into an agreement to acquire Federal Trust Corporation and its insured depository, Federal Trust Bank. Id. ¶ 170. According to the press release, The Hartford acquired these entities in order to become a thrift holding company which could apply for $3.4 billion in funds under the U.S. Treasury's Capital Purchase Program, which was a part of the Troubled Asset Relief Program ("TARP"). In the press release, Ayer assured the market that The Hartford was sufficiently capitalized even in the event of further market deterioration, but noted that this capital request would allow the Company to "further supplement [its] existing capital resources" given the "continued uncertainty in the economic markets." Id.

The second press release was dated November 20, and announced that the Company was "repositioning [its] portfolio" given the unstable economic circumstances. Id. ¶ 171. According to plaintiffs, this was an acknowledgment of the "de-risking" strategy engaged in by defendants. Plaintiffs believe this press release is significant because it demonstrates that defendants must have known the prices that they received for sold ABS.

8. December 5 Investor Day

On December 5, The Hartford hosted an Investor Day. In advance of this event, the Company issued a press release in which Ayer stated that the Company's statutory surplus exceeded $13 billion as of September 30 and the that the Company held more than $12 billion in cash, short-term investments, and treasury bonds as of November 30. Id. ¶ 173.

In his opening remarks at Investor Day, Ayer repeated his confidence in the Company's capital position. Id. ¶ 174. Zlatkus followed with significantly increased year-end RBC ratio estimates. Specifically, she projected an RBC ratio of 420% if S&P levels were at 800 and 535% at 900. Id. ¶ 175. Lastly, Marra echoed the views of Ayer and Zlatkus that the Company remained well-capitalized. Id. ¶ 178.

The Company also released this table, reflecting the differences between its December 5 and previous[30] estimates:

| | December 5 Estimates | | November 3 Estimates | |
|---|---|---|---|---|
| Year-end S&P 500 levels | 900 | 800 | 900 | 800 |
| Life Company RBC ratio, excluding credit-related Impacts | 585% | 470% | 440% | 345% |
| Estimated 4Q credit-related Impacts | -50% | -50% | -30% | -45% |
| 2008 Estimated RBC ratio | 535% | 430% | 410% | 300% |

Id. ¶ 176.

Significantly, Zlatkus noted at Investor Day that in all of the scenarios presented, the Company was assuming that the full $2.5 billion from Allianz would go to HLA. Id. ¶ 177.

The market was extremely optimistic about The Hartford's prospects following Investor Day, rising 102.4% on December 5 on a volume of 119.9 million shares. Id. ¶ 180. Contemporaneous news and analyst reports suggest that the increased RBC ratio guidance was the central factor behind this rise in stock. Id. ¶¶ 181-84.

9. The "Truth" is Revealed: Year-End Financial Results

On February 5, 2009, the Company announced its fourth quarter ("4Q08") and full-year results for 2008 ("FY08"). Despite an S&P level of 900, the RBC ratio was 385%, 150

[30] The plaintiffs allege that despite the table's reference to "November 3 Estimates," these figures actually represent the estimates from the October 29 conference call, not the November 3 SEC filing or press release. Id. ¶ 176 n.29.

percentage points below the most recent projection on December 5. Id. ¶ 185. As for capital margin, the Company stated in a press release that it was "capitalized at levels consistent with those historically associated with AA level property and casualty insurers." Id. ¶ 187.

The following morning, February 6, 2009, Moody's downgraded both The Hartford's senior debt from A3 and the "insurance financial strength ratings of The Hartford's property and casualty and life insurance operating subsidiaries to A1 from Aa3." Id. ¶ 198. It also changed its outlook on the Company to negative. Id. The stated reason for the modifications was "reduced capitalization" in connection with "investment losses." Id. The Hartford's stock price dropped 16% on February 6, as compared to a 2.3% increase in the DJUSIR and a 2.7% increase in the S&P 500. Id. ¶ 200. The drop followed negative media and analyst reports which expressed disappointment in the RBC ratio and serious doubts about management's ability both to effectively guide the Company going forward and to provide realistic estimates and projections. Id. ¶¶ 194-97, 201-04.

Defendants provided several explanations for the missed estimate, and plaintiffs take issue with two of them. First, defendants stated that a significant part of the overestimate was the result of the fact that only $1.5 billion of the Allianz

proceeds went to HLA, whereas $1 billion was retained by the holding company. Id. ¶ 188. Defendants asserted that had they known that only $1.5 billion would go to HLA, the RBC ratio projection would have been 465%, rather than 535%, and thus only 80 percentage points below the ultimate number. Id. ¶ 190. However, plaintiffs claim that defendants had previously misled investors into believing that the entire Allianz investment would be provided to HLA.

Second, defendants cited widening credit spreads for certain asset classes, particularly CMBS, as another factor in the missed estimate. Id. ¶ 190. These assets had to be marked to market pursuant to SAP's annual filing requirements. Id. ¶ 190. Specifically, defendants stated that "[c]redit-related impacts on the Company's life insurance subsidiaries were $450 [million] higher than assumed for the December 5th estimate, primarily due to continued spread widening on certain asset classes, particularly commercial real estate investments, that are marked to market under statutory accounting rules."[31] Id.

[31] Defendants' two other reasons for the missed RBC ratio projections are not central to plaintiffs' allegations of fraud: (1) cash-flow testing required under NAIC's guidelines that reduced statutory capital by $600 million compared to the December 5th estimates, which used a number of assumptions about year-end business, market conditions, and other inputs instead of the cash-flow testing; and (2) the strengthening of the Yen, which reduced the surplus by $150 million as a result of closing the year at a Yen/$ level of just under 91, rather than 93 as assumed in the December 5th estimate. Id. ¶ 190. Defendants also stated that unidentified "other items" had a net effect of increasing the statutory capital by $50 million above the December 5th projections.

Plaintiffs claim that defendants' reference to "continued" widening of CMBS spreads ignores the fact that the spreads on certain asset levels had suffered "severe distress" and reached their peak in November, prior to the projections at Investor Day on December 5. The CAC includes the following chart[32] to demonstrate that the CMBS spread-to-swap rates significantly worsened in November and, in some cases, actually improved in December:

| Date | Super Senior AAA | Junior AAA | AA | A | BBB | BBB- |
|---|---|---|---|---|---|---|
| 25-Jul-08 | 212 | 488 | 695 | 1055 | 1813 | 2170 |
| 22-Aug-08 | 293 | 640 | 913 | 1388 | 2228 | 2725 |
| 26-Sep-08 | 310 | 695 | 863 | 1333 | 2200 | 2400 |
| 31-Oct-08 | 593 | 1200 | 1532 | 2037 | 3075 | 3425 |
| 28-Nov-08 | 1100 | 3150 | 3975 | 4600 | 5750 | 6275 |
| 26-Dec-08 | 893 | 2963 | 4013 | 4775 | 7170 | 7915 |

CAC ¶ 191, Table 4.[33]

Plaintiffs contend this chart is significant because of the fact that the projections provided by defendants on December 5 used financial information as of October 31. According to plaintiffs, defendants used this stale information in order to

[32] The CAC identifies "The Mortgage Bankers' Association" as the source of this chart.

[33] We note that for some ratings levels, the spreads were worse in December than November.

paint a rosy picture about the Company's financial position and offer optimistic projections about year-end capital levels.[34] However, had they used more recent data, or simply acknowledged that the situation had deteriorated, either their projections would have been lower or the market would not have reacted as positively to their overly optimistic statements.

10. The Aftermath: Resignations of Marra and Ayer

On February 25, Marra announced his resignation from the Board of Directors, effective immediately, and that he would retire as President and COO of The Hartford on July 3, 2009. In June 2009, Ayer, who had served as Chairman of the Board of Directors and CEO of The Hartford since February 1, 1997, announced that he would retire as well, which he did on October 1, 2009 when he resigned from both positions. Id. ¶¶ 206-07. Plaintiffs note that despite the Company's reported net loss of $2.75 billion in 2008, Ayer received $4.5 million in compensation during that year. Id. ¶ 207.

## DISCUSSION

A. Elements of Section 10(b) and Rule 10b-5 (Count I)

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a

[34] As discussed in detail below, defendants disclosed at Investor Day that they were using the October 31 numbers and that spreads had increased throughout November.

cause of action for manipulative practices by defendants acting in bad faith." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206 (1976)). The SEC implemented Section 10(b) of the Exchange Act by promulgating Rule 10b-5. In relevant part, Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

In order to sustain a private cause of action for securities fraud under section 10(b) and Rule 10b-5,[35] plaintiffs must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008) (citing Dura Pharms. V. Bruodo, 544 U.S. 336, 341-42

[35] Although the text of the Exchange Act does not explicitly provide for a private cause of action for section 10(b) violations, "[i]t is now established that a private right of action is implied under § 10(b)." Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971).

(2005)). In this motion, defendants focus their arguments on plaintiffs' failure to plead falsity[36] or scienter.

1. Scienter

Under the PSLRA, in order to plead scienter adequately and state a claim under section 10(b) and Rule 10b-5, it is necessary to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) (quoting Ernst & Ernst, 425 U.S. at 193 n.12).

Second Circuit case law provides that "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).[37] In this case,

[36] In other words, for purposes of this motion defendants acknowledge material statements, but maintain that they were not *mis*statements.

[37] Though this standard predates the passage of the PSLRA, the Second Circuit has explicitly noted that "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA." Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001); see also, e.g., Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting Shields, 25 F.3d at 1128).

plaintiffs effectively concede that they have not pled facts demonstrating that defendants had both a motive and opportunity to commit fraud.[38] Thus, they must rely on their ability to allege facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." However, we note that while it is "possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant," where "motive is not apparent...the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987), overruled on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989) (en banc)).

The Supreme Court, in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), interpreted the PSLRA's "strong inference" requirement and held that a "complaint will survive... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. In conducting this analysis, a court must be careful to consider

[38] In their memorandum of law, plaintiffs focus on the fact that a plaintiff may establish scienter by "pleading facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Opp'n Mem. at 23-24 (quoting In re Ambac Sec. Litig., 693 F. Supp. 2d 241, 264 (S.D.N.Y. 2010) (internal quotations omitted)). Indeed, we have not found any allegations in the CAC which would support finding scienter based on "motive and opportunity."

whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis in original). The Supreme Court further noted that "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. at 424 (internal citation omitted). In analyzing whether plaintiffs have pleaded the requisite "strong" inference of scienter, the Court will utilize case law developed in the Second Circuit prior to Tellabs. See In re PXRE Group Sec. Litig., 600 F. Supp. 2d 510, 529 & n.21 (S.D.N.Y. 2009) (finding analyses under Tellabs and the Second Circuit's case law "are very much interrelated," such that "the determination of whether [p]laintiff[s] [have] pleaded the proper 'strong' inference of scienter under Second Circuit case law serves as a significant, if not determinative, factor in assessing whether [p]laintiff[s] [have] pleaded the proper 'strong' inference of scienter under Tellabs"), aff'd sub nom. Condra v. PXRE Group Ltd., 357 Fed. Appx. 393 (2d Cir. 2009).

Plaintiffs must plead scienter with respect to each defendant. As for the corporate entity, The Hartford, courts look to whether the pleaded facts "create a strong inference

that someone whose intent could be imputed to the corporation acted with the requisite scienter." See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority. See, e.g., In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897 (HB), 2005 U.S. Dist. LEXIS 96527 at *37 (S.D.N.Y. Oct. 19, 2009). For purposes of deciding the instant motion, we assume that plaintiffs have adequately pled that the intent of the Individual Defendants can be imputed to The Hartford. Thus, we will focus our discussion of scienter on the intent of the Individual Defendants.

2. Scienter and Valuation of Assets

In this case, most of the alleged misstatements relate to defendants' valuations of assets. The parties agree that these valuations may be considered opinions.[39] See, e.g. Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 122 n.38 (S.D.N.Y. 2010) (collecting cases). In order to sustain a claim based on false opinion, the plaintiffs must demonstrate that defendants "deliberately misrepresented a truly held opinion." Podansky v.

[39] In addition, many of the misstatements arising out of these valuations were projections, which are only "actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact...or if the speaker does not genuinely or reasonably believe them." In re IBM Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

Robertson Stephens, Inc., 318 F. Supp. 2d 146, 153-54 (S.D.N.Y. 2004) (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96 (1991)). In other words, plaintiffs must "allege with particularity that defendants did not sincerely believe the opinion they purported to hold," by alleging "provable facts to demonstrate that the statement of opinion is both objectively and subjectively false." Podansky, 318 F. Supp. 2d at 154 (quoting Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074 (JSM), 2003 U.S. Dist. LEXIS 7838 at (S.D.N.Y. May 12, 2003)). It is not sufficient to allege that the defendants could have reached a different opinion or that, with hindsight, the opinion reached by defendants was unreasonable. Podansky, 318 F. Supp. 2d at 154.

In cases alleging a false statement of opinion, the "falsity and scienter requirements are essentially identical." Id. This is so because a "material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief." Id. Fundamentally, "proving the falsity of the statement 'I believe this investment is sound' is the same as proving scienter, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion." Id.

With these standards in mind, we now turn to plaintiffs' specific allegations of false and misleading statements or omissions.

B. Purported False and Misleading Statements and Omissions

As is clear from the detailed facts section above, the CAC suggests that defendants made a litany of misstatements and omissions during the Class Period. In their memorandum of law opposing the instant motion, plaintiffs organize their claims into four categories of misstatements and omissions concerning The Hartford's capital position and cite to the specific allegations in the CAC that they believe support each group. Pl.'s Mem. of Law in Opp'n at 11. These categories include (1) "deceptive statements concerning the Company's capital adequacy," the (2) "continuing failure to disclose the Company was selling separate account ABS for significantly less than the supposed fair value at which Defendants carried them," the (3) "estimates of The Hartford's RBC ratio that were unsupportable based on contemporaneous knowledge available only to Defendants," and (4) the "statements intended to leave the public with the belief that Defendants would send the entire $2.5 billion Allianz infusion to The Hartford's life insurance subsidiaries, a necessary predicate to meet the RBC ratio estimates." Id.

Using plaintiffs' own citations to the CAC, we will address each of these categories in turn. We will also briefly discuss other allegations found in the CAC that are not stressed by plaintiffs in their opposition papers.

1. Statements Concerning The Hartford's Capital Adequacy

In their memorandum of law in opposition to the instant motion, plaintiffs specify the affirmative statements pertaining to the Company's capital that they believe are actionable as false or misleading.[40] These include:

(1) Statements made by Ayer and Zlatkus on the conference call held July 29 following the release of The Hartford's Form 10-Q for 2Q08 which asserted that the Company maintained a $1.5 billion capital cushion and generally was well-capitalized. CAC ¶¶ 97-99.

(2) Statements made by Zlatkus on the conference call held October 29 following the release of The Hartford's Form 10-Q for 3Q08 which asserted that the Company was "very adequately capitalized at a level for a AA minus company" and provided year-end 2008 RBC ratio guidance of 300% based on an S&P level of around 815 and 400% if the S&P closed at 900. CAC ¶¶ 138-40.

(3) The press release, also issued October 29, in which Ayer stated that The Hartford was financially strong and well-capitalized. CAC ¶¶ 153-55.

(4) The press release issued November 3 in which The Hartford once again asserted that the Company was well-capitalized and further projected a capital

[40] Plaintiffs do not affirmatively state that this list was intended to be comprehensive. However, we assume that they attempted to rely on their strongest allegations in their memorandum of law. Our independent review of the CAC did not reveal any other actionable misstatements concerning The Hartford's capital adequacy.

margin of approximately $2 billion and an RBC ratio above 400% assuming S&P levels of 900. CAC ¶¶ 164-65.

(5) Statements made at Investor Day on December 5 in which Zlatkus and Ayer asserted that The Hartford was well-capitalized, possessed a statutory surplus above $13 billion as of September 30, and increased the RBC ratio projection for year-end to 535% assuming S&P levels of 900 and 420% at 800, and Marra's echo of those statements and assertion that The Hartford's "capital position has improved." CAC ¶¶ 173-75, 178.

According to plaintiffs, these statements were false because defendants "overvalued the Company's separate account ABS during the [Class Period], as evidenced by the consideration received on actual sales that was significantly lower than reported fair value of the same ABS." Mem. of Law in Opp'n to Mot. at 12. In other words, as phrased by defendants, plaintiffs "*do not* allege that these statements were false or misleading for any reason *other than* that they allegedly incorporated the 'overvaluation' of ABS." Mem. of Law in Supp. of Mot. at 13 (emphasis in original). Thus, plaintiffs' entire theory of liability rests on the assertion that defendants were overvaluing sold ABS throughout the Class Period, and therefore must have been overvaluing retained ABS as well. However, our exploration of this claim, both at oral argument and by reviewing the supporting papers submitted to the Court, persuades us that the plaintiffs' assumptions are faulty. At a minimum, it is clear that plaintiffs have not adequately alleged

the intentional overvaluation of retained ABS resulting in misleading statements regarding the Company's capital. Since plaintiffs have not properly supported the fundamental premise of their accusations, any allegations based on this premise cannot survive a motion to dismiss.

a. <u>Plaintiffs' Theory of Overvaluation of Sold ABS</u>

As noted above, plaintiffs' allegations of overvaluation hinge on their belief that a column on HLIC's 2008 year-end Schedule D - Part 4, dated February 5, 2009, titled "Book/Adjusted Carrying Value at Disposal Date," reflects what defendants had determined were those assets' "fair value" on their disposal date. A copy of the relevant headings of the Schedule D – Part 4 as well as an example of the figures listed for a particular bond is reproduced below:

| 1<br>Cusip Identification | 4<br>Disposal Date | 7<br>Consideration | 8<br>Par Value | 9<br>Actual Cost | 10<br>Prior Year Book / Adjusted Carrying Value | Change in Book/Adjusted Carrying Value | | 16<br>Book / Adjusted Carrying Value at Disposal Date | 18<br>Realized Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 11<br>Unrealized Valuation Increase (Decrease) | 12<br>Current Year's (Amortization) / Accretion | | |
| 40431C AC 2 | 11/21/2008 | 1,974,147 | 2,067,063 | 2,066,696 | 2,076,894 | (10,105) | 59 | 2,066,849 | (92,702) |

In the CAC, plaintiffs provide no explanation as to why they interpret "Book/Adjusted Carrying Value at Disposal Date" as "fair value at disposal date." They simply equate the terms as if their uniformity is obvious, with conclusory statements

such as: "HLIC reported the fair values of its separate account assets in its year-end statutory filings with state regulators under the heading "Book/Adjusted Carrying Value," and "[the overvaluation alleged in the complaint] is demonstrated by examining two key metrics that were known to Defendants but not available to investors until they were finally disclosed after the Class Period in HLIC's 2008 year-end statutory filing: (1) the prices at which HLIC sold a large quantity of ABS ("Consideration"); and (2) the values at which HLIC carried these same ABS *on the date of disposition* (BACV/Fair Value)."[41] CAC ¶¶ 74, 76 (emphasis in original).

When pressed on this assumption by defendants' memorandum of law in support of the instant motion, plaintiffs countered that this is an issue of fact not properly resolved on this motion, but that the facts presently known demonstrate that defendants did view "Book/Adjusted Carrying Value at Disposal Date" as equivalent to "fair value at disposal date."[42] In making

---

[41] As noted by defendants, the phrase "BACV/Fair Value" is a creation of plaintiffs' counsel that appears nowhere in any statutory or regulatory filing submitted to the Court. In an effort to explain their use of this phrase, plaintiffs simply assert that Book/Adjusted Carrying Value at Disposal Date was intended to reflect fair value, and that: "Given that statutory regulations require that BACV be different for different accounts, products and/or securities, to avoid confusion about what the BACV of the separate account assets was supposed to represent, the Complaint defines the term 'BACV/Fair Value.'... The meaning is the same." Mem. of Law in Opp'n to Mot. at 10.

[42] Plaintiffs' response that this is an issue of fact is simply inadequate. Plaintiffs must have a basis for their complaint before it is filed.

this argument, they point to defendants' Schedule D - Part 1 from previous years. A copy of the relevant headings from the Schedule D – Part 1 for 2007 as well as the figures listed for a particular bond is reproduced below:

| 1 Cusip Identification | 7 Actual Cost | Fair Value | | | | Change in Book/Adjusted Carrying Value | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 8 Rate Used to Obtain Fair Value | 9 Fair Value | 10 Par Value | 11 Book / Adjusted Carrying Value | 12 Unrealized Valuation Increase (Decrease) | 13 Current Year's (Amortization) / Accretion | 14 Current Year's Other Than Temporary Impairment Recognized | 15 Total Foreign Exchange in B / A.C.V. |
| 802613 AE 5 | 1,271,716 | 105,749 | 1,290,141 | 1,220,000 | 1,290,141 | 20,335 | (1,909) | | |

As opposed to Part 4, which lists the bonds and other securities sold during the previous calendar year, Part 1 identifies the long-term bonds retained by HLIC at the end of the year. As can be seen, column nine on this chart is titled "Fair Value," and plaintiffs note that in 2007 and 2008 the numbers listed in this column as the bonds' "Fair Value" are equivalent, or nearly equivalent, to the numbers listed in column eleven, titled "Book/Adjusted Carrying Value."[43] From this comparison, plaintiffs extrapolate that on Part 4,

Regardless, at oral argument plaintiffs' counsel was unable to explain away the benign reading of The Hartford's insurance filings posited by the Court and detailed herein.

[43] According to plaintiffs, in 2007 the "Fair Value" and "Book/Adjusted Carrying Value" columns on that year's Schedule D - Part 1 were equal for every one of the more than 11,000 bonds listed. In 2008, the grand totals differed by 0.00021%. Plaintiffs claim that this difference is accounted for by only four of the more than 10,000 securities listed, and that these four securities would not qualify as ABS as the term is defined in the CAC. Opp'n Mem. of Law at 10 n.18.

"Book/Adjusted Carrying Value at Disposal Date" is equivalent to "fair value[44] at disposal date."

While plaintiffs are correct that the numbers ascribed to the columns titled "Book/Adjusted Carrying Value" and "Fair Value" are identical for Part 1, their assumption that defendants necessarily viewed these phrases as equivalent in Part 4 is wanting. Indeed, a review of Part 4 demonstrates that the numerical values assigned to "Book/Adjusted Carrying Value at Disposal Date" for each security are very similar to those listed in column nine, for "Actual Cost."[45] This makes sense when one considers the different functions that Part 1 and Part 4 serve in evaluating a company's financial results for a given year. Since Part 1 identifies assets the company still owns, any gain or loss that the company has experienced from those assets during the year is unrealized. Thus, in order to ascertain the financial impact on the company as a result of owning the asset,

---

[44] Notably, unlike on Part 1, in which it has its own column, the phrase "fair value" does not appear anywhere on Part 4. As discussed below, an obvious explanation for this absence could be that it is unnecessary to estimate an "amount at which [an] instrument could be exchanged in a current transaction between willing parties" when the instrument actually has been sold in a transaction between willing parties.

[45] We note that for some securities these numbers are not precisely equivalent. It appears that in some circumstances, the difference can be accounted for by the number listed as the bond's "Current Year's (Amortization) Accretion." See Docs. Submitted at Oral Argument at 7. For other bonds, we are not entirely sure what explains the difference. Nevertheless, we are comfortable with our analysis of the Schedule D – Part 4. Even if we have not discerned the exact explanation for the minimal difference, that inability does not undermine the far more fundamental flaw in plaintiffs' reading of the reports.

management determines a fair value for the asset, which it then lists as that asset's "book value" under the heading "Book/Adjusted Carrying Value." In contrast, Part 4 reflects the assets which the company has disposed of during the course of the year. Since the company no longer owns these assets, they have realized a gain or loss from their ownership, and the assets' "fair value" is now irrelevant. In this case, the significant number for accounting purposes, and what an analyst or investor would want to know, is the difference between the consideration received for that asset and the actual cost expended by the company to purchase the asset in the first instance. Thus, in order to provide useful information, the company would equate the "book value," or "Book/Adjusted Carrying Value at Disposal Date," to actual cost.[46] In other words, rather than demonstrating the "enormity" of defendants' overvaluations, Part 4 likely reflects that ABS in 2008 were typically sold by The Hartford for an amount far less than the

[46] Part 4 also contains a column titled "Prior Year Book/Adjusted Carrying Value." Presumably, this column recites the numbers listed in the prior year's Part 1 as "Book/Adjusted Carrying Value," and reflects what management viewed to be those assets' fair values at the end of the previous year. Furthermore, Part 4 contains a column titled "Realized Gain/Loss" which appears to equal the Book/Adjusted Carrying Value at Disposal Date less consideration, with some minor adjustments for that year's accretion/amortization and unrealized valuation increase/decrease.

cost they originally expended for them.[47] This would make sense given the state of affairs in the financial system during that time period.

Even if our analysis of Schedule D is not without error, plaintiffs fall well short of adequately supporting their interpretation. There is simply no explanation as to why anyone reviewing a company's financial statements would be interested in knowing how management had internally valued an asset on the date of disposal, or why management would believe that this is a number worth including in their financial statements.[48] Furthermore, even if an investor was curious to know management's estimate of "fair value" on the disposal date, it appears rather obvious that in a regular transaction, management's estimate of fair value *is* the sale price.

---

[47] The definitions of "Book Value" and "Carrying Value (Amount)" found in the glossary of NAIC's SAP provide little support for plaintiffs' view. In fact, they support our reading:

> **Book Value** Original cost, including capitalized acquisition costs and accumulated depreciation, unamortized premium and discount, deferred origination and commitment fees, direct write-downs, and increase/decrease by adjustment.
>
> **Carrying Value (Amount)** The SAP book value plus accrued interest and reduced by any valuation allowance and any nonadmitted adjustment applied to the individual investment. Carrying value is used in the determination of impairment.

Ex. B to Bernstein Decl.

[48] Of course, an investor might want to know the book value of an asset on its sale date, in order to calculate any gain or loss as a result of the sale. But plaintiffs provide no reason why that book value would equal management's estimate of "fair value." We will not endorse their assumption that these phrases are equivalent simply because it fits the narrative that counsel has crafted in the CAC.

Otherwise, the company would not have sold the asset. As defense counsel stated at oral argument: "no question, if you sell something...that becomes your fair value." Tr. of Oral Argument at 10.

Indeed, it is simply bizarre to suggest that defendants concocted a fraudulent scheme in which they would sell an asset for $697,500 yet internally value that asset at $1,500,000, only to reveal this massive overvaluation to the world a few months later. If defendants were willingly engaged in a substantial fraud in which they internally overvalued assets on the date they were sold in order to provide inflated RBC ratio projections and general statements of optimism, it would be extremely illogical for them to disclose the fraudulent numbers at the end of the year. Indeed, they would have no reason to do so, as they could simply provide lower numbers that are not obviously mistaken or fraudulent.[49]

Ultimately, plaintiffs' inference of systemic and intentional overvaluation of retained ABS is not "at least as strong as any opposing inference." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 326 (2007). In addition to our concern that "Book/Adjusted Carrying Value at Disposal Date"

---

[49] Of course, it is also bizarre to suggest that defendants had any reason to continuously identify a fair value for assets as they sold them, particularly given that they were under no SAP obligation to do so.

does not appear to be equivalent to "fair value at disposal date," another fact belies plaintiffs' inference of scienter. As alleged by plaintiffs in the CAC, defendants used third party pricing services in order to value their retained assets for SEC filings. These services were used to value 92% of the ABS in separate accounts at year-end 2008, and were also used throughout the year in SEC filings. CAC ¶ 89.

Significantly, not only did defendants solicit these third party valuations, but in many cases they actually *lowered* the values that these services provided.[50] Plaintiffs argue that defendants' alteration of the numbers reflects their awareness that the pricing was unreliable. CAC ¶ 91; Opp'n Mem. at 40-41. In their view, the lowering of these numbers does not explain "why, when confronted with evidence of flaws in their pricing methodologies, they continued to ignore huge discrepancies between the values they assigned to the ABS and the prices that willing buyers were paying for them," and that the "more plausible" inference is that "those huge discrepancies had grown so large that Defendants could not refrain from making any adjustment at all." Opp'n Mem. at 41. This argument suffers from

[50] To be clear, these third party services were used for The Hartford's SEC filings, pursuant to GAAP, and not the year-end insurance filings, which are subject to SAP and contain the valuations that plaintiffs allege were inflated. Nevertheless, defendants' willingness to involve an outside third-party in the valuation process undermines plaintiffs' theory that there was an internal scheme to deliberately overvalue ABS.

two flaws. First, it assumes the accuracy of plaintiffs' underlying factual allegation, that "Book/Adjusted Carrying Value at Disposal Date" is equivalent to fair value at disposal date. As stated above, we have concluded that this is not a well-founded assumption. Second, it asks the Court to assume a bad intent when there is a more plausible, non-fraudulent explanation for the action: that the defendants realized in the context of a fluid market that the numbers were faulty, and sought to fix them. We will not assume bad faith when plaintiffs have not pled any reliable facts to support such an inference.

Additionally, the CAC suffers from another fundamental shortcoming. Even if plaintiffs are correct that defendants were internally valuing the sold ABS at prices well above their actual sales prices, this says nothing about the value of ABS that defendants *retained*. In other words, not only do plaintiffs ask the Court to assume that "Book/Adjusted Carrying Value at Disposal Date" is equivalent to "fair value at disposal date" (some number other than actual sale price) for the ABS that were sold, but they also ask us to assume that defendants overvalued the retained ABS to the same degree as the sold ABS. There are several problems with such a conclusion. First, the sold ABS and retained ABS were not identical, and each ABS has its own unique

characteristics supporting a different value.[51] Second, the proportion of ABS held by HLIC that were sold during 2008 is rather small. See CAC ¶¶ 77-78; Table 1, 2.[52] Therefore, plaintiffs seek to draw a conclusion about a much larger pool of securities based on facts only applicable to a small subset. Third, as discussed above, defendants used third-party services to value a significant amount of the ABS in the separate accounts, and lowered many of these valuations. Fourth, The Hartford was consistently writing down the value of its retained ABS throughout 2008 and decreasing its statutory surplus figures, as seen in the Form 10-Qs for 2Q08 and, to a far greater extent, 3Q08. Fifth, even if the magnitude of the alleged divergence between sales prices and fair value for sold ABS suggests that retained ABS were overvalued as well, the figures in Table 1 of the CAC are misleading because it is implausible that the overvaluation of retained and sold ABS would be exactly the same.[53]

[51] As noted above, plaintiffs were unable to identify any truly "identical" assets when asked to do so at oral argument.

[52] Table 2 lists the "Separate Accounts ABS Balance" for each month of 2008. The fact that only a minor proportion of ABS were sold in 2008 can be observed by comparing either the consideration or BACV/Fair Value figures in Table 1 with the balance of ABS listed in Table 2.

[53] In addition, despite their assertion at oral argument that fair value is equivalent to sale price, in their memoranda defendants suggest that in the frenzied market environment of late 2008, an asset's sale price is not necessarily equivalent to its fair value. See, e.g. Mem. of Law in Supp. at 2. Defendants support this argument with citations to NAIC's definition of

In the parties' memoranda of law, they vigorously debate whether it would be proper for the Court to extrapolate about the overvaluation of retained ABS simply because of overvaluation of sold ABS. They further argue whether this is a determination of fact fairly reached on this motion. Ultimately, we will not address the arguments put forth by each party, and do not rest our conclusion to dismiss the CAC on the ultimate merits of this dispute. We simply note that, in addition to the unfounded assumption about overvaluation addressed above, the CAC's allegations of fraud rely on other questionable and potentially equally unfounded assumptions.

In both their memoranda of law and at oral argument, defendants stressed that plaintiffs' allegations are not supported by a single internal document or confidential witness from inside the company, unlike many successful PSLRA complaints. Tr. of Oral Argument at 4-5; Mem. of Law in Supp. at 33, 45; Reply Mem. of Law at 4-5. In response, plaintiffs noted that there is no magic formula necessary to survive a motion to dismiss under the PSLRA, and that confidential sources, internal documents, or regulatory violations are not required. Opp'n Mem.

---

fair value, which states that in some disorderly or inactive markets fair value is equivalent to management's "best estimate," and a press release from the SEC issued on September 30, 2008, during the Class Period, which stated that while the market was under its current distress, "[t]ransactions in inactive markets...would likely not be determinative of fair value." Id. (citing CAC ¶ 2 n.2; Ex. 1 to Spenner Decl. in Supp. of Mot.).

of Law at 26. While plaintiffs are correct that the PSLRA does not require internal information, defendants' argument exposes a significant flaw in the CAC. As discussed in detail, the entire conspiracy envisioned by plaintiffs depends on their view of the defendants' actual understanding of "Book/Adjusted Carrying Value at Disposal Date." Without any insight into the internal operations of The Hartford, plaintiffs' interpretation is nothing more than an assumption. For the reasons discussed above, this assumption does not rest on adequately pled facts or firm analysis. Thus, it is without foundation, and these allegations must be dismissed.

a. December 5 Projections

While plaintiffs' memorandum of law appears to rely entirely on their claim that defendants engaged in systemic overvaluation of ABS, the CAC and plaintiffs' contentions at oral argument could be construed as alleging a separate basis for a rule 10b-5 action based on material misstatements and omissions at Investor Day on December 5. Specifically, plaintiffs suggest that the December 5 RBC ratio estimates were fraudulent because they were based on financial information as of October 31, and therefore avoided consideration of widening credit spreads in November.

However, defendants disclosed at Investor Day that their projections were based on figures available as of October 31. Even more, they explicitly stated that "[c]redit spreads have continued to widen in the fourth quarter," and that "[s]ince October 31, 2008, we continue to see additional spread widening, which has been largely offset by declines in interest rates." Ex. 16 to Spenner Decl. at 9, 16. Plaintiffs concede these disclosures in their memorandum of law in opposition to the instant motion, but argue that the defendants did not adequately explain ***"the impact"*** of the widening credit spreads or offer alternative guidance based on the use of financial data from November 2008. Opp'n Mem. of Law at 20 (emphasis in original).

It is telling that plaintiffs cite no case law for their implication that beyond simply disclosing negative information, defendants must also quantify the precise impact the information will have on future financial results. Indeed, even if one were to consider a failure to provide alternative projections an "omitted fact,"[54] we cannot conclude that such an omission would be material. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact

[54] Of course, the projections themselves would be statements of opinion and only "actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact...or if the speaker does not genuinely or reasonably believe them." In re IBM Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'") (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 348, 449 (1976)). Furthermore, the CAC contains no allegations suggesting that the omission of alternative projections "strongly" suggests that defendants engaged in conscious misbehavior or recklessness.

Ultimately, plaintiffs cannot rely on statements made at the December 5 Investor Day as the basis of a claim under Rule 10b-5. Given that some (but not all) credit spreads were worse in November than in December, it might appear incongruous that the December 5 projections of year-end RBC ratio and capital margin did not account for $450 million in lost capital that the Company ultimately suffered as a result of credit-related impacts. However, this incongruity is not sufficient to plead fraud.[55]

2. Failure to Disclose that ABS Were Being Sold for Significantly Less than Accounted "Fair Value"

[55] We further note that the $450 million in reduced statutory capital that is attributable to credit-related impacts on The Hartford's life insurance subsidiaries, while significant, was hardly the only cause for the missed RBC ratios. In addition, the Company failed to account for the $1 billion from Allianz that remained at the holding company level, NAIC cash-flow testing which caused a decrease in statutory surplus of $600 million, and a strengthened yen which cost $150 million. CAC ¶ 190. For the sake of completeness, we also note that certain unidentified "other items" actually increased the statutory capital by $50 million over where it would have been under assumptions made in the December 5 projections. Id.

The next category of allegations cited by plaintiffs in their memorandum of law pertains to defendants' failure to disclose that they were selling separate account ABS for significantly less than they were valuing those assets on their disposal date.[56] These allegations are the mirror image of the issue regarding misstatements of capital adequacy addressed above. Rather than citing to affirmative statements overestimating the Company's capital as a result of the overvaluations, these refer to the failure to disclose such overvaluations. For the reasons discussed above, any claim that defendants did not disclose that they were selling ABS for significantly less than the amounts they were internally attributing to those ABS is insufficiently pled and must be dismissed.

3. RBC Ratio Estimates that were Unsupportable Based on Contemporaneous Knowledge Available to Defendants

The next issue is whether plaintiffs have adequately alleged that defendants intentionally overestimated their RBC ratio estimates. The specific statements at issue include:

(1) The October 29 conference call following the release of the Form 10-Q for 3Q08 on which Zlatkus estimated a year-end RBC ratio of 300% if the S&P was around 800-815, and 400% if the S&P was at 900. CAC ¶ 139.

[56] It appears as though this category specifically relates to the failure to acknowledge the actual sales prices of sold ABS. Thus, it does not require further extrapolation regarding the valuation of retained ABS.

(2) The November 3 Form 8-K in which defendants increased their year-end RBC ratio estimates to a range of 345% to 440% "depending on the year-end S&P levels"[57] and press release in which they asserted that the RBC ratio would be "above 400 percent at year-end S&P 500 levels of 900." CAC ¶¶ 162, 164.

(3) The December 5 press release in which Zlatkus further increased year-end RBC ratio estimates to 420% with S&P levels at 800 and 535% with S&P levels at 900, and the Company issued a table comparing the November 3 and December 5 estimates:

| | December 5 Estimates | | November 3 Estimates | |
|---|---|---|---|---|
| Year-end S&P 500 levels | 900 | 800 | 900 | 800 |
| Life Company RBC ratio, excluding credit-related Impacts | 585% | 470% | 440% | 345% |
| Estimated 4Q credit-related Impacts | -50% | -50% | -30% | -45% |
| 2008 Estimated RBC ratio | 535% | 430% | 410% | 300% |

CAC ¶¶ 175-76.

These allegations are founded on the same rationale as the claims pertaining to false statements of capital adequacy. For the reasons discussed above, these claims must be dismissed.[58]

4. Statements Regarding the Allianz Investment

Lastly, plaintiffs claim that defendants knowingly misled investors into believing that the entire $2.5 billion capital infusion from Allianz would be placed in the coffers of HLIC,

[57] While not specified in the CAC, presumably 800 was the lower end of this range of potential S&P levels in the Form 8-K.

[58] The specific considerations pertaining to the December 5 projections are addressed above.

thereby falsely inflating their projections of year-end RBC ratios, which assumed that HLIC would receive the funds. The memorandum of law identifies three misleading statements[59] pertaining to the Allianz infusion:

(1) The October 6 press release announcing the binding agreement with Allianz, in which defendants, in a quote attributed to Ayer, estimated a year-end capital margin of $3.5 billion in excess of rating agency requirements to maintain AA level credit ratings and noted that the estimate "assumes year-end market levels are the same as the end of the third quarter, rating agency models remain unchanged and the company's operations perform as planned for the remainder of the year." CAC ¶ 127.

(2) The November 3 Form 8-K in which defendants noted that their increased year-end RBC ratio estimates "assume" that the Company would contribute to HLA the net proceeds of the $2.5 billion received from Allianz. CAC ¶ 163.

(3) The December 5 statement by Zlatkus at Investor Day in which she stated: "So one thing I want to remind everybody, ***we are assuming <u>in all of our scenarios</u> that we, [] downstream [] the full $2.5 billion from the Alliance*** [sic] ***investment."*** CAC ¶ 177 (emphasis and alterations in original).

[59] In the CAC, plaintiffs also complained about the failure to disclose, until the Proxy on February 9, 2009, (1) the extent that the Company's capital position was "precarious" in the absence of this investment, (2) that The Hartford was "desperately scrambling" to finish the deal, (3) that Ayer and Marra had been appointed to a two-person Special Committee to negotiate and close the transaction, (4) that the Company did not obtain a fairness opinion prior to the closing date, and (5) that the Company was so desperate to obtain the investment that it agreed to pay a $125 million fee if the shareholders failed to approve. <u>Id.</u> ¶ 129. It appears that plaintiffs have abandoned these claims in their memorandum of law, which only focuses on the alleged failure to disclose that alternatives to downstreaming the entire $2.5 billion to HLA were being considered. We agree that none of these allegations are pled sufficiently to survive a motion to dismiss.

While acknowledging that The Hartford's statements were explicit in articulating the assumption that the Allianz investment would flow entirely to HLA, plaintiffs nonetheless argue that these statements are misleading because defendants had an obligation to disclose "serious consideration of other strategic ways to distribute the capital, what those considerations were, factors upon which that decision would hinge, and the consequences to its capital position if they made such alternative decisions." Opp'n Mem. of Law at 22. Furthermore, they claim that the "'literal' recitation of 'true facts' – receipt of the Allianz infusion[,] that assuming it went to the life insurance subsidiaries, the Company would meet increased RBC guidance – was misleading due to Defendants' material omissions." Id. In support of these arguments, plaintiffs cite to two cases from the Second Circuit. The first, In re Time Warner Secs. Litig., 9 F.3d 259 (2d Cir. 1993), stands for the proposition that corporations have an affirmative duty to disclose potential alternative courses of action "whenever secret information renders prior public statements materially misleading, not merely when that information negates the public statements." Id. at 268. The second, McMahan & Co v. Wherehouse Entm't, Inc., 900 F.2d 576 (2d Cir. 1990), held that "[s]ome statements, although literally accurate, can become,

through their context and manner of presentation, devices which mislead investors," and as a result the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." Id. at 579.

Plaintiffs' arguments are unavailing, and the cited case law provides little support. In this case, there is simply no factual basis for plaintiffs' claim that the defendants intentionally misled investors into believing that they had firmly decided to confer the entire $2.5 billion from Allianz to HLA. As for the second and third statements referenced above, defendants explicitly stated that their projections were assuming that The Hartford would downstream the investment from Allianz. While plaintiffs wish to find recklessness in the word "assume," it is a perfectly adequate disclaimer. Indeed, in one of the statements at issue, Zlatkus stated: "So one thing I want to remind everybody, we are assuming in all of our scenarios that we, [] downstream [] the full $2.5 billion from the Alliance [sic] investment." It is remarkable that plaintiffs could interpret this statement as "repeating a misleading impression" that the decision to pass the funds on to HLA had been made. To the contrary, the fact that Zlatkus explicitly reminded investors that the projections assumed the

downstreaming of funds is more properly viewed as clarifying that the decision to provide the funds to HLA had not yet been made, and that the projections would go down should HLA not receive the full $2.5 billion.

At oral argument, plaintiffs suggested that defendants could have offered alternative RBC ratios or capital margin projections depending on the amount of the Allianz investment granted to HLA, just as they provided different projections depending on S&P levels of 800 or 900. Tr. of Oral Argument at 53-56. We decline to hold that defendants, who were addressing sophisticated investors and analysts at Investor Day and in the Form 8-K and related press release, engaged in reckless or fraudulent behavior because they left it to their audience to calculate the potential impact on RBC ratio as a result of HLA receiving different amounts of capital from the Allianz investment. To hold otherwise would open the door to requiring defendants to break down their projections without limit.

It is true that the first alleged misstatement pertaining to the Allianz investment does not include the cautionary language that the capital margin estimate "assumed" that the entirety of the investment would go to HLA. However, we simply cannot find anything misleading, much less fraudulent, in a statement that the Company was estimating a year-end capital

margin of $3.5 billion assuming that "year-end market levels are the same as the end of the third quarter, rating agency models remain unchanged and the company's operations perform as planned for the remainder of the year." CAC ¶ 127.

C. SOX Certification

Defendants fairly construe the CAC as potentially alleging that the SOX certifications attached to the Form 10-Qs for 2Q08 and 3Q08 were false or misleading as a result of "internal controls over financial reporting [which] were inadequate." CAC ¶¶ 102, 158. In their memorandum of law, plaintiffs appear to abandon this basis for a Rule 10b-5 violation, and only reference the SOX certifications in order to build their case of scienter. See Opp'n Mem. of Law at 36-37.

Regardless, plaintiffs have not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that The Hartford lacked adequate internal controls.[60] Since plaintiffs' "allegations of lack of controls...[are] conclusory assertion[s] without any factual support," they cannot survive this motion to dismiss. La Pietra v. RREEF Am., L.L.C., 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010).

[60] Indeed, plaintiffs do not actually challenge defendants' accounting in any of the SEC filings.

D. Section 20(a) (Count II)

Section 20(a) of the Exchange Act provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder...unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78u-4(b)(2). Naturally, the first requirement of pleading a claim under Section 20(a) is to "allege facts showing...'a primary violation by the controlled person'...." Anwar v. Fairfield Greenwich, Ltd., 728 F. Supp. 2d 372, 413 (S.D.N.Y. 2010) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)). Since plaintiffs have failed to support their claims of a primary violation under Section 10(b) and Rule 10b-5, their claim of liability for control persons under 20(a) must be dismissed.

## CONCLUSION

For the aforementioned reasons, the CAC is dismissed with prejudice. The Clerk of the Court is directed to close the case.[61]

**SO ORDERED.**

Dated: New York, New York
September 16, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

[61] Plaintiffs have made a perfunctory request for leave to amend in a footnote attached to the final sentence in the conclusion of their memorandum of law. Such a request was also made at oral argument, which was denied. See Tr. of Oral Argument at 25. Plaintiffs, who filed an amended complaint of 114 pages and 265 paragraphs, an opposition memorandum of law of 50 pages supported by 13 exhibits, and attended oral argument at which they submitted further documents to the Court, have failed to indicate the content of any new pleading. In such circumstances, leave to amend is denied. See, e.g. Wood ex rel U.S. v. Applied Research Assocs., Inc., 328 Fed. Appx. 744, 750-51 (2d Cir. 2009 (affirming denial of motion for leave to amend the complaint dismissed pursuant to Rule 9(b) where plaintiff did not explain how amended pleading would add particularity to the previously dismissed allegations); Bruce Winston Gem Corp. v. Harry Winston, Inc., 09 Civ. 7352 (JGK), 2010 U.S. Dist. LEXIS 96974 (S.D.N.Y. Sept. 16, 2010) (denying leave to amend where plaintiff did "not show what additional facts it would plead that would save th[e] case from dismissal"); see also In re Gildan Activewear, Inc Sec. Litig., No. 08 Civ. 5048 (HB), 2009 U.S. Dist. LEXIS 113393 at *15 n.4 (noting that argument made wholly in a footnote need not be addressed by the Court).

Copies of the foregoing Order have been mailed on this date to the following:

**Attorney for Plaintiffs**
Joel H. Bernstein
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005

**Attorney for Defendants**
Dorothy J. Spenner
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019